**Alan McSURELY and Margaret McSurely**

v.

**John J. McCLELLAN et al., Appellants.**

**No. 73–1991.**

United States Court of Appeals, District of Columbia Circuit.

Argued en banc April 19, 1976.

Decided Dec. 21, 1976.

Irwin Goldbloom, Atty., Dept. of Justice, Washington, D.C., with whom Carla A. Hills, Asst. Atty. Gen., Washington, D.C. at the time the reply brief was filed, Irving Jaffe, Acting Asst. Atty. Gen., Washington, D.C. at the time the opening brief was filed, Robert E. Kopp, David J. Anderson and Raymond D. Battocchi, Atty., Dept. of Justice, Washington, D.C., were on the brief for appellants. Morton Hollander and Judith S. Feigin, Attys., Dept. of Justice, Washington, D.C., also entered appearances for appellants.

Morton Stavis, Newark, N.J., with whom Nancy Stearns, New York City, and Charles N. Mason, Jr., Washington, D.C., ᴏre on the brief for appellees.

Before BAZELON, Chief Judge, DANAHER, Senior Circuit Judge, WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges, sitting en banc.

PER CURIAM:

In August 1967, Kentucky officials, executing warrants issued under a state sedition statute, arrested plaintiffs (appellees) and seized books and papers from their home. Plaintiffs obtained a federal court ruling on September 14, 1967, declaring the state statute unconstitutional, enjoining prosecution, and ordering that the seized materials in the custody of the state prosecutor continue to be held by him in safekeeping until final disposition of the case. *See McSurely v. Ratliff*, 282 F.Supp. 848 (E.D.Ky.1967).

This appeal involves the claim that the transportation and use of the seized materials subsequent to September 14, 1967, by the chairman of the Senate subcommittee and several members of the subcommittee staff (federal defendants) violated the constitutional and other rights of the McSurelys.

These federal defendants appeal from the District Court's denial of their motion, for dismissal or summary judgment, which they based on the immunity provided by the Speech or Debate Clause of the Constitution, Art. I, § 6, cl. 1.

 This court, en banc, enters these orders: (1) Reverses the District Court's failure to grant the motion of the federal defendants to dismiss that part of the complaint relating to the original taking of the McSurelys' books and papers by the Kentucky authorities. (2) Reverses with directions to grant summary judgment to appellants on those parts of the complaint that complain of the alleged use made of the documents within Congress,

since such use is protected by the Speech or Debate Clause. (3) Affirms the District Court, with remand for further proceedings, on the claim as to alleged dissemination of some of the documents outside of Congress. (4) Affirms by an equally divided vote, the District Court's denial of summary judgment on the allegations concerning the action of subcommittee investigator Brick in inspecting the documents and transporting copies of some of them to Washington prior to issuance of a subcommittee subpoena.

The case is remanded for further proceedings not inconsistent with these opinions.

Opinions filed by: (a) Circuit Judge Leventhal—for a majority of the court en banc as to items (1), (2) and (3) above; and for himself and Chief Judge Bazelon, and Circuit Judges Wright, McGowan and Robinson, for affirmance as to item (4). (b) Circuit Judge Wilkey, for himself, Senior Circuit Judge Danaher, and Circuit Judges Tamm, MacKinnon and Robb, for reversal as to item (4). (c) Senior Circuit Judge Danaher, joined by Circuit Judges, Tamm, MacKinnon and Robb for dismissal of the complaint.

LEVENTHAL, Circuit Judge:

This appeal is from a District Court order entered on June 12, 1973, in an action by Alan and Margaret McSurely against Honorable John L. McClellan, Jerome S. Adlerman, Donald F. O'Donnell, and John Brick, then the Chairman, General Counsel, Chief Counsel and Investigator, respectively of the Permanent Subcommittee on Investigation of the United States Senate Committee on Government Operations (hereinafter Subcommittee); and Thomas B. Ratliff, then Commonwealth Attorney for Pike County, Kentucky.[1] The plaintiffs, appellees here, seek compensatory and punitive damages from each defendant for alleged

---

1. During the pendency of this action, defendants Brick and Adlerman died. On December 4, 1974, this court, *sua sponte*, ordered the parties to file memoranda on whether a tort action against Brick or his personal representative survives that defendant's death. Both ap-

pellants and appellees responded that the action was maintainable against the personal representative of Brick's estate. Presumably the same would follow for defendant Adlerman. This matter should be addressed by the District Court on remand.

violations of their rights under 42 U.S.C. §§ 1981, 1983, and 1985, and under the First, Fourth, Fifth and Fourteenth Amendments of the Constitution.[2] These are claimed to arise from individual actions and a conspiracy of defendants to harass, stigmatize, and intimidate plaintiffs through the appropriation and use of materials taken from their home in an unlawful search by Kentucky agents on August 11, 1967. The District Court's order denied a motion of defendants McClellan, Adlerman, O'Donnell and Brick (hereinafter federal defendants) to dismiss or for summary judgment, and allowed the suit to proceed. Defendant Ratliff did not join the motion and is not a party to this appeal.[3]

The federal defendants argue in their appeal that further proceedings would violate their right under the Speech or Debate Clause of the Constitution[4] not to be questioned outside of Congress for their legislative acts, and that the use in a congressional investigation by defendant Senator and his aides of documents unlawfully seized by others was not barred by the Fourth Amendment.

A panel of this court in an opinion rendered October 28, 1975, one judge dissenting in part, reversed the District Court as to some of the claims in the complaint and remanded for further development "certain disputed issues which conceivably might show plaintiffs to have a cause of action."[5] By an order issued February 10, 1976, this court, *en banc*, granted appellees' suggestion for rehearing *en banc* and vacated the decision of the panel. Oral argument before the full court was held on April 19, 1976.

## I. BACKGROUND

The factual background of this case has been developed extensively in other decisions of this court.[6] To aid present consideration, we review briefly the facts pertinent to this appeal, drawing generously on the outline of facts in the panel decision.[7]

In 1967 Alan and Margaret McSurely were organizers for the Southern Conference Educational Fund, Inc., in Pike County, Kentucky. Alan McSurely was also affiliated with the National Conference of New Politics and Vietnam Summer, both unincorporated associations. On the night of August 11, 1967, following issuance of an arrest warrant charging Alan McSurely with seditious activities against the Commonwealth of Kentucky in violation of KRS 432.040 and a search warrant calling for a seizure of seditious material, officials of Pike County arrested both the McSurelys

2. Jurisdiction is founded on 28 U.S.C. §§ 1331, 1332, 1343(3) and (4).

3. Defendant Ratliff is named in the amended complaint and filed an answer, see Appendix "A" to Br. for Appellees for the Court, Sitting En Banc. Since he did not file any motions in response to the issues raised in this action, there has been no pre-trial activity with respect to him. Plaintiffs maintain they have not discontinued the proceedings as to him. *Id.* at 17–18 n. 7. The Government does not represent Ratliff and this appeal is not taken in his behalf. Br. for Appellants at 11 n. 8.

4. The Senators and Representatives shall receive a Compensation for their Services, to be ascertained by Law, and paid out of the Treasury of the United States. They shall in all Cases, except Treas⌐⌐ Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place.

Art. I, § 6, cl. 1.

5. *McSurely v. McClellan,* 172 U.S.App.D.C. 364, 369, 521 F.2d 1024, 1029 (1975).

6. See *McSurely v. McClellan,* 138 U.S.App.D.C. 187, 189–90, 426 F.2d 664, 666–67 (1970); *United States v. McSurely,* 154 U.S.App.D.C. 141, 143–47, 473 F.2d 1178, 1180–84 (1972); *McSurely v. McClellan, supra* note 5, 172 U.S.App.D.C. at 369–73, 521 F.2d at 1029–33.

7. Reference will also be made throughout this opinion to the stipulations that were entered into, on December 5, 1967, between counsel for the McSurelys and the United States following the decision in *McSurely v. Ratliff,* 282 F.Supp. 848 (E.D.Ky.1967) (hereinafter Stip.), App. 20–22; and to Defendants' Appendix in the related case, *United States v. McSurely,* 154 U.S.App. D.C. 141, 473 F.2d 1178 (1972) (hereinafter D.A.), which was filed as part of the record in this action on September 14, 1973.

and seized a large volume of books, posters, pamphlets and other materials found in their home.

On September 14, 1967, in response to a complaint filed by the McSurelys, a three-judge district court, for the Eastern District of Kentucky, found the Kentucky sedition statute facially unconstitutional, on grounds of First Amendment overbreadth and vagueness and federal preemption, and enjoined state prosecution of the McSurelys under the authority of *Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).[8] In its order, the court directed Thomas B. Ratliff, Commonwealth Attorney for Pike County, to hold in safekeeping the seized materials, pending possible appeal of the court's decision to the Supreme Court.[9] Shortly thereafter, Lavern Duffy, Assistant Counsel to the Subcommittee, telephoned Ratliff to inquire about the seized items.[10] In a stipulation entered into after the three-judge court decision, counsel for the McSurelys and the United States agreed that "[t]he aforesaid telephone call represented the only contact" between Duffy and Ratliff.[11]

As a result of the Duffy call, on October 8, 1967, John Brick, an investigator for the Subcommittee, traveled to Pikeville. After Ratliff confirmed that the seized materials contained information relating to activities of organizations in which the Subcommittee was interested, Brick examined photocopies of 234 documents delivered to his Pikeville motel room by Thadeus Scott, a Commonwealth Detective. The following morning, October 9, Scott drove Brick to the Pike County Court House, where Scott's assistant, Herman Dotson, opened a locked door to the walk-in vault room in the Commonwealth Attorney's office which housed the originals of the seized materials. After examining these documents, Brick proceeded to the United States Post Office in Pikeville, where he inspected the file of three-judge court action, asking for copies of the September 14 order and the inventory of seized items. On October 12, Brick returned to Pike County Court House, where, again accompanied by Scott and Dotson he reexamined the seized materials for four hours and, according to a stipulation agreed to by the McSurelys' counsel, for the first time took notes of the contents of the documents.[12] Apparently, Brick was provided with copies of 234 of the documents, which he took with him on his return to Washington.[13]

On October 16, 1967, at Senator McClellan's direction, Brick prepared subpoenas duces tecum for certain of the McSurely materials in Ratliff's possession which the Senator had determined would be relevant to the Subcommittee investigation of the April, 1967 riot in Nashville, Tennessee. Plaintiffs filed motions with the three-judge court to prevent Ratliff from releasing the seized materials to the Subcommit-

8. *McSurely v. Ratliff*, 282 F.Supp. 848 (E.D.Ky. 1967).

9. It is further ordered that all books, papers, documents and other material now in the custody of the Commonwealth Attorney of Pike County, Ratliff, reflected by the Inventory filed in this action continue to be held by him in safe keeping until final disposition of the case by appeal or otherwise.
D.A., II, 962.

10. Apparently in response to queries from reporters, Ratliff had previously announced that the seized materials would be made available to congressional committees. *See* Answer of Thomas Ratliff, *supra* note 3, at 2A; Ratliff's testimony at the McSurelys' contempt trial, D.A., I, 399.

11. Stip. 3, App. 20.

12. Stip. 11, App. 21.

13. Stipulation 9 states that on the morning of October 9, 1967, "Mr. Brick brought with him the xeroxed material which Mr. Scott had furnished to him the night before and returned it to Mr. Scott." App. 20–21. This appears to be an error, because Brick himself, in testimony at the McSurelys' contempt trial, stated that he took back to Washington the 234 photocopies that Scott had given to him on October 8, and these were returned to Scott on August 18, 1968, and received by the McSurelys on November 8, 1968. D.A., II, 728–30. Appellants concede this was the case, Br. for Appellants at 7. This court so found in our 1972 ruling, *United States v. McSurely, supra* note 7, 154 U.S.App.D.C. at 145–46, 154, 473 F.2d at 1182–83, 1191.

tee and to direct him to return the documents to them. Considerable litigation ensued, culminating in a decision by the Court of Appeals for the Sixth Circuit, on July 29, 1968, ordering the return of the materials because the time for appeal of the three-judge district court judgment had expired, but without prejudice to the right of the Subcommittee to proceed with the enforcement of its subpoenas.[14] On November 8, the district court for Kentucky directed the return to the McSurelys of the seized items, and on the same day the McSurelys received the 234 copies that had been given to Brick.[15]

Upon receipt of these materials, the McSurelys were immediately served with new subpoenas similar to the original ones. The McSurelys appeared before the Subcommittee, on March 4, 1969, but refused to produce the subpoenaed materials. Pursuant to a Senate resolution, they were indicted for contempt of Congress on August 29, 1969. They were tried in the United States District Court for the District of Columbia. They were convicted on June 20, 1970. On appeal this court reversed the conviction, the majority taking the position that "the framing by the Subcommittee of the subpoenas relied upon here for conviction of the McSurelys was based upon information derived from unconstitutional searches, both by state officials and by the Subcommittee's investigator." *United States v. McSurely*, 154 U.S.App.D.C. 141, 155, 473 F.2d 1178, 1192 (1972).

The action for damages presently under consideration was originally filed in the District Court for the District of Columbia on March 4, 1969, the same day that the McSurelys appeared before the Subcommittee. The District Court issued an order staying all proceedings, to continue in effect until thirty days after final resolution of the criminal case against the McSurelys. On December 26, 1970, this court vacated the stay as overbroad, and remanded for further proceedings.[16] On August 30, 1971, plaintiffs were granted leave to file an amended and supplemental complaint. Shortly thereafter, the federal defendants filed a motion to dismiss or for summary judgment, which the District Court denied on June 12, 1973. During this period, the trial court reimposed a stay of discovery efforts by plaintiffs.[17] After the Supreme Court decided *Doe v. McMillan*, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973), the federal defendants moved for reconsideration or certification under 28 U.S.C. § 1292(b) of the issue of their legislative immunity. The District Court denied this motion on July 9, 1973. This appeal followed.

## II. THE ISSUE ON APPEAL

The sole issue here is whether the federal defendants enjoy absolute immunity under the Speech or Debate Clause, both as a matter of substantive defense and as a bar to further judicial inquiry, for the conduct alleged in the amended complaint.[18] Fol-

14. *McSurely v. Ratliff*, 398 F.2d 817 (6th Cir. 1968). *See* discussion in note 58 *infra*.

15. There is some dispute as to when Brick returned the 234 copies. Defendants assert that Brick made the return to Commonwealth Detective Scott on August 14, 1968 for which he received a receipt, although the actual transfer to the McSurelys did not take place until November 8. D.A., II, 730. Plaintiffs counter that Brick retained possession until the November 8 transfer. To the extent this issue is relevant to the claims that survive our partial grant of summary judgment on the ground of legislative immunity, *see* note 25 *infra*, it is a matter for initial determination by the District Court on remand.

16. *McSurely v. McClellan*, 138 U.S.App.D.C. 187, 426 F.2d 664 (1970).

17. After the District Court vacated the stay on June 12, 1973, plaintiffs proceeded to depose defendant O'Donnell on July 10 and Robert E. Dunne, a former employee of the Subcommittee, on August 3. No deposition has been taken from Senator McClellen, although he filed an affidavit denying plaintiffs' allegations, App. 56–61. Further discovery came to a halt after the federal defendants filed a notice of appeal on August 6, 1973.

18. The District Court's denial of the motion to dismiss or for summary judgment based on a claim of legislative immunity is an appealable final order for purposes of 28 U.S.C. § 1291. On this point, we adopt the reasoning of the

lowing the approach of the Supreme Court in *Doe v. McMillan,* 412 U.S. at 325, 93 S.Ct. at 2031, we decide here only the threshold question of legislative immunity, "indicat[ing] nothing as to whether [plaintiffs] have pleaded a good cause of action or whether [defendants] have other defenses, constitutional or otherwise."

The panel decision characterized the activities alleged in the amended complaint as falling into seven categories. All are asserted to have been engaged in by the federal defendants, in conspiracy with defendant Ratliff, for the purpose of harassing and intimidating plaintiffs and the organizations with which they may have been associated, driving plaintiffs out of Pike County, or carrying out a "personal vendetta" of defendant McClellan. The seven categories are as follows:

(1) The unlawful search and seizure of the McSurelys' books and papers by Kentucky authorities.

(2) The inspection by Brick of those unlawfully seized materials.

(3) The transport by Brick of copies of 234 documents to Washington.

(4) The inspection of some or all of these 234 copies by the staff of the Subcommittee.

(5) The use of the copies, as the basis for issuance of subpoenas for some of the documents.

(6) The procurement of Contempt of Congress citations against the plaintiffs by consciously withholding from the Senate .the facts relating to the challenged subpoenas.

(7) The dissemination of some or all of the 234 copies obtained by Brick to persons or agencies outside of the Subcom-

mittee—particularly the Internal Revenue Service.[19]

Appellants maintain that their conduct in this case is completely insulated from judicial scrutiny by the Speech or Debate Clause. We agree with the District Court that plaintiffs' action is not entirely foreclosed by legislative immunity. However, some of the allegations implicate legislative activity falling within the protective ambit of the Clause. To ensure that appellants are not put to the burden of defending themselves as to their protected legislative activity, we proceed to identify for the District Court's guidance on remand which of the allegations on the present record may be the subject of further proceedings, and which involve conduct entitling appellants to summary judgment in their favor.

### III. CONDUCT SUBJECT TO FURTHER PROCEEDINGS

■ Previous decisions of the Supreme Court make clear that the Speech or Debate Clause, designed to preserve the independence and integrity of the Legislative Branch, has been "read broadly to effectuate its purposes," *United States v. Johnson,* 383 U.S. 169, 180, 86 S.Ct. 749, 755, 15 L.Ed.2d 681 (1966), including within its protective sweep those activities which are "generally done in a session of the House by one of its members in relation to the business before it," *Kilbourn v. Thompson,* 103 U.S. 168, 204, 26 L.Ed. 377 (1880). Accordingly, in addition to literal speech or debate within either House, the Court has recognized absolute immunity for legislators' acts of voting, conduct at committee hearings, preparation of committee reports, authorization of committee publications and their internal distribution,[20] and issuance of subpoenas concerning a subject "on which 'leg-

---

panel decision. *McSurely v. McClellan, supra* note 5, 172 U.S.App.D.C. at 370–72, 521 F.2d at 1030–32.

**19.** *McSurely v. McClellan, supra* note 5, 172 U.S.App.D.C. at 373, 521 F.2d ·at 1033.

For a discussion of the claim based on dissemination to persons or agencies outside of Congress, see note 25 *infra.*

**20.** *See Doe v. McMillan,* 412 U.S. 306, 311–13, 317–18, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973); *Gravel v. United States,* 408 U.S. 606, 615–16, 624, 628–29, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972); *Tenney v. Brandhove,* 341 U.S. 367, 377–78, 71 S.Ct. 783, 95 L.Ed.2d 1019 (1951).

islation could be had.' " [21] Aides are protected for conduct which would enjoy immunity if performed by the Members of Congress themselves.[22]

However, the Court has repeatedly insisted that the Speech or Debate Clause is subject to "finite limits," [23] refusing to stretch its protective umbrella "beyond the legislative sphere" to conduct not "essential to legislating." [24] We now turn to those parts of the amended complaint that make allegations of conduct that may have breached those "finite limits," and are subject to further proceedings on remand.

## A. *Dissemination Outside of Congress*

■ We discuss, first, the allegation of dissemination of some or all of the 234

documents to individuals or agencies outside of the Subcommittee. To the extent plaintiffs charge dissemination outside of the Halls of Congress, the federal defendants are not immune to further questioning.[25] "That Senators generally perform certain acts in their official capacity as Senators does not necessarily make all such acts legislative in nature." *Gravel v. United States*, 408 U.S. 606, 625, 92 S.Ct. 2614, 2627, 33 L.Ed.2d 583 (1972). Even though Members of Congress or their aides frequently intercede on behalf of constituents with agencies of the Executive Branch [26] or disseminate to the public beyond "the legitimate legislative needs of Congress" documents introduced at committee hearings,[27] such conduct falls outside of

**21.** *See Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 504–06, 95 S.Ct. 1813, 1823, 44 L.Ed.2d 324 (1975).

**22.** *See Eastland v. United States Servicemen's Fund*, 421 U.S. at 507, 95 S.Ct. 1813; *Doe v. McMillan*, 412 U.S. at 317–18, 93 S.Ct. 2018; *Gravel v. United States*, 408 U.S. at 620–22, 92 S.Ct. 2614. *Compare Dombrowski v. Eastland*, 387 U.S. 82, 84–85, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967) discussed in note 36 *infra*.

**23.** *Doe v. McMillan*, 412 U.S. at 317, 93 S.Ct. 2018.

**24.** *Gravel v. United States*, 408 U.S. at 621, 624–25, 92 S.Ct. 2614.

**25.** The claim of dissemination of some or all of the 234 documents to the Internal Revenue Service (IRS) was not made in the amended complaint. This claim arose because of the disclosure of certain IRS documents, obtained as a result of a Freedom of Information Act suit, which indicated contacts, beginning on August 28, 1968, between members of the Subcommittee staff and the IRS concerning formal access to each other's files.

On November 25, 1974, plaintiffs filed a supplemental affidavit lodging these recently disclosed materials with the court. The federal defendants countered on January 24, 1975, arguing that even if the IRS had gained access to the Subcommittee files at some point after August 28, 1968, the McSurelys could not have been harmed thereby because the 234 copies were returned to Commonwealth Detective Scott on August 14, 1968 (and received by the McSurelys on November 8, 1968), and Brick had testified at the McSurelys' contempt trial that he made no copies and that neither he nor the Subcommittee retained any of the documents, D.A., II, 730. Plaintiffs, in their reply to

defendants' response, filed January 31, 1975, dispute both that the documents were turned over to Scott on August 14, 1968 and that no copies were made. Since we affirm the District Court's denial of summary judgment on this claim, we leave the resolution of this question to the District Court on remand.

Plaintiffs' amended complaint also alleges that Brick exhibited copies of the 234 items to unknown persons causing plaintiffs damage and embarrassment, and that McClellan "used the instrumentality of the [Subcommittee] investigation to carry out a personal vendetta between himself and a certain personage of prominence named in some of the private correspondence of the plaintiff Margaret McSurely." Amended and Suppl.Compl. ¶¶ 19, 28(b)(ii), App. 45, 50. However, there is no specific allegation that Brick embarrassed plaintiffs or that McClellan pursued his purported "vendetta" by dissemination outside of the Subcommittee itself. The claim of dissemination outside of the Halls of Congress apparently rests on access by IRS officials.

**26.** *See United States v. Brewster*, 408 U.S. 501, 512–14, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972); *United States v. Johnson*, 383 U.S. 169, 172, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966). As the Court stated in *Gravel v. United States*, "[m]embers of Congress are constantly in touch with the Executive Branch of the Government and with administrative agencies—they may cajole, and exhort with respect to the administration of a federal statute—but such conduct, though generally done, is not protected legislative activity." 408 U.S. at 625, 92 S.Ct. at 2627.

**27.** Although the Court has yet to deny legislative immunity to all public dissemination of materials developed in the course of congressional proceedings, it has held significant as-

legislative immunity. It does not meet the test set forth in *Gravel*, that activities other than literal speech or debate are entitled to the immunity of the Speech or Debate Clause only when they are "an integral part of the deliberative [or] communicative processes by which Members participate in committee and House proceedings" with respect to matters before the House. 408 U.S. at 625, 92 S.Ct. at 2627. Similarly, distribution or exhibition of the 234 photocopies outside of legislative channels is not legislative activity entitled to absolute immunity by force of the Speech or Debate Clause, in the absence of a claim of legislative purpose.[28] Such activity, if otherwise actionable under the applicable law—a matter on which we express no opinion[29]—may be subject of a private suit for damages.[30]

B. *Inspection and Transportation of Documents Held in "Safekeeping" by Court Order*

■ The more difficult allegations relate to what may be termed investigative activity. We have no doubt that information gathering, whether by issuance of subpoenas or field work by a Senator or his staff, is essential to informed deliberation over proposed legislation. The recent decision in *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 504, 95 S.Ct. 1813, 1822, 44 L.Ed.2d 324 (1975), holds that "[t]he power to investigate and to do so through compulsory process plainly falls within" the test for legislative activity announced in *Gravel*. We think this principle must also extend to field investigations by a Senator or his staff. "A congressman cannot sub-

pects of "the informing function of Congress," W. Wilson, Congressional Government 303 (1885), outside of the protection of the Speech or Debate Clause. In *Gravel v. United States*, the Court found that private republication of documents introduced and made public at a committee hearing "was in no way essential to the deliberations of the Senate," at least in the absence of authorization by Congress or the full committee. 408 U.S. at 625–26, 92 S.Ct. at 2627.

*Doe v. McMillan* goes a step further, at least three Justices holding that even congressional authorization does not serve to immunize publication and dissemination to the general public of "otherwise actionable materials going beyond the reasonable requirements of the legislative function." 412 U.S. at 314–16 & n. 10, 93 S.Ct. at 2026. The Court did not elaborate at what point general, public dissemination transcends "legitimate legislative needs," but apparently this turns on the extent of the publication and distribution. *Id.* at 324, 93 S.Ct. 2018. In a separate concurrence, Justice Douglas, joined by Justices Brennan and Marshall, felt that the "informing function" was protected by the Speech or Debate Clause, but not where exposure to the public can be said to violate the First Amendment. *Id.* at 327–28, 93 S.Ct. 2018. Even this view, however, denies "the absolute nature of the speech or debate protection" that has been afforded, say, issuance of subpoenas concerning a subject "on which 'legislation could be had.'" *See Eastland v. United States Servicemen's Fund*, 421 U.S. at 509, 95 S.Ct. at 1823, 1824 & note 77 *infra*.

**28.** As previously indicated (see text at pp. —— —— of 180 U.S.App.D.C., pp. 1285–1286 of 553 F.2d & notes 26–27 *supra*), there is a difference between actions taken by legislators, however frequently, and legislative activity protected by the immunity of the Speech or Debate Clause.

**29.** The decision of the panel in this case stated that although dissemination to private individuals of unlawfully seized materials or to executive agencies of material which are known to have no reasonable relationship to the agencies' task might be actionable, "a Congressional committee lawfully may forward to appropriate Executive agencies information which it believes relates to their legitimate functions—particularly in a case, such as this, where the agency itself requested the information." *McSurely v. McClellan, supra* note 5, 172 U.S. App.D.C. at 387, 521 F.2d at 1047.

The issue before the court at this time is simply one of absolute legislative immunity. We leave open the question whether dissemination of otherwise actionable material may be privileged on some other basis.

**30.** We caution, however, that liability, if any, must be premised on acts of actual distribution or exhibition outside of the Halls of Congress, and plaintiffs must prove their case without reference to any legislative activity, such as acts of authorization. *See Doe v. McMillan*, 412 U.S. at 317–18, 93 S.Ct. 2018; *Gravel v. United States*, 408 U.S. at 628–29, 92 S.Ct. 2614.

poena material unless he has enough threshold information to know where, to whom, or for what documents he should direct a subpoena. The acquisition of knowledge through informal sources is a necessary concomitant of legislative conduct and thus should be within the ambit of the privilege so that congressmen are able to discharge their constitutional duties properly." [31]

However, there are "finite limits" to the shield erected by the Speech or Debate Clause. Thus, *Servicemen's Fund* requires the court to determine whether the inquiry " 'may fairly be deemed within [the Subcommittee's] province.' " 421 U.S. at 506, 95 S.Ct. at 1823. This requirement of congressional authorization of the inquiry by the particular subcommittee involved was clearly met in this case. In the broad, the investigative activity here concerned matters "on which 'legislation could be had.' " *Id.* at 506, 95 S.Ct. at 1823. The Senate Resolution of August 11, 1967 authorized an investigation into the causes of civil and criminal disorder that were racking the nation during this period. And there was reason for investigative focus on the McSurelys. A riot had occurred on April 8–9, 1967, in Nashville, Tennessee. The McSurelys have stipulated that they attended a meeting of the Southern Conference Educational Fund in Nashville immediately before the April, 1967, riot.[32] Commonwealth Attorney Ratliff advised Brick in Pikeville on October 8 that some of the materials seized from the McSurelys' home contained reference to that meeting.[33]

This does not end our inquiry. Even though there is broad authorization for an investigation and justification for focus on particular individuals, a Member of Congress or congressional employee is not free to use every conceivable means to obtain investigatory materials, without fear of criminal prosecution or civil suit. The Court has taken "a decidedly jaundiced view towards extending the Clause so as to privilege illegal or unconstitutional conduct beyond that essential to foreclose executive control of legislative speech or debate and associated matters such as voting and committee reports and proceedings." *Gravel v. United States*, 408 U.S. at 620, 92 S.Ct. at 2625. In *Gravel* the Court held the Senator and his aide immune from questioning with respect to conduct that transpired at a committee hearing, but refused to extend immunity to grand jury questioning concerning third-party crime or criminal conduct by the Senator or his aide related to preparation for the hearing.[34] Thus, the grand jury was permitted to "trac[e] the source of obviously highly classified documents that came into the Senator's possession," provided "no legislative act is implicated by the questions," *id.* at 628, 92 S.Ct. at 2628, notwithstanding the fact that those documents were an integral part of the preparation for the committee proceeding that was held protected conduct.[35] *Dombrowski v. Eastland*, 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967), holds that the Speech or Debate Clause will not protect a Member or employee of Congress from suit if he engages in a conspiracy with state officials to obtain

**31.** Reinstein & Silverglate, *Legislative Privilege and the Separation of Powers*, 86 Harv.L.Rev. 1113, 1154 (1973).

**32.** Stip. 15, App. 21.

**33.** Stip. 5, App. 20.

**34.** An interesting parallel to the *Gravel* case can be found in the Duncan Sandys incident. In 1938, Sandys, an opposition member of the House of Commons, obtained and disclosed secret military documents, allegedly in violation of the Official Secrets Act, 10 & 11 Geo. 5, c. 75 (1920). Sandys sought to arouse public sentiment to remedy inadequate anti-aircraft defenses around London, a problem disclosed by

the documents. A military court of inquiry subpoenaed Sandys to determine the source of the documents. This led to the appointment of a special committee of Commons, which determined that the solicitation or receipt of information in contravention of the Official Secrets Act was not privileged activity. Report for the Select Committee on the Official Secrets Act xi (London, 1939).

**35.** *See Gravel v. United States*, 408 U.S. at 629–33, 92 S.Ct. 2614 (Stewart, J., dissenting in part); Reinstein & Silverglate, *supra* note 31, at 1155–56.

information by unlawful search and seizure in violation of the Fourth Amendment.[36]

■ The employment of unlawful means to implement an otherwise proper legislative objective is simply not "essential to legislating." As with taking a bribe, resort to criminal or unconstitutional methods of investigative inquiry is "no part of the legislative process or function; it is not a legislative act." *United States v. Brewster,* 408 U.S. 501, 526, 92 S.Ct. 2531, 2544, 33 L.Ed.2d 507 (1972). While "protecting the rights of others" in such cases "may have to some extent frustrated a planned or completed legislative act," the focus on means permits the court to afford relief "without proof of a legislative act." *Gravel v. United States,* 408 U.S. at 621, 92 S.Ct. at 2625.[37]

■ As to the matter of conspiracy in the initial raid of the McSurelys' home by Kentucky authorities, the amended complaint alleges Ratliff's involvement,[38] but it does not appear to charge any of the federal defendants with promotion of or participa-

tion in the original search and seizure. The amended complaint merely asserts that "[a]t or about the time of the initial unconstitutional and illegal raids" the federal defendants, and unknown others, "undertook a plan of action to [c]ontinue the course of action undertaken by defendant Ratliff . . . ."[39] Although there is a certain tolerance in the federal system of lapses in pleading and curative amendments, at this late stage of an action which was originally filed on March 4, 1969, we must hold plaintiffs to their failure specifically to allege that any of the federal defendants promoted or participated in the Kentucky raid.[40] Appellants are entitled to dismissal at this juncture of any claim that they participated in the initial unlawful seizure by the Kentucky officials.

■ The amended complaint clearly charges a conspiracy of the federal defendants, in concert with Ratliff, to inspect, obtain copies of, and transport back to Washington private and personal correspon-

**36.** In *Dombrowski v. Eastland,* the Speech or Debate Clause protected Senator Eastland, who was also a subcommittee chairman, but not subcommittee counsel Sourwine. The Court dismissed the complaint as to Eastland because "the record [did] not contain evidence of his involvement in any activity that could result in liability," but permitted trial to continue as to Sourwine because "[t]here [was] controverted evidence in the record . . . which afford[ed] more than merely colorable substance" to the yet unproved charge that he conspired to violate the constitutional rights of private parties. 387 U.S. at 84–85, 87 S.Ct. at 1427.

The case stands for the proposition that both a Member of Congress and his aides are equally answerable to a charge of conspiracy to violate Fourth Amendment rights, provided petitioners set forth specific facts showing a genuine issue for trial. *See* Note, *The Scope of Immunity for Legislators and Their Employees,* 77 Yale L.J. 366, 381–82 (1967). Notwithstanding some language in the opinion, *see* 387 U.S. at 85, 87 S.Ct. 1425, subsequent decisions of the Court make clear that the immunity available is defined by the nature of the act involved, not the status of the actor. *See Gravel v. United States,* 408 U.S. at 620–22, 92 S.Ct. 2614; *Doe v. McMillan,* 412 U.S. at 315, 317–18, 93 S.Ct. 2018; *Eastland v. United States Servicemen's Fund,* 421 U.S. at 507, 95 S.Ct. 1813.

**37.** *See also United States v. Dowdy,* 479 F.2d 213, 224 n. 20 (4th Cir.), *cert. denied,* 414 U.S. 823, 94 S.Ct. 124, 38 L.Ed.2d 56 (1973).

**38.** Amended and Suppl.Compl. ¶¶ 11–14, App. 41–43. Since Ratliff is not a party to this appeal, we have no occasion to decide whether a state prosecutor enjoys absolute immunity in a 42 U.S.C. § 1983 suit for actions undertaken in an investigative capacity, a question left open in the Supreme Court's recent decision in *Imbler v. Pachtman,* 424 U.S. 409, 430–31 & n. 32, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976).

**39.** Amended and Suppl.Compl. ¶ 18, App. 43–44.

**40.** We note that the McSurelys had stipulated in an earlier case that Subcommittee assistant counsel Duffy did not have any contact with Ratliff until their September, 1967 telephone call, more than a month after the raid, Stip. 2–3, App. 20; and there is no evidence in the record at present that Brick, or any other individual associated with the Subcommittee, traveled to Kentucky until October 8, almost two months after the raid.

If in the course of discovery on the claims that survive the legislative immunity bar evidence develops as to the complicity of the federal defendants in the original raid, plaintiffs may seek to amend their complaint, subject to the requirements of Fed.R.Civ.P. 15.

dence among the seized materials "notwithstanding the [safekeeping] order of the United States District Court," and "without knowledge of the plaintiffs. . . ."[41] Although plaintiffs have not sharply articulated their theory of liability, their allegations are unmistakably addressed to a wrongful inspection and transportation of documents (causing constitutional injury) which were independent of the initial raid by Kentucky officials.[42] Without deciding whether Brick, and the others allegedly acting in concert with him, did indeed violate the Fourth Amendment by his inspection and transportation back to Washington of

documents that were under a court-imposed "safekeeping" order, and, if so, whether other defenses are available to escape or mitigate liability in damages, there is evidence in the record as it presently stands "which affords more than merely colorable substance" to the claim of an independent Fourth Amendment violation by Brick.[43]

We note that the prior decision of this court reversing the McSurelys' conviction for contempt of Congress was premised on the fact that Brick committed an independent Fourth Amendment violation by his unauthorized inspection and transportation back to Washington of the 234 documents.[44]

41. Amended and Suppl.Compl. ¶ 19, App. 45.

42. The focus here is on the illegality committed by the federal defendants, for it is *their* employment of means in violation of the Fourth Amendment, if any, that would bring this case within *Gravel v. United States* and *Dombrowski v. Eastland.*

43. As is explained in part V *infra*, we do not at this juncture pass on whether the Fourth Amendment claim should be dismissed as to defendants McClellan, Adlerman and O'Donnell, even though plaintiffs have made no factual proffer of "involvement in any activity that could result in [their] liability." *Dombrowski v. Eastland,* 387 U.S. at 84, 87 S.Ct. at 1427.

44. "[T]he thrust of" the McSurelys' appeal in that case was "upon the basic constitutional issue of unlawful search and seizure, not only by the Kentucky officials, *but later by a United States Senate Subcommittee.* It is their position that their refusal to comply with the Subcommittee subpoenas cannot support contempt convictions when the subpoenas themselves were based on *an unauthorized inspection by the Subcommittee investigator* of documents which had been seized by state officials in Kentucky in violation of the Fourth Amendment and under an unconstitutional statute." *United States v. McSurely, supra* note 7, 154 U.S.App.D.C. at 144, 473 F.2d at 1181 (emphasis supplied). Throughout the opinion the court makes clear that the conviction must be reversed because the subpoenas "were the product of the unauthorized inspection and search of the documents by an agent of the Subcommittee itself"—the product of an independent Fourth Amendment violation by the Subcommittee through the actions of its investigators. *See id.* at 145–46 & n. 8, 147, 154–55, 157, 473 F.2d at 1182–83 & n. 8, 1184, 1191–92, 1194.

This was not a case of mere "derivative use" by the Subcommittee of the "forbidden fruits"

of the initial illegality of Kentucky authorities. In addition to *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), which established the exclusionary rule for federal prosecutions, the McSurelys relied on *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). *See* 154 U.S.App.D.C. at 147, 473 F.2d at 1184. In *Silverthorne* the Court struck down a contempt conviction for refusal to comply with a grand jury subpoena for originals of documents that had been previously unlawfully seized by the Government and ordered returned by a district court. As Justice Holmes noted, "the case is not that of knowledge acquired through the wrongful act of a stranger, but it must be assumed that the Government planned or at all events ratified the whole performance." 251 U.S. at 391, 40 S.Ct. at 182. *Silverthorne* did not involve "knowledge of [facts] gained from an independent source [which] may be proved like any others, but [rather] knowledge gained by the Government's own wrong [which] cannot be used by it in the way proposed." *Id.* at 392, 40 S.Ct. at 183.

Judge Wilkey, concurring in the 1972 reversal of the McSurelys' conviction, explained that "Justice Holmes properly refused to allow a subsequent regular subpoena to remove the taint on evidence which had been discovered in a previous illegal search," because "[t]he knowledge obtained from the illegal search would have made the subpoenaed documents, in effect, their own fruit." 154 U.S.App.D.C. at 159 & n. 3, 473 F.2d at 1196 & n. 3. Moving to the case before him, Judge Wilkey noted that "some degree of *active* participation by the Subcommittee's investigator in a violation of the McSurelys' Fourth Amendment rights, if that violation was also the sole source of the information upon which the subpoenas were issued, might justify refusal to enforce the subpoenas." *Id.* at 164, 473 F.2d at 1201. However, Judge Wilkey decided to reverse the conviction on "[t]he sounder ground" of lack of

Although our prior decision is not res judicata as to appellants who were not parties to the criminal proceeding, the findings and conclusions stated therein are surely pertinent to the determination of whether plaintiffs have made enough of a proffer of unconstitutional investigative activity to survive a motion for summary judgment grounded on legislative immunity. In unmistakable terms, this court rejected the contention that Brick's conduct was merely passive receipt of materials from one who had lawful custody and authority to grant access to a legislative investigator. We stated:

> That activity might more appropriately be described (1) as an unconstitutional exercise of power by the Commonwealth attorney, Ratliff, and his subordinates at a time when Ratliff had no right whatever in and to these papers except to hold them in safekeeping (pending appeal) pursuant to the order of the three-judge court; and (2) as an unlawful encroachment by the Subcommittee investigator himself upon the rights of the McSurelys under the Fourth Amendment. Not only was the search and seizure of appellants' property by the Commonwealth officials illegal, but the subsequent search and use of that property by the Subcommittee investigator, with the cooperation of the Commonwealth attorney, violated appellants' constitutional right to have their property safe and secure from unwarranted inspections.

*United States v. McSurely,* 154 U.S.App. D.C. at 155, 473 F.2d at 1192.[45]

This case is shaped by appellants' position in the pleadings. It does not involve, nor require probing what legal consequences would be appropriate for, an instance of a truly passive receipt by Subcommittee personnel. This is not a case where appellants had nothing more to do with the seized documents than to be in the office at a time when, without prearrangement, Ratliff spontaneously either deposited the documents on Brick's desk in the Subcommittee office in Washington or disclosed their contents to the public at large.[46] The pleadings before us are entirely congruent with the situation as presented in the stipulations of counsel for the McSurelys and the United States in an earlier case and Ratliff's testimony at the contempt trial, that the inquiry was initiated by the Subcommittee and that Brick took active steps to obtain access to the seized materials and cart back from Kentucky to Washington copies of the McSurelys' documents, including two separate visits to the walk-in vault room where the originals were stored.[47] Appellants' counsel contend that Brick "played no role in the selection of the documents he would be given."[48] Brick's own testimony at the contempt trial indicates that his activities included some discretion in selection of what he examined and re-ex-

---

pertinency of some of the subpoenaed material "to the valid subject of the legislative inquiry." *Id.* at 166, 473 F.2d at 1203.

**45.** *See also* 154 U.S.App.D.C. at 154, 473 F.2d at 1191.

**46.** Judge Wilkey's concurring opinion in *United States v. McSurely* notes that "although Brick's examination of the McSurelys' documents may be characterized as an illegal subcommittee action," there are serious line-drawing problems in determining when active conduct ends and "passive reception of illegally seized information from others" begins. 154 U.S.App.D.C. at 165, 473 F.2d at 1202. The line to be drawn in the case before us is fairly clear. As Justice Holmes has pointed out, even the broadest, least controversial standard may well be arbitrary at the margin, yet that is no reason for refusing to recognize differences of degree and thereby giving no weight to important privacy interests. *Cf. Haddock v. Haddock,* 201 U.S. 562, 631–32, 26 S.Ct. 525, 50 L.Ed. 867 (1906) (Holmes, J., dissenting).

**47.** *See* Stip. 1–11, App. 20–21. Ratliff testified at the McSurelys' contempt trial that he never contacted a Member of Congress or his staff ("I was contacted, but I did not contact"). He also stated that at first he refused Brick access to the seized materials, because he had refused "other people who had wanted to see this and who were curious to see this material," but "after [Brick] assured me—what his purpose was, he was permitted to view it." D.A., I, 401–03.

**48.** Reply Br. for Appellants at 5.

amined.[49] Moreover it cannot rightly be put that there is no claim within the cognizance of the Fourth Amendment because of the cooperation of the custodian. Cooperation of a custodian without authority to grant access may obviate use of force, but it does not validate an otherwise unlawful search and seizure.[50]

The scope of Ratliff's actual authority as court-designated custodian to hold in "safekeeping" the seized materials remains an issue. While in the absence of the "refinement which can occur only as a result of trial"[51] we can not make a conclusive determination, we can state with fair certainty that plaintiffs have made out a prima facie case to the effect that the purpose of the "safekeeping" order of the three-judge court was to preserve the seized items both for the McSurelys' benefit and for the orderly administration of the judicial process through "appeal or otherwise," and that Brick's investigative activity outside of the channels established by the court violated its order.

The three-judge court had found unconstitutional on grounds of First Amendment overbreadth and vagueness and, alternatively, federal preemption the Kentucky sedition statute under which the original raid was made. The court also enjoined further state prosecutions under the statute, largely because it discerned a concerted effort by state and county officials to "freeze" the McSurelys and their associates out of Pike

**49.** Brick testified on direct that he did not "play any part at all in the selection" of the documents that Commonwealth Detective Scott delivered to him in Brick's Pikeville motel room on October 8, 1967. D.A., II, 728. But he then went on to explain that the following morning he went to the Pike County Court House to examine the originals of the seized items, segregating out records that were of absolutely no interest to him. "I wouldn't want to say [I examined] all [of the documents]. I would say almost all. I may have missed some of them. I did not inspect the records of a man named Joseph Malloy. They were mixed in with these. I had no interest in those." *Id.* at 729. *See also id.* at 738–39 (on cross-examination).

On cross-examination Brick stated that when the documents were handed to him he examined what he was receiving; that he told Assistant Commonwealth Attorney Dotson and his assistant, Scott, that he did not think he needed some of the documents, but did not return the items he did not need; and that "[t]here were many others in the locked vault in the Court House" that he did not take but "would have obtained under the [first] subpoena had not the Subcommittee stopped all action when the defendants went into Court." D.A., II, 734–36.

**50.** "[S]earches without a warrant or probable cause may be made upon the voluntary consent of the party affected or of someone authorized *by that party to control* access to the places or things searched." Amsterdam, *Perspectives on the Fourth Amendment,* 58 Minn.L.Rev. 349, 358 (1974) (emphasis supplied). As to third-party consent, "when the consenting party has less than a complete proprietary or possessory interest in the searched premises, the implicated party is usually not bound by the consent." Comment, *Third Party Consent to Search and Seizure,* 33 U.Chi.L.Rev. 797, 805 (1966). *See,*

e. g., *Stoner v. California,* 376 U.S. 483, 488–90, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964) (hotel clerk's apparent authority to consent to search of guest's room held inadequate to validate search); *Chapman v. United States,* 365 U.S. 610, 616–17, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961) (landlord's consent held inadequate even though he had not only apparent authority but actual authority for some purposes to enter leased premises, e. g., "to view waste"). *See also United States v. McSurely, supra* note 5, 154 U.S.App.D.C. at 164 n.23, 473 F.2d at 1201 n.23 (Wilkey, J., concurring).

In connection with a disposition on the merits, there may be available to Brick a qualified defense to the damages action (not an absolute immunity from suit) of "good faith and reasonable belief in the validity of the search"—a matter on which we express no opinion. *See, e. g, Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 456 F.2d 1339, 1348 (2d Cir. 1972). We cannot anticipate what might be involved if such a defense is proffered. We are aware of fragments of Brick's position as presented at the McSurelys' contempt trial—that he believed in good faith that Ratliff had authority to show him the documents, D.A., II, 728, and learned of the court's "safekeeping" order when he examined the court's file on October 9, 1967, his last day in Pikeville on the first visit, *id.* at 737–38. Assuming good faith in his first inspection, other issues would remain—concerning his second visit; and his transporting the documents with awareness of the court's "safekeeping" order, without the court's permission, McSurelys' consent, or arrangement for a committee subpoena.

**51.** *Dombrowski v. Eastland,* 387 U.S. at 84, 87 S.Ct. at 1427.

County.[52] With the statutory predicate declared unconstitutional, there was no legal justification for the intrusion into the McSurelys' home or for the seizure of their papers, and certainly none for the retention of those papers. The court did not return the seized materials to their owners because it sought to preserve the existence of the res in the event of appeal to, and reversal by, the Supreme Court. Toward this end, the court made Ratliff, then the state's chief attorney for the county, custodian over the documents for a limited purpose, but it did not empower him to act without further permission to make these materials available to anyone of his choosing.[53] Ratliff was apparently of this view at first, for he testified at the McSurelys' contempt trial that he tried to obtain the court's permission before granting Brick access to the documents. Without obtaining the court's permission,[54] or seeking the consent of the McSurelys or their lawyer, or even advising his co-custodian, the United States Marshal,[55] Ratliff acceded to Brick's request for access.

The seriousness of the situation is not mitigated by the possibility that the three-judge court might have deemed it appropriate to honor a request from Ratliff or the Subcommittee to permit Brick to examine pertinent papers. Indeed, that only accentuates the gravity of the situation. Instead of acting lawlessly, the Subcommittee investigator should have used proper process which, in turn, would have permitted the court, if it granted the request, or the McSurelys, if their permission had been sought, to safeguard against encroachment beyond the legitimate legislative sphere, into personal and private papers that lacked even arguable relevance to the legislative inquiry.[56]

Nor do we think that events occurring subsequent to Brick's actions in Pikeville on October 8–9 and 12, 1967, rebut plaintiffs' present showing that Brick committed an independent Fourth Amendment violation.

---

**52.** [T]he conclusion is inescapable that the criminal prosecutions were instituted, at least in part, in order to stop plaintiffs' organizing activities in Pike County. That effort has been successful. Not only has there been the "chilling effect" on freedom of speech referred to in *Dombrowski* [*v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965)], there has been in fact a freezing effect. The Governor has issued a public statement that federal funds to the Appalachian Volunteers should be discontinued. Plaintiff's possessions have been seized and impounded and they have been placed in jail. . . . Clearly, the criminal prosecutions have put a damper on plaintiffs' freedom of speech, as well as on others who might be in sympathy with their objectives.
*McSurely v. Ratliff, supra* note 8, 282 F.Supp. at 852–53.

**53.** The court, on September 11, 1967, upon the motion of the McSurelys' counsel that the seized materials be impounded and that defendant Ratliff safeguard such material, and pursuant to the agreement of the parties, directed (1) that the materials be kept in the custody of Ratliff and the United States Marshal for the district, Archie Kraft, and that the co-custodians make an inventory of the documents; and (2) that Ratliff return to the McSurelys "such personal articles and property as he does not deem material to the investigation and prosecution herein." Three days later, on finding KRS 432.040 facially unconstitutional and enjoining state prosecution of the McSurelys, the court issued its "safekeeping" directive. This satisfied in part the request of McSurelys' counsel, and was responsive to the McSurelys' privacy interests, modified only to obviate mootness.

**54.** Ratliff testified that he "was admonished" by the court "to keep the materials [in the walk-in vault room of the Commonwealth Attorney's office in the County Court House] and agreed to do so," D.A., I, 404; and that before granting Brick access to the materials he made "strenuous efforts to contact one or all of the three judges," and although he could not find Judges Combs and Gordon he "did talk to Judge Monahan," *id.* at 406. Although later on in the testimony Ratliff stated in oblique fashion "I had my permission," *id.* at 407, this court in *United States v. McSurely, supra* note 7, 154 U.S.App.D.C. at 165 n.8, 473 F.2d at 1183 n.8, found that he merely "contacted the third" judge, and "there is no evidence that Ratliff received any formal permission in the form of a court order authorizing inspection of the McSurelys' seized property by the Subcommittee investigator."

**55.** Ratliff acknowledged that he did not seek the approval of the McSurelys, their counsel, or United States Marshal Kraft, co-custodian for the seized materials. D.A., I, 408.

**56.** *See* discussion in section III C, *infra*.

If Brick's prior search-and-taking was unlawful, it could not be sanitized by the subsequent issuance by the Subcommittee of subpoenas duces tecum.[57] Nor can its validity be established by the subsequent orders of the three-judge court, issued while its September 14, 1967, order was still subject to appeal and review, refusing to direct Ratliff to return to the McSurelys the seized documents called for by the Subcommittee subpoena.[58] The issue before the court was whether the McSurelys had a right to bar access to documents sought by a facially proper subpoena duces tecum. Apparently, and appellants do not contend otherwise, this matter was decided without regard to Brick's pre-subpoena activities.[59] The court's decision to honor proper process issuing from the Subcommittee was not intended as, nor did it constitute, approval of the prior search and seizure of Brick, pursued in a surreptitious manner and without resort to the procedures of the very court which had intervened and asserted control over the seized materials.

## The Calandra Doctrine

Appellants contend throughout that, in addition to the bar raised by the Speech or Debate Clause, the Supreme Court's decision in *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), saves them from any liability on Fourth Amendment grounds for Brick's conduct. The theory seems to be that if the mere use of information by a grand jury obtained from a prior unlawful search and seizure does not state an independent Fourth Amendment violation, neither does the mere use by Brick and the Subcommittee of the fruits of prior unlawful conduct by the Kentucky authorities.

Without determining whether *Calandra* applies with full force to the legislative context,[60] we find maintenance of the present action wholly congruent with *Calandra.* In *Calandra* the government agent had taken custody and authorized delivery of the seized materials to the grand jury before there was any judicial determination of illegality and ruling restricting access to

57. *See, e. g., Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), discussed in note 44 *supra.*

58. These orders issued on October 30 and December 13, 1967. Following the Supreme Court's dismissal of the McSurelys' appeal for want of jurisdiction, the Court of Appeals for the Sixth Circuit ordered the return of the seized materials because the time to appeal the three-judge court's September 14, 1967 ruling had expired. The latter refused "to render an advisory opinion" on the McSurelys' objections "concerning the validity and interpretation of the Senate Resolution and the breadth of the investigation authorized thereby," and simply reversed the district court "without prejudice to the right of the Senate Committee to proceed with the enforcement" of its subpoenas. *McSurely v. Ratliff,* 398 F.2d 817, 818 (6th Cir. 1968).

59. Appellants contend in their opening brief "that at every significant stage of this case the conduct of the federal defendants has been sanctioned by the courts." Br. for Appellants at 32. They retreat somewhat from this position in their reply brief, suggesting that if the three-judge court and the Sixth Circuit failed to pass on Brick's prior search and seizure this was due to plaintiffs' failure to bring the matter to the courts' attention. Reply Br. for Appellants at 10 n.9.

The McSurelys testified at their contempt trial that they first learned of Brick's inspection and possession of 234 copies of their documents on December 5, 1967, and were not sure which documents, in particular, were made available to Brick until the 234 photocopies were returned on November 8, 1968. D.A., II, 655–56, 681–82, 704–05, 707–09. Appellees assert that "[t]he record before the Sixth Circuit included none of the facts which subsequently emerged as to what was done with Mrs. McSurely's personal correspondence." Br. for Appellees at 23.

The parties have not filed with this court copies of the record that was before the three-judge court and the Sixth Circuit. Thus we do not know whether the McSurelys' objections to the Subcommittee subpoena made reference to Brick's prior conduct. This is a matter that would benefit from further ventilation on remand.

60. The opposing considerations are identified in the opinions of the panel of this court. *Compare McSurely v. McClellan, supra* note 5, 172 U.S.App.D.C. at 385–86, 521 F.2d at 1045–46, *with* 172 U.S.App.D.C. at 392–93, 521 F.2d at 1052–53 (Leventhal, J., concurring in part and dissenting in part).

the materials.[61] Here prior to Subcommittee access a court had intervened and declared the state search and seizure without legal justification because the operative statute was unconstitutional. Through the "safekeeping" directive the court asserted control over the seized documents, and did not authorize delivery to the Subcommittee. In Fourth Amendment terms, *Calandra* involved a single search and seizure by federal agents and mere "derivative use" by the grand jury, whereas two separate, independent searches and seizures took place here. When *Calandra* refused to apply the exclusionary rule, it noted the availability of an action for damages for the unlawful taking by government agents.[62] To raise *Calandra* as a bar to this action is to extend that decision beyond its rationale and express limitations, to the effect that there is no action for any constitutional wrong by federal defendants, with the McSurelys "necessary left remediless in the face of an unlawful search and seizure." 414 U.S. at 354–55

n.10, 94 S.Ct. at 623. *Calandra* does not bar plaintiffs' action against Brick, and any federal defendants who acted in concert with him, for acting outside of judicial channels in inspecting the materials in court safekeeping and transporting copies back to Washington.

## C. Selection and Seizure of Documents Concededly Irrelevant to Legislative Inquiry

We hold that even if Brick's examination of the materials had not violated the three-judge court's "safekeeping" order, trial may proceed on plaintiffs' claim that Brick's selection and transportation back to Washington of documents of a private nature [63] which he acknowledged to be irrelevant to the Subcommittee inquiry violated their right of privacy and is outside the protection of legislative immunity.[64] This case is unusual because Brick in testimony at the McSurelys' contempt trial conceded that

**61.** Although *Calandra* holds the exclusionary rule generally inapplicable to grand jury inquiry, the Court was careful to preserve intact the holding of *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). Justice Powell, for the Court, noted that *Silverthorne* was distinguishable in part because "prior to the issuance of the grand jury subpoenas, there had been a judicial determination that the search and seizure were illegal." 414 U.S. at 352 n.8, 94 S.Ct. at 622. That a judicial determination of illegality preceded issuance of the subpoenas in *Silverthorne* rendered inapplicable a major concern of the Court: the fear that allowance of pre-indictment suppression hearings would hopelessly disrupt the orderly progress of grand jury investigations. *Id.* at 349–50, 94 S.Ct. 613. Thus, even assuming *arguendo* that *Calandra* applies with full force to legislative inquiry, our 1972 ruling in *United States v. McSurely* remains good law. As we develop in note 44 *supra,* this court's 1972 decision rested, by analogy to *Silverthorne,* on the independent illegality committed by an investigator's circumvention of judicial control over seized documents after a ruling that the initial seizure was made without legal justification.

**62.** It should be noted that, even absent the exclusionary rule, a grand jury witness may have other remedies to redress the injury to his privacy and to prevent a further invasion in the future. He may be entitled to maintain a cause of action for damages against the officers who

conducted the unlawful search. . . . In these circumstances, we cannot say that such a witness is necessarily left remediless in the face of an unlawful search and seizure.

414 U.S. at 354–55 n.10, 94 S.Ct. at 623.

**63.** Among the 234 items which Brick carried back to Washington were some "personal letters," as Brick conceded to Government counsel during his testimony at the contempt trial. D.A., II, 727–28. Government counsel, Mr. Bress, acknowledged "that the list of documents, copies of which Brick had but later returned according to the record, contains confidential letters." D.A., I, 431–32. The documents that Brick took to Washington were introduced into the record of the contempt trial as a defendants' exhibit, and are described in D.A., II, 628–49.

Appellees focused particularly on the fact that at least one of these was a love letter to plaintiff Margaret McSurely from Drew Pearson, a prominent columnist (Document No. 201), because Brick's testimony establishes that he not only examined the love letter in Kentucky, took it to Washington, but also singled it out to show to defendant McClellan because it was written by this prominent columnist. D.A., II, 730–31. Defendant McClellan's affidavit acknowledges, without comment, Brick's testimony on this point. App. 60.

**64.** Br. for Appellees at 11, 13–15; Amended and Suppl.Compl. ¶¶ 18(b), 19, App. 44–45.

when "he went to Pikeville to examine the documents in the Court House," he looked through the papers and books and determined there were "many" items that he "didn't need at all," including a letter addressed to plaintiff Margaret McSurely, as "Dearest Cucumber," from a prominent newspaper columnist.[65]

That the investigation of the McSurelys fell within the broad authorization of the Senate resolution does not render everything done by investigator Brick with respect to the McSurelys privileged activity which is "essential to legislating." For an activity to be considered "essential to legislating" it must be "an integral part of the deliberative and communicative processes" dealing with matters within the jurisdiction of Congress. *Gravel v. United States,* 408 U.S. at 625, 92 S.Ct. at 2627. Even in the case of investigation by compulsory process, the Court in *Servicemen's Fund* cautioned that "[a]lthough the power to investigate is necessarily broad it is not unlimited. Its boundaries are defined by its source." 421 U.S. at 504 n.15, 95 S.Ct. at 1822. The Court cited with approval *Watkins v. United States,* 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957), which states that "[t]here is no general authority to expose the private affairs of individuals without justification in terms of the functions of the Congress," and "there is no congressional power to expose for the sake of exposure." 354 U.S. at 187, 200, 77 S.Ct. at 1179, 1185.

In the usual case if the activity is arguably within the "legitimate legislative sphere" the Speech or Debate Clause bars inquiry even in the face of a claim of "unworthy motive." As Justice Frankfurter explained in *Tenney v. Brandhove,* 341 U.S. 367, 377, 71 S.Ct. 783, 788, 95 L.Ed. 1019 (1951):

> The claim of an unworthy purpose does not destroy the privilege. Legislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good. One must not expect uncommon courage even in legislators. The privilege would be of little value if they could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives.

The principle is designed to give legislators and their aides a certain measure of elbow-room to pursue legislative activity without the inhibitions that necessarily flow from exposure to suit because of the mere "conclusion of a pleader" or "a jury's speculation as to motives."

---

65. The record contains the following exchange between the McSurelys' counsel, Mr. Stavis, and Brick (D.A., II, 734–36):

> Q (Mr. Stavis): Did you tell Mr. Dotson or any of the folk with whom you met there that there was some of that stuff that you didn't think you needed?
> A (Brick): Yes.
> Q: Did you give it back to them?
> A: No.
> Q: Did you need that letter signed Dearest Cucumber or addressed, Dearest Cucumber?
> Mr. Bress (Government counsel): Objection. Irrelevant.
> The Court: He may answer the question.
> The Witness: No. Didn't you say signed Dearest Cucumber and when in fact it says addressed to Dearest Cucumber.
> Mr. Stavis: No, I didn't.
> The Witness: Was the question, did I need that letter?
> Mr. Stavis: Yes. For the performance of your duties.
> A: No, Sir.

> Q: As a matter of fact, in respect to the performance of your duties, you didn't need most of the items in that list, did you?
> A: Some of them.
> \* \* \* \* \* \*
> Q: Did you—when I was asking my questions about this list of 234 items, there were lots of these items that you didn't need at all, correct?
> Mr. Bress: Objection. Irrelevant.
> The Court: I believe he has already answered the question.
> By Mr. Bress.
> Q. What was your answer?
> A. Some, yes.
> Q. Some that you did?
> A. It was—
> Q. Lots?
> A. I object to the use of the word lots.
> Q. A great many, a good many?
> A. Oh, I will say many.
> Let me explain.
> I didn't select any of these as I told you.

However, the immunity shield that protects conduct of legislators and staff in an area that is at least arguably within a proper legislative sphere, that pertains to a subject "on which 'legislation could be had,'" *Eastland v. United States Servicemen's Fund,* 421 U.S. at 504 n.15, 95 S.Ct. at 1822, and in such sphere protects against lawsuits that are based on mere allegation or speculation, is not a license to invade privacy where no legislative purpose can be plausibly interposed. The fact that Brick took and transported *concededly* extraneous material—and it is significant that he seized "some personal letters"—takes this case outside the protection of legislative immunity. While *Servicemen's Fund* notes the legislative nature of investigation, it reiterates that the subject must be one on which "legislation could be had." [66] Brick's testimony at the contempt trial ultimately may be explained away to the satisfaction of a jury.[67] But it is plainly sufficient to preclude an automatic dismissal of the lawsuit

at the threshold, on the basis of legislative immunity.[68] "To hold otherwise would be to invite gratuitous injury to citizens for little if any public purpose." *Doe v. McMillan,* 412 U.S. at 316–17, 93 S.Ct. at 2027.

## IV. PROTECTED LEGISLATIVE CONDUCT

■ We turn to the allegations pertaining to staff inspection within the Subcommittee of the 234 photocopies, the use of the copies as the basis for issuance of subpoenas for some of the documents, and the procurement of contempt of Congress citations against plaintiffs. Here, we find further inquiry barred by the Speech or Debate Clause.

■ The law is clear that even though material comes to a legislative committee by means that are unlawful or otherwise subject to judicial inquiry the subsequent use of the documents by the committee staff in the course of official business is

---

**66.** *Doe v. McMillan* states the rule for inquiry into matters arguably relevant to legislative tasks. In *Doe* the Court cautioned that it had "no authority to oversee the judgment of the Committee . . . or to impose liability on its Members if we disagree with their legislative judgment." 412 U.S. at 313, 93 S.Ct. at 2025. The Court declined to second-guess a committee's decision to include names of specific children and descriptions of their conduct in the record of its hearings on the District of Columbia public schools and in a committee report. "The report stated that these materials were included to 'give a realistic view' of a troubled school and 'the lack of administrative efforts to rectify the multitudinous problems there.'" *Id.* at 308–09, 93 S.Ct. at 2022. Since the accounts of the students' conduct were broadly related to the subject matter of the committee's inquiry, the Court properly refused to enmesh itself in reviewing the usefulness or necessity of the degree and type of details included in the illustrative material assembled by the committee.

Here the McSurelys make no claim that names or descriptions of *arguably* extraneous activities should have been deleted by Brick or the Subcommittee from documents pertinent to the Nashville disturbances. Rather they claim that material dealing with intimate subjects completely foreign to the committee's inquiry was taken back to Washington. Of course, "the legitimacy of a congressional inquiry" is not "defined by what it produces." *Eastland v.*

*United States Servicemen's Fund,* 421 U.S. at 509, 95 S.Ct. at 1824. But knowing retention and transportation of highly private, embarrassing papers, in the absence of a *claim* of conceivable legislative interest, can serve no legitimate legislative function and can have "no relation to the business before" Congress.

As previously noted (see text at p. —— of 180 U.S.App.D.C., p. 1290 of 553 F.2d & note 49 *supra* ), Brick testified at the contempt trial that he did not concern himself with items in which he had absolutely no interest. But if his interest in taking personal items was of a personal nature, whether for his benefit or for the benefit of his superiors, rather than a legislative interest, there is no legislative immunity from suit.

**67.** Appellants suggest that Brick was merely "testifying to his ultimate conclusion that the private correspondence was unnecessary to the performance of his duties," rather than to the determination made at the time he decided to transport the documents to Washington. Reply Br. for Appellants at 5–6 n.6.

**68.** It has been clear since *Dombrowski v. Eastland,* 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967), that the rule that prohibits lawsuits with respect to legislative activity on mere speculative pleading does not operate to provide immunity when there has been a meaningful proffer that the conduct in question was not "essential to legislating."

privileged legislative activity.[69] In *Dombrowski v. Burbank,* 123 U.S.App.D.C. 190, 192–93, 358 F.2d 821, 823–24 (1966), this court refused to enjoin the chairman and chief counsel of a Senate subcommittee from using records that had been seized by state officials in an alleged conspiracy with the subcommittee. "Since the documents are now held by the Subcommittee, they are accessible to the [defendants] only by virtue of their officials positions with that body. We cannot prohibit, nor are we asked to prohibit, [their] use of the documents in the course of their official business for the Subcommittee; and neither do [plaintiffs] seek any restraint upon the Subcommittee itself." [70] We also held the defendants immune against answerability in damages for the issuance of subpoenas to obtain the records.[71] The Supreme Court upheld our disposition of the "claims which related to the take-over of the records by respondents *after* the 'raids.'" *Dombrowski v. Eastland,* 387 U.S. at 83–84, 87 S.Ct. at 1427 (emphasis in original). Similarly in *Gravel v. United States,* although the Court permitted grand jury inquiry as to third-party crime or criminal acts by the Senator or his aide "relevant to tracing the source of obvi-

ously highly classified documents," it barred questioning as to the Senator's or his aide's conduct at the subcommittee meeting where the documents were read into the record, the motives behind that conduct, communications between the Senator and his aide during the term of their employment which were related to the meeting or any other legislative act of the Senator, and any act not in itself criminal performed in preparation for the meeting. 408 U.S. at 628–29, 92 S.Ct. at 2628.

Likewise foreclosed is plaintiffs' claim of invasion of privacy based on retention and display of their private papers within the Subcommittee for non-legislative purposes.[72] Although the federal defendants are not immune from inquiry as to dissemination of the 234 photocopies to individuals or agencies outside of Congress, dissemination within the Subcommittee is privileged activity.[73] The mere retention— without dissemination or use—of the copies cannot be the subject of judicial inquiry. Such retention may be subject to abuse, but judicial inquiry on a claim that documents were retained beyond the time needed to determine relevancy to legislative purpose

**69.** The rule is different where Congress seeks the affirmative aid "of the Judiciary to enforce its will" in criminal prosecutions for contempt. In that context constitutional rights may be balanced against the claim of legislative privilege because the court's performance of the judicial function requires it to scrutinize "the predicates of the criminal prosecutions." *Eastland v. United States Servicemen's Fund,* 421 U.S. at 509–10 n.16, 95 S.Ct. at 1825. *See Tenney v. Brandhove,* 341 U.S. at 378, 71 S.Ct. 783; *Watkins v. United States,* 354 U.S. at 216, 77 S.Ct. 1173 (Frankfurter, J., concurring).

**70.** *Citing Hearst v. Black,* 66 U.S.App.D.C. 313, 87 F.2d 68 (1936), where this court refused to enjoin a congressional committee from using information obtained by having the Federal Communications Commission take possession of telegraph offices and examine wholesale private messages received and dispatched therefrom over a period of seven months. The court noted that a victim of the unlawful dragnet seizure of telegraph messages could not be held in contempt for refusing to answer questions based on the unlawfully procured information, and that an injunction could properly issue to enjoin such a trespass were it still in progress, but refused to exercise its equity power to

restrain use of material physically in the possession of the committee. *Id.* at 316, 87 F.2d at 71.

**71.** 123 U.S.App.D.C. at 193–95, 358 F.2d at 824–26.

**72.** Br. for Appellees at 7; Amended and Suppl. Compl. ¶¶ 18(b), 19, App. 44–45. *See* note 66 *supra.*

**73.** *See Doe v. McMillan,* 412 U.S. at 312–13, 93 S.Ct. 2018.

We are not suggesting that everything physically done within the Halls of Congress is immune to questioning. Legislative functionaries that execute a resolution authorizing an arrest, *Kilbourn v. Thompson,* 103 U.S. 168, 26 L.Ed. 377 (1881), or excluding a representative-elect, *Powell v. McCormack,* 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), without basis in congressional power are subject to judicial inquiry. However, under *Doe v. McMillan* the act of dissemination of otherwise actionable material is protected activity, at least absent concession by the disseminators that material was distributed for non-legislative purposes.

would embroil the courts in the kind of review of legislative performance that is prohibited by the Speech or Debate Clause.[74]

The same applies to the claim based on the Subcommittee's issuance of the two sets of subpoenas and attempt to enforce the second set by citing the McSurelys for contempt of Congress. The Subcommittee here employed proper process for information "on which 'legislation could be had.' "[75] We note that the subpoenas called for materials that were at least arguably relevant to its investigation, but did not call for the production of Mrs. McSurely's letter or any other demonstrably irrelevant private correspondence.[76] Under these circumstances *Servicemen's Fund* prevents further inquiry into plaintiff's charge that the Subcommit-

tee's purpose was to harass and intimidate them in the exercise of their First Amendment rights.[77] The Subcommittee's issuance of subpoenas is privileged activity, notwithstanding plaintiffs' bare allegation that the real purpose behind the subpoenas was to "cover-up" the earlier improper conduct by Brick, and the further assertion that had there been full disclosure the Subcommittee would not have issued the subpoenas, and the Senate would not have approved the contempt citations.[78]

## V. ON REMAND

We hold, as a matter of law, that appellants are entitled to summary judgment on the allegations in the amended complaint pertaining to the Subcommittee staff's inspection of the 234 documents that Brick

74. We note that Brick testified at the contempt trial that the 234 documents were maintained "by order of Senator McClellan" in Brick's personal file under lock and key, and that the personal letter to Margaret McSurely from Drew Pearson was displayed to Senator McClellan and then placed in a sealed envelope "to be opened only by John Brick, J. S. Adams, General Counsel and Senator McClellan." D.A., II, 729, 732–33. Defendant McClellan acknowledged this testimony in his affidavit. App. 60. In the absence of the kind of admission that was present with respect to Brick's selection and transportation of irrelevant material back to Washington, judicial inquiry must come to a halt.

75. *Eastland v. United States Servicemen's Fund,* 421 U.S. at 504–07 & n. 15, 95 S.Ct. at 1822–1823.

76. The subpoenas in issue are reproduced at App. 70–74. Concerning the scope of this subpoena, appellants state (Reply Br. 7–8):

[T]he Subcommittee subpoenas called for materials clearly relevant to its investigation, but did not call for the production of Mrs. McSurely's letter [8] or any other private correspondence.

[8] We have never seen this letter and have had no interest in attempting to discover it. However, if plaintiffs' contention that this letter was nothing more than a love letter, and was not relevant to any possible investigation into riots, is correct, it necessarily follows that the letter would not have

been subject to production under the subpoena. And any suggestion that the subpoenas were utilized to obtain production of such private correspondence would be totally unfounded.

77. The Supreme Court refused to cut back on "the absolute nature of the speech or debate protection" even in the face of allegations that First Amendment rights were being infringed by congressional action. 421 U.S. at 509–10, 95 S.Ct. at 1824.

*Servicemen's Fund* involved an attempt to enjoin issuance of a subpoena duces tecum by a Senate subcommittee. We think its rationale applies to an action for damages resulting from a subpoena that has issued, as opposed to an action maintained by the Government to prosecute non-compliance with a subpoena. *Compare id.* at 509–10 n. 16, 95 S.Ct. 1813.

78. *See Dombrowski v. Burbank,* 123 U.S.App. D.C. at 194, 358 F.2d at 825, where this court dismissed the claim that the subcommittee chairman and chief counsel were acting outside the scope of their authority because the records were subpoenaed without prior subcommittee authorization, although the subcommittee chairman approved in advance the action taken. We held that subsequent ratification by the full subcommittee was sufficient, given the subcommittee's longstanding interest in the matter at issue, to preserve defendants' immunity against liability in damages for issuing and executing the subpoena. *Wheeldin v. Wheeler,* 373 U.S. 647, 650–51, 83 S.Ct. 1441, 10 L.Ed.2d 605 (1963), was distinguished as a case involving service of a subpoena "which had been approved by no one, either before or after its issuance."

brought to the Subcommittee, the utilization of the information obtained by Brick as the basis for congressional subpoenas, and the issuance of contempt of Congress citations against the McSurelys. Since no allegation has been made as to conspiracy in the original raid of the McSurelys' home, appellants are entitled to dismissal on this point.

We leave for the District Court on remand the initial determination as to (1) whether any cause of action against defendants Brick and Adlerman survives their deaths; (2) whether Brick's inspection of the seized material put in Ratliff's possession under the three-judge court's "safekeeping" directive, and Brick's transport to Washington of copies of 234 documents, violated the McSurelys' rights under the Fourth Amendment; (3) whether Brick selected and transported to Washington copies of documents he knew to be wholly unrelated to the legislative inquiry, and, if so, whether such conduct was actionable under the applicable law; (4) whether any other federal defendants acted in concert with Brick in action for which he enjoys no legislative immunity; (5) whether any of the federal defendants distributed copies of documents in the Subcommittee's possession to individuals or agencies outside the Congress, and, if so, whether such distribution was actionable under the applicable law; and (6) other matters identified in this opinion as requiring further development. Of course, if Brick or the other appellants have defenses to liability, other than the claim of absolute immunity from suit, these should be pleaded and would be a matter for initial determination by the District Court.

Although plaintiffs have alleged Brick's involvement in possible actionable conduct with sufficient factual particularity to permit trial to proceed as to him, the record at present is silent on the involvement of defendants McClellan, Adlerman and O'Donnell "in any activity that could result in liability." *Dombrowski v. Eastland,* 387 U.S. at 84, 87 S.Ct. at 1427. Plaintiffs allege that the latter defendants were act-

ing in concert with Brick in the actions that are pertinent. If that is so, they enjoy no greater immunity for conduct not "essential to legislating" than Brick, their agent. Of course, an allegation is not proof. But at this stage of the case, given that the argument of parties thus far has been drawn in terms of whether or not the Speech or Debate Clause erects a complete barrier to this action, we are unable to say on the basis of the undisputed facts that the other federal defendants are constitutionally entitled to summary judgment excusing them from further inquiry, even though Brick is not. The path remains open for these defendants to make a renewed motion for summary judgment on the ground that the McSurelys have failed to adduce specific facts "which affords more than merely colorable substance," *Dombrowski v. Eastland,* 387 U.S. at 84, 87 S.Ct. at 1427, to the assertion of concert with Brick in conduct that survives the legislative immunity bar. Since the Speech or Debate Clause acts as an exclusionary rule and testimonial privilege, as well as substantive defense, plaintiffs must prove their case through evidence which "does not draw in question the legislative acts of the defendant member of Congress [and his aides] or [their] motives for performing them." *United States v. Brewster,* 408 U.S. at 526, 92 S.Ct. at 2544, *quoting United States v. Johnson,* 383 U.S. at 185, 86 S.Ct. 749.

## SUPPLEMENT

Since our opinion anticipates many of the points raised in Judge Wilkey's opinion, we have decided not to retrace and interlard the body of the opinion with responsive material. We think it more useful to provide focus through the vehicle of a supplemental statement.

### I.

Most of Judge Wilkey's characteristically vigorous opinion is beside the point. He assumes that the Fourth Amendment liability of Congressional investigator Brick is

premised on the acceptance and use of the fruits of the unlawful activity of another.[79] On the contrary, our ruling is based on the investigator's own unlawful activity—the inspection and transportation of copies of materials in violation of a three-judge federal district court order.

We need not be detained by Judge Wilkey's traverse of cases like *Calandra, Elkins* and *Sherwin.* What makes all the difference in the world is that in this case a Federal court did issue an order, did make a determination that papers and other material had been seized by state authorities under an unconstitutional statute, did assert custody over the seized documents, and that investigator Brick examined them and took copies without resort to the procedures of the Federal court that had intervened and asserted control over the materials. It would not be analysis but legerdemain, to characterize Brick's actions in violation of a court order as part of a subsequent "transfer" inherently unreachable under the

Fourth Amendment. The case is entirely different from *Calandra.*[80]

We do not think it can be seriously argued that conduct like Brick's, compounding his own inspection of documents with transportation to permit access by others, fails to state a Fourth Amendment violation in a case where there has been a court order that establishes a custodian with possession (pending appeal) of papers seized unlawfully from plaintiffs, and provides that any other access requires court approval (in the absence of permission by plaintiffs).

Judge Wilkey misses the point in his argument (e. g., at p. —— of 180 U.S.App. D.C., p. 1316 of 553 F.2d) that Brick's activity involves no legal injury not already wrought by the state officials. Even assuming for discussion plaintiffs had no valid claim against any state officials for the seizure from their home, perhaps on the theory that the taking was under a warrant to enforce a state sedition statute not yet

79. Whether another agency of the Federal Government, *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); an agent of a state *Elkins v. United States,* 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960); or a private individual acting, without any governmental encouragement, *United States v. Sherwin,* 539 F.2d 1 (9th Cir., 1976) (en banc).

80. In *Calandra,* the wrong was "fully accomplished by the original search," 414 U.S. at 354, 94 S.Ct. at 623. Here the McSurelys claim that the investigator's conduct in violation of a court order worked a "new Fourth Amendment wrong." It is not simply a matter of the timing of the judicial determination of illegality. The gravamen of the McSurelys' complaint is that Brick acted in violation of the order of a court that had intervened on constitutional grounds with a ruling that entitled the McSurelys to immediate return of what had been seized, if the ruling were implemented immediately, and that accompanied a deferral of that consequence in order to avoid mootness, pending appeal to the Supreme Court, with an order restricting access to those seized materials.
 Judge Wilkey (at pp. ——–—— of 180 U.S. App.D.C., pp. 1318–20 of 553 F.2d) misconstrues our discussion of *Calandra,* and erroneously equates Brick's conduct with the situation in *Calandra.*
 In *Calandra* the grand jury got its access to the documents before there was any judicial

determination that they had been invalidly seized. The subpoena that it issued as a result of this access could not be quashed, held the Court. (Of course, the grand jury's access was handled by the prosecutor who acted as its aide.) Likewise, in the present case, the court would not quash the subpoena issued by the subcommittee as a result of the access it got to the documents. But the person(s) who provided that access did so after a judicial determination of invalidity, and that makes the difference from *Calandra* in determining liability in damages. This matter of timing was identified by Justice Powell when he distinguished *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), in part because "prior to the issuance of the grand jury subpoenas, there had been a judicial determination that the search and seizure were illegal." 414 U.S. at 352 n. 8, 94 S.Ct. at 622.
 The facts show that the grand jury's subpoena to *Calandra*—obviously issued *before* the suppression hearing of August 27, 1971, or the trial court ruling of October 1, 1971 granting Calandra's motion to suppress—was explicitly identified by the Court as an instance when the grand jury "subpoenaed Calandra in order to ask him questions *based on the evidence seized during the search of his place of business on December 15, 1970.*" 414 U.S. at 341, 94 S.Ct. at 616 (emphasis added).

held unconstitutional, plaintiffs may nevertheless maintain an action against Brick for his inspection and taking of papers after the federal court held invalid both the state statute and the continued retention of the seized materials by the state prosecutor except as a court custodian.

Judge Wilkey's opinion rests on a restricted reading of the court's "safekeeping" order of September 14, 1967.

Physical preservation of the *res*—during the course of a potential appeal to avoid mootness problems—was one of the court's concerns but by no means the only or even predominant concern. This emerges from an examination of the decision itself. The order accompanied a full-scale decision on the merits, granting substantial relief to the McSurelys on First Amendment grounds. In addition to declaring the state sedition statute unconstitutionally vague and overbroad, the court enjoined state prosecutions pursuant to the statute under the authority of the landmark *Dombrowski v. Pfister,* 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). The injunction issued largely because the court perceived a concerted effort by state and county officials to "freeze" the McSurelys and their associates out of Pike County. The court's language on this point is illuminating. "The conclusion is inescapable that criminal prosecutions were instituted, at least in part, in order to stop plaintiffs' organizing activities in Pike County. That effort has been successful. Not only has there been the 'chilling effect' on freedom of speech referred to in *Dombrowski,* there has been in fact a freezing effect." *McSurely v. Ratliff,* 282 F.Supp. 848, 852–53 (E.D.Ky.1967).

Judge Wilkey seeks to avoid the absurdity of a construction that would make this a mere "hold safe" order by repair carpentry, that the order at least in "spirit," may have required Ratliff to deny access to some "prosecutors" (p. —— of 180 U.S.App.D.C., p. 1311 of 553 F.2d), yet authorized him to grant access to anyone he deemed to have a legitimate interest (p. —— of 180 U.S. App.D.C., p. 1316 of 553 F.2d).

Given the context of the court's order, and its sensitivity to the First Amendment dimension of the actions taken by Kentucky authorities against the McSurelys, the sensible reading of the court's order, and the one adopted by this court in 1972,[81] is that Ratliff was directed to hold the materials as co-custodian for the court, during the period allowable for appeal, not with a right to grant access to others as he might determine in the exercise of personal discretion, but with questions of access to or other use or disposition of the materials reserved for determination by the court. Ratliff himself was apparently of this view, for he tried to obtain the court's permission before acceding to Brick's request for access. There is nothing in the record as it stands that rebuts this reading of the "safekeeping" order.

Judge Wilkey's opinion makes much of the court's orders of October 30 and December 13, 1967, issued before the time to appeal the September 14 ruling had expired. These orders pertained to a motion by the McSurelys to enjoin Ratliff from releasing any of the seized materials called for by the Subcommittee subpoena.[82] The court refused to block the Subcommittee's access by way of subpoena to the seized materials. Judge Wilkey's opinion assumes that this refusal to interfere with a facially proper subpoena of a Congressional subcommittee

---

**81.** Our court in 1972 may or may not have had before it the text of all the orders of the Kentucky three-judge court, but there is no doubt that it was fully aware of their thrust. This matter was adequately summarized in the Sixth Circuit decision ordering the return of the documents once the time to appeal had expired. *McSurely v. Ratliff,* 398 F.2d 817, 818 (6th Cir. 1968).

As to the Judge Wilkey's attempt to dismiss this court's earlier characterization of the scope of the "safekeeping" order as dicta, *see supra* n. 44, or as bad law after *Calandra, see supra* pp. ——–—— of 180 U.S.App.D.C., pp. 1318–19 of 553 F.2d & nn. 61 & 80.

**82.** The October 30, 1967 order may not make specific reference to the word "subpoena," but the motion of the McSurelys was unmistakably addressed to the subpoena that Brick had served on October 17.

"on a subject on which legislation could be had" is a sub silentio approval of the challenged activity of Brick prior to and in the absence of a subpoena or ruling, and establishes that Brick's activity had not contravened the court's order.

Out of the blue, Judge Wilkey's opinion conjures up a judicial determination by the three-judge court. It does not even appear that Brick's pre-subpoena investigation and transportation of copies of the seized documents had been raised as an objection to the subpoena.[83] More importantly, Judge Wilkey's opinion does not claim that applicable legal doctrine established then or establishes now that prior invalidity under the Fourth Amendment in obtaining documents—however vulnerable in a damage action—would have been material as authorizing a court to interfere with a subpoena of a subcommittee. There is neither a statement by the three-judge court nor any basis for implication that the three-judge court considered it material.

The Supreme Court ruled in *United States Servicemen's Fund v. Eastland,* 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975), that notwithstanding allegations of First Amendment violations the judiciary may not prevent implementation of a Senate subcommittee subpoena duces tecum directing certain banks to produce records of a particular account. We are not called upon to determine whether *Servicemen's Fund* applies when the records sought are in the custody of the court. It is enough—on this motion for summary dismissal of the damage action—to say that the action of the three-judge court in declining the McSurleys' invitation to hamper a subpoena investigation of a coordinate branch of government, *cf. Hearst v. Black,* 66 U.S. App.D.C. 313, 87 F.2d 68 (1936), is not inconsistent with its having a view that the McSurelys could have redress in damages for Brick's pre-subpoena conduct.

We hold that the District Court correctly denied the motion to dismiss or for summary judgment on the claim of a Fourth Amendment violation by Brick and the federal defendants who acted in concert with him. The showing made by the McSurelys suffices to avoid any absolute bar to suit, particularly when it is compared with the proffer, held sufficient in *Dombrowski v. Eastland,* 387 U.S. 82, 84, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967), involving a possible misdating of a committee subpoena with the result that the date of the subpoena coincided with the date of the original search and seizure by state authorities. On the record as it presently stands, Brick is not entitled to demand absolute immunity from suit as a matter of law, and we need not consider the possibility that the defense may hereafter find and adduce material from the record of the three-judge court that would advance the kind of speculation raised by Judge Wilkey.[84]

## II.

We turn to the McSurelys' privacy claim against Brick. Since this appeal presents only the threshold question of immunity, we have no occasion to indicate whether they

---

**83.** See *supra* pp. ——–—— of 180 U.S.App. D.C., pp. 1292–93 of 553 F.2d & n. 59. Ratliff testified he contacted one of the judges, but we do not know what in fact transpired. His oblique assertion, "I had my permission" may be relevant to a defense of good faith on the merits, but it hardly establishes that he had approval of the court. Any failure on the McSurelys' part to raise Brick's activity as a ground to block compliance with a subpoena, assuming it were cognizable, would not be an absolute bar to this private action for damages from Brick's pre-subpoena activity.

**84.** Although the record as it stands would support a finding of Fourth Amendment violation, we are not now decreeing such a judgment. The parties have not even filed in this case copies of the record that was before the three-judge court and Sixth Circuit. The orders of the three-judge court relied on by Judge Wilkey—and which we find fall short of the claims made by him—were obtained after oral argument en banc by Judge Wilkey.

Our judgment allows opportunity for the parties to make a systematic search of the proceedings of the three-judge court and to present to the trial court proof and arguments based thereon.

have pleaded a good cause of action or there are defenses on the merits. *Doe v. McMillan,* 412 U.S. 306, 325, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973).

Assuming for discussion that the McSurelys do not have a cause of action for constitutional tort, because of the reasoning of *Paul v. Davis,* 424.U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), or other authority, they may have a good claim for common law invasion of privacy that is maintainable in federal court under the doctrine of pendent jurisdiction, *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), and may accordingly move to amend their pleadings to conform to the evidence, F.R.Civ.P. 15(b). Under *Doe v. McMillan, supra,* these are matters that should not be decided on a motion that did not present anything more than a threshold barrier of absolute legislative immunity from suit.

Of course, Brick's concession cannot bind the Subcommittee, its members, or other of its agents. As to the privacy claim against Brick, Judge Wilkey speculates as to plausible legislative purposes behind Brick's seizure of a love letter and other personal documents. On the record as it stands, Brick by his own mouth conceded that "many" of the items he brought to Washington were unrelated to his duties. Conceivably this testimony may be explained away. As of now we are not aware that any claim of legislative need has been interposed for the love letter from Drew Pearson to Magaret McSurley—a letter that

Brick testified he held in his personal file, under lock and key, on direction of Subcommittee chairman McClellan.[85] Certainly the record as it stands does not entitle Brick to summary judgment.

WILKEY, Circuit Judge, with whom joined DANAHER, Senior Circuit Judge, TAMM, MacKINNON and ROBB, Circuit Judges, dissenting:

The majority remands this case for trial on three of the seven claims advanced by the plaintiffs McSurelys, on the ground that, if established, the actions of the defendant Senator and his aides fall outside the protection of the Speech or Debate clause. With regard to one of these subjects of inquiry, the alleged dissemination of the McSurely documents outside the legislative sphere, we are in accord. This was the result reached by the panel opinion.[1] With the majority action on two of the asserted claims of the McSurelys made the subject of the remand, the inspection and transportation of the McSurely documents from Pikeville, Kentucky to Washington, D.C., we are in serious disagreement.[2]

The bottom line of the McSurelys' suit on these two points must be that the actions of the Senate investigator Brick constituted an "unreasonable search and seizure" within the meaning of those words in the Fourth Amendment, for if they did not, the investigative actions of the Senate aide were admittedly[3] protected by the Speech or Debate clause.[4]

---

**85.** Senator McClellan's affidavit is silent on this point. App. 60. There is no indication in the present record that legislative use was made of the letter in question. *See supra* n. 74.

**1.** 521 F.2d at 1048. This was No. (7) of the seven categories of claims listed in the majority opinion (p. —— of 180 U.S.App.D.C., p. 1284 of 553 F.2d) and in the panel opinion, 521 F.2d at 1033.

**2.** "(2) The inspection by Brick of those unlawfully seized materials. (3) The transport by Brick of copies of 234 documents to Washington." Majority Op. at —— of 180 U.S.App. D.C., p. 1284 of 553 F.2d. With regard to "(1) The unlawful search and seizure of the McSurelys' books and papers by Kentucky au-

thorities," the majority holds that the "appellants are entitled to dismissal at this juncture of any claim that they participated in the initial unlawful seizure by the Kentucky officials." (p. —— of 180 U.S.App.D.C., p. 1288 of 553 F.2d). We agree. With regard to claims (4), (5), (6), the majority holds that "We find further inquiry barred by the Speech or Debate clause." (p. —— of 180 U.S.App.D.C., p. 1296 of 553 F.2d). We agree that this is "privileged legislative activity."

**3.** The majority states the principle, which we endorse, that investigative activity is so essential to the legislative process that it is ordinarily absolutely privileged, provided, of course, that the basic conditions of authorization and pertinency are established. Maj.Op. at —— –

Many of the key facts have been expressly stipulated [5] by counsel for the McSurelys and the United States and many others appear uncontradicted from prior testimony. All the relevant court orders and decisions are before us, in addition to the relevant uncontroverted facts. From all this settled evidence, as we shall demonstrate, it can be determined as a matter of law that the inspection and copying did not violate the custody order. Thus, it is likewise not necessary to supplement the text of the motions and the orders with further findings about the details of prior arguments, as the majority suggests would be "benefi[cial]" for an understanding of the custody order.[6]

Indeed, the plaintiffs McSurelys make no claim on the issues of the inspection, copying, and transport of the documents that any additional facts need be or can be brought out. The McSurelys' claim rests on the argument that the admitted actions violated their rights under the Fourth Amendment and thus were not protected by the Speech or Debate clause. It is this argument which the trial court sustained in denying defendants' motion for summary judgment and with which we understand the majority here to agree. The defense left to the Senator and his aides on trial thus would be a good faith defense justifying admitted actions, which the trial court and this court find did constitute violations of the Fourth Amendment.

This is not the full immunity of members of Congress and their aides, engaged in carrying out legislative duties, guaranteed by the Speech or Debate clause of our Constitution. The disposition of the case here by the *en banc* majority requires the Senate defendants to undergo trial in the District Court,[7] precisely that against which the Speech or Debate clause was designed to protect. Of course, the defendants will have the protection of qualified immunity, as in *Bivens v. Six Unknown Agents*[8] or

—— of 180 U.S.App.D.C., pp. 1286–88, of 553 F.2d. But this absolute privilege can be lost where the investigator engages in a search and seizure in violation of the Fourth Amendment. *Dombrowski v. Eastland,* 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967), cited by the majority at —— of 180 U.S.App.D.C., p. 1287–88 of 553 F.2d.

4. The McSurelys also assert a claim of violation of privacy against Brick alone (Maj. op. ——–—— of 180 U.S.App.D.C., pp. 1294–96 of 553 F.2d) based on the alleged irrelevancy of some of the documents inspected, copied, and transported by Brick. If cognizable at all by a federal court, this claim would be based on a Fifth Amendment due process violation. As we show later, Part IV, the Supreme Court has recently held in *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (23 March 1976) that such common law tort actions can not be based upon Fifth Amendment or other constitutional grounds.

5. See Maj. op., note 7. Brick has testified to these facts in the previous trial of contempt of Congress, and he is now dead. Commonwealth Attorney Ratliff has testified to these facts; his testimony stands uncontradicted, and, indeed, is relied upon by the majority opinion, and by the McSurelys. The majority does characterize Ratliff's testimony on one point, his conversation with Judge Moynahan, as "oblique." Maj. op., —— of 180 U.S.App.D.C., p. 1292 of 553 F.2d, note 54. But even to the extent that this characterization is fair and more testimony by Ratliff or Moynahan would amplify the conversation, a finding of actual consent is not necessary to a decision on the scope of the custody order. If the inspection and copying are found to be violations of the Fourth Amendment, then the resolution of Ratliff's and Brick's claims of good faith immunity from damages may be aided by fuller testimony on efforts to obtain judicial consent. Here, however, on the issue of violation, we believe that the record shows that Brick and Ratliff acted in conformity with the orders of custody. A further finding of actual consent would be only cumulative and does not justify a remand.

6. Maj. op. at —— of 180 U.S.App.D.C., p. 1293 of 553 F.2d note 59.

7. We discuss later how the nature of the remand here erodes the principle of the Speech or Debate clause.

8. 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). *See also Bivens v. Six Unknown Agents,* 456 F.2d 1339 (2d Cir. 1972) (on remand).

*Scheuer v. Rhodes.*[9] Yet, as Justice Powell so recently wrote in *Imbler v. Pachtman:*

> The procedural difference between the absolute and the qualified immunities is important. An absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity. The fate of an official with qualified immunity depends upon the circumstances and motivations of his actions, as established by the evidence at trial.[10]

The issue here, as it was in the trial court on motion for summary judgment by the Senate defendants, is on the law. While the majority at the outset of their opinion states "[t]he sole issue here is whether the federal defendants enjoy absolute immunity under the Speech or Debate Clause,"[11] their analysis and ours make clear that the absolute immunity of the Speech or Debate clause applies unless there was a violation of the plaintiffs' Fourth Amendment right to be free from "unreasonable searches and seizures."

After a tangential approach to this basic underlying issue,[12] the majority opinion does refer to Brick's "searching-taking" (p. —— of 180 U.S.App.D.C., p. 1292 of 553 F.2d), the "search and seizure of Brick" (p. —— of 180 U.S.App.D.C., p. 1293 of 553 F.2d), and then asserts flatly "two separate, independent searches and seizures took place here" (p. —— of 180 U.S.App.D.C., p. 1294 of 553 F.2d).

With this holding our colleagues make new law. The transfer from one investigative agency to another is not a "separate, independent search and seizure," and, as we show later, the rationale of all the Supreme Court "silver platter" decisions[13] and the recent *en banc* specific holding of the Ninth Circuit in *United States v. Sherwin*[14] are directly contrary.

New law it is, but law absolutely necessary to the majority's holding that the McSurelys' Fourth Amendment rights were violated here, for without an "unreasonable search and seizure" by the Senate aide his investigative activities and related acts by his superiors are admittedly protected by the Speech or Debate clause. To see how the Senate investigator's "Inspection and Transportation of Documents Held in 'Safekeeping' by Court Order"[15] could never, on all logic and precedent, be held an "unreasonable search and seizure" within the Fourth Amendment, it is important to give

---

**9.** 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

**10.** *Imbler v. Pachtman,* 424 U.S. 409, 419 n.13, 96 S.Ct. 984, 989, 47 L.Ed.2d 128 (1976).

The McSurelys have obviously employed a *counter-offensive technique* here. "The action for damages presently under consideration was originally filed in the District Court for the District of Columbia on March 4, 1969, the same day that the McSurelys appeared before the Subcommittee." (Majority op. —— of 180 U.S.App.D.C., p. 1283 of 553 F.2d). To the extent that members of Congress and their staff can be embroiled in defending private suits for damages, arising out of their legislative activities, to the same extent may the more timid members of Congress be discouraged in carrying out their duties. The same counter-offensive technique could likewise be employed against judges, prosecutors, and other public officials if hitherto established absolute immunity is allowed to be cut down, as the majority opinion does here, to only a qualified immunity.

**11.** Maj. op. —— of 180 U.S.App.D.C., 1283 of 553 F.2d.

**12.** With perceptible reluctance the majority initially characterizes the actions of Brick as being "a *wrongful inspection and transportation* of documents (causing constitutional injury) which were independent of the initial raid by Kentucky officials" (maj. op. ——–—— of 180 U.S.App.D.C., 1288–89 of 553 F.2d, emphasis supplied) and, later states "Brick committed an independent Fourth Amendment violation by his *unauthorized inspection and transportation* back to Washington of the 234 documents." (Maj. op., —— of 180 U.S.App. D.C., 1289 of 553 F.2d, emphasis supplied).

**13.** *E.g., Lustig v. United States,* 338 U.S. 74, 78–79, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949).

**14.** 539 F.2d 1 (1976).

**15.** Maj. op. at ——–—— of 180 U.S.App.D.C., at 1286–94 of 553 F.2d.

a detailed chronological description of these events, putting in proper perspective the actions by the Kentucky officials, the Senate investigators, and the United States courts.

## I. SEQUENCE OF ACTIONS BY KENTUCKY OFFICIALS, SENATE INVESTIGATORS AND UNITED STATES COURTS

Under authority of a judicial warrant charging seditious activities against the Commonwealth of Kentucky in violation of K.R.S. 432.040, on 11 August 1967 officials of Pike County arrested the McSurelys and seized a large volume of books, posters, pamphlets, and other private and published documents found in their home. Immediately following their arrest the McSurelys filed a complaint in the United States District Court for the Eastern District of Kentucky, challenging the constitutionality of the Kentucky sedition statute and requesting that the matter be heard by a three-judge court.[16] On 17 August a hearing was held before U.S. District Judge Moynahan, at the close of which an order was entered denying plaintiffs' motion for a temporary restraining order, denying plaintiffs' motion to impound the material seized by the Commonwealth of Kentucky, and granting the motion for a three-judge court.[17]

On 1 September 1967 a hearing was held before Combs, Circuit Judge, and Gordon and Moynahan, District Judges, sitting as a three-judge District Court in Pikeville.[18] Following the hearing an order was issued on 11 September 1967, recording among other events, "Mr. Kuntsler then moved the Court to direct the Marshal to impound the material seized by the Pike County Sheriff and to direct the defendants to safe guard such materials so seized as may be in their custody and control." Pursuant to this request of plaintiffs' attorney, the order recited, "The parties having agreed thereto, it was further ordered by the Court that the material, literature, and all objects seized herein shall be kept in the custody of the defendant, Thomas B. Ratliff, and that same shall be made available to the United States Marshal for the Eastern District of Kentucky; and that said United States Marshal and the defendant, Thomas B. Ratliff, shall forthwith make an inventory thereof and file same in the record herein." The court further ordered that Ratliff should return to the plaintiffs "such personal articles and property as he does not deem material to the investigation and prosecution herein."

On that same day, 11 September, the grand jury of Pike County returned an indictment against the McSurelys charging them with seditious activities against the Commonwealth in violation of K.R.S. 432.-040.

However, on 14 September the three-judge U.S. District Court rendered its decision holding K.R.S. 432.040 facially unconstitutional and enjoining state prosecution of the McSurelys.[19] In the final paragraph of its order the three-judge court stated,

> It is further ordered that *all books, papers, documents, and other material now in the custody of the Commonwealth Attorney* of Pike County, Ratliff, reflected by the Inventory filed in this action *continue to be held by him in safe keeping until final disposition of this case by appeal or otherwise.*[20]

---

**16.** Civil Action No. 1146. In addition to Thomas B. Ratliff, Commonwealth Attorney, the other defendants were Perry A. Justice, Sheriff of Pike County, Grover Atkins, Jailer of Pike County, and Robert L. Matthews, Attorney General for the Commonwealth of Kentucky.

**17.** Order of 17 August in No. 1146, signed by Moynahan, J.

**18.** Pursuant to order of 30 August 1967 issued at Lexington, Kentucky.

**19.** The U.S. Court also ordered that "all the plaintiffs be placed under bond to this court in the amount of five thousand dollars ($5,000.00) each on their own recognizance to make themselves amenable to the further orders of this court."

**20.** In explanation of their order the judges issued opinions on 18 and 20 October. 282 F.Supp. 848 (E.D.Ky.1967). The language used in the opinion refers to Commonwealth Attorney Ratliff's custody of the documents, but

The wording of this order, which established the nature of the Commonwealth Attorney's custody two weeks before any inquiry was made by the Senate Subcommittee re the documents, and the wording of the order of 30 October, in response to the McSurelys' effort to bar Senate access to the documents, along with the intervening meeting of Ratliff with Judge Moynahan, are vital to an understanding of the legitimacy of the actions of both Ratliff and Brick.

For the first time, according to the record in this and all other related cases, an employee of the United States Senate then took action in regard to the McSurelys. On 25 September 1967 Lavern Duffy, Assistant Counsel to the Permanent Subcommittee on Investigations (Subcommittee) of the Senate Committee on Governmental Operations (Committee), called Commonwealth Attorney Ratliff by telephone from Washington to inquire about the seized items.[21] On Sunday, 8 October John Brick, an investigator employed by the Senate Committee and assistant to Duffy, came to Pikeville. After Brick explained to Ratliff the purpose of the Senate investigation, and confirmed that the McSurely material contained information relating to the activities of a number of organizations in which the Subcommittee was interested, on the evening of that same day Thadeus Scott, Commonwealth Detective, delivered to Brick in his motel photocopies of some of the seized documents. On the following morning, 9 October 1967, Brick was taken to the Pike County Court House, where he examined the seized items for about one hour.[22] These were located in the walk-in vault in the Commonwealth Attorney's office (Ratliff's office), where Ratliff had been instructed by the United States District Court to keep the material.[23] Later that day Brick inspected the file of the three-judge court action in the U. S. Court House. On 12 October Brick returned to the vault in Ratliff's office where, again accompanied by Dotson (Assistant Commonwealth Attorney) and Scott, he examined the seized material for about four hours and for the first time took notes. He then returned to Washington, taking with him photocopies of 234 of the documents.[24]

A very important event took place before Commonwealth Attorney Ratliff permitted even the Senate investigator access to the documents. Ratliff testified,

> Before that was done, however, I made strenuous efforts to contact one or all of the three judges, and I couldn't find Judge Combs. I couldn't find Judge Gordon, and I want to say, Sir, with certainty that I believe that it was at this point that I did talk with Judge Moynahan. I found him, I think, at his mother's . . .. There was no secret as to what happened. I was very open about it and it was a Senate investigator and he identified himself with the credentials and he took none of the material. None of the material was taken other than the copies that he used.[25]

As to what happened when he talked with Judge Moynahan, Ratliff further testified,

---

nowhere is there implied secrecy or confidentiality or any other object other than the preservation of the documents for such purposes as may be relevant in the legal proceedings in the federal and/or Kentucky courts.

**21.** Testimony of Thomas B. Ratliff, in the trial of Alan and Margaret McSurely for contempt of Congress before U.S. District Judge John Lewis Smith, Jr., 24 June 1970 (*United States v. McSurely*, No. 24,812 and 24,813, (D.D.C.1970), (D.A. 401 and 402). *Rvsd. and Rmnd.,* 154 U.S.App.D.C. 141, 473 F.2d 1178 (1972). In the Kentucky three-judge court case plaintiffs stipulated that Duffy had no contact with Ratliff until this telephone call. Stip. 3, App. 20. In

an affidavit attached to the defendants' motion for dismissal or summary judgment, Senator McClellan flatly denied any participation of any sort in the search and seizure of 11 August by the Kentucky authorities.

**22.** Stip. 9, App. 20–21.

**23.** *United States v. McSurely, supra,* note 21, D.A. 403–04.

**24.** Stip. 12, App. 21.

**25.** *United States v. McSurely,* D.A. 406.

Q. Did you permit your assistants to permit Mr. Brick of the McClellan committee to examine and photograph this material after you had represented to the Court that you would keep it inviolate as the custodian with the United States Marshal? . . .

A. The answer is that I assume that he did see the material, Mr. Combs. I was not present. *I had my permission and I gave members of my staff permission to do that on the condition that none of it be removed.*[26]

. . . . .

Q. Did you not contact your custodian, the U.S. Marshal, to see if he would agree that Mr. Brick may examine and photograph the material?

A. No, Sir, *I contacted the federal bench.*[27]

On 16 October, at the direction of Senator McClellan, Chairman of the Subcommittee, Brick prepared subpoenas for the original McSurely documents still in Ratliff's possession which the Senator had determined would be of value to the Subcommittee's investigation. On the following day, Brick was in Kentucky and informed Judge Moynahan by telephone of the subpoenas prior to service on Ratliff, Kraft, (the U.S. Marshal) and the McSurelys.[28] On 18 October plaintiffs filed motions with the three-judge U.S. District Court seeking orders blocking Ratliff from releasing the seized material to the Subcommittee and directing him to return those materials to the McSurelys.

The action of the three-judge U.S. District Court on this effort of the McSurelys to obtain the release of their documents and to bar Subcommittee access to them was

unequivocal. On 30 October 1967 the court issued an order, the complete text of which is:

*The motion* of the plaintiffs, Alan McSurely, Margaret McSurely, and Joseph Mulloy, *that the materials now in the custody of the Commonwealth Attorney of Pike County be returned to them at this time is overruled.*

The motion of plaintiffs for a restraining order enjoining defendants from releasing such of the materials as are desired by a Committee of the United States Senate is overruled.

*The parties* to this action and the officers of this Court *are directed to cooperate with the Senate Committee in making available such of the materials, or copies thereof, as the Committee considers pertinent to its inquiry*; but until time for appeal is expired, this will be done in such manner as to keep intact those materials that may be pertinent to the appeal of this case. (emphasis added).

On 1 November the court denied plaintiffs' motion for rehearing and reconsideration of the 30 October order, but granted a twenty-four hour stay in order that plaintiffs could apply to the Supreme Court for review of the District Court's order. Pending this Supreme Court review the District Court further ordered "that the material in question shall not be removed from the custody of the Commonwealth Attorney of Pike County, Kentucky, and copies thereof shall not be made on or before 2:00 p. m. Eastern Standard Time, November 2, 1967."

The history of that Supreme Court application[29] is referred to in the final order of the U.S. District Court of 13 December 1967, which recites,

---

26. *Id.,* D.A. 407 (emphasis added).

27. *Id.,* D.A. 408 (emphasis added). The testimony about this conversation has, as noted, been taken from the court record in another proceeding. Our conclusion about the nature of the custody orders in this case does not rest solely on this testimony, however, but is based instead upon the uncontroverted facts of this case, *e. g.,* the language of the order of 30 October 1967. We have quoted from this testi-

mony only as a further, cumulative demonstration that the three-judge court never meant its custody order to be a secrecy order.

28. Stip. 13, App. 21.

29. See 389 U.S. 949, 88 S.Ct. 313, 19 L.Ed.2d 358 (1967).

On November 10, 1967, Mr. Justice Stewart, for the Supreme Court, granted an emergency relief to the extent that the *documents in issue remain in their then custody* until this Three-Judge Court might hear and rule upon the factual and legal objections of the plaintiffs to the validity of a subpoena duces tecum of the Senate Committee.

Whereupon, on December 5, 1967, this matter came on for hearing on said objections before this Three-Judge Court. . . . IT IS HEREBY ORDERED that the objections of the plaintiffs to the subpoena duces tecum of the Senate Committee be and the same are hereby overruled, AND IT IS FURTHER ORDERED that the defendant Ratliff, Commonwealth's Attorney, Pike County, Kentucky, be and he is hereby ordered and directed, subject to the hereinafter stay provisions of this order, *to comply with the subpoena duces tecum of the Senate Committee by allowing said Committee representatives to photograph copies of any of the desired books, papers, documents and other materials now in his possession under order of this Court.* . . . (emphasis added).

A stay of five days before Ratliff should comply with the Senate subpoena duces tecum was granted to allow plaintiffs to apply to the Supreme Court again.

On 20 January 1968 the Supreme Court, again per Justice Stewart, stayed the order of the three-judge court "to the extent that the seized documents shall remain in custody," [30] but conditioned the stay upon the filing of an appeal to the Supreme Court. (The order being appealed was the order of 30 October, not the order of 14 September). The McSurleys thereafter submitted their jurisdictional statement and the Solicitor General responded. On 18 March 1968 the entire Court declined to hear the case, and dismissed the appeal with a *per curiam* order.[31] The stay was continued, however, for another thirty days so that the McSurelys could apply to the Sixth Circuit for a stay.

By the time their appeal to the Sixth Circuit was taken, the question of custody of the documents was in a different posture, as time for appeal from a three-judge court (order of 14 September) to the Supreme Court had expired, a distinction the Sixth Circuit was careful to make. All of the actions of the three-judge court after the order of 11 September through that of 13 December 1967 had been taken before time for appeal, first by Kentucky and then by the McSurelys, to the Supreme Court had expired.[32] The Sixth Circuit was now acting in a different setting. "The single issue *now* before this court is whether the District Court erred in refusing to return to their owners documents which were seized in aid of a prosecution under an unconstitutional statute, *now that the time for appeal has expired.* . . . The right of the court to retain possession of the seized documents, which include no contraband, has expired." [33] The Sixth Circuit thus ordered in July 1968 that the documents be returned to the McSurelys, but without prejudice to the right of the Subcommittee to proceed with the enforcement of its subpoenas.[34] The District Court thereupon directed Ratliff to return all of the seized materials, including all copies, which he did on 8

---

30. 390 U.S. 914, 88 S.Ct. 845, 19 L.Ed.2d 974 (1968).

31. 390 U.S. 412, 88 S.Ct. 1112, 19 L.Ed.2d 1272 (1968).

32. "After the decision of the [three-judge] District Court *and before the time for appeal had expired,* subpoenas duces tecum ordering production of certain of the seized documents were issued [16 October 1967] by the Permanent Subcommittee . . . ." 398 F.2d 817 (1968).

33. 398 F.2d at 818 (emphasis supplied).

34. 398 F.2d at 818: "[Q]uestions [as to the subpoenas] may be adjudicated under the appropriate procedure for challenging subpoenas of Congressional Committees."

November 1968.[35] Upon receipt of these materials the McSurelys were immediately served with new Subcommittee subpoenas similar to the original ones.[36]

## II. THE EXISTENCE OF A SEARCH AND SEIZURE—ACTIONS OF THE THREE–JUDGE DISTRICT COURT AS THEY BEAR ON THE ALLEGED VIOLATION OF THE CUSTODY ORDER

The six orders and one opinion of the three-judge United States District Court and the opinion of the Sixth Circuit at no time expressed disapproval of the Kentucky officials' actions in cooperating with the Senate investigators. The recital of the language of the District Court's orders in itself should be convincing that what Ratliff did in furnishing Brick the copies of the documents in his custody was thoroughly approved by that court. There is not one word in the language of the six orders, before or after Brick's inspection and copying of the documents in October 1967, which indicates that this was in the view of those judges in any way unauthorized or improper.

In addition to the language of the court in its orders, we have the testimony of

Ratliff that before permitting Brick's inspection of the documents he "did talk to Judge Moynahan," that "I had my permission and I gave members of my staff permission [to permit Brick to examine and receive photocopies of the material]," and "I contacted the federal bench."

### A.

Examining the orders more in detail, the order of the three-judge District Court on 14 September, making Ratliff's possession of the documents "custody" "in safe keeping" for the federal court, was a *preservation* order, *not* a *secrecy* order. The purpose of the court order was to preserve the documents for the use of whoever might eventually have a rightful interest in their use. On 14 September that party which might have such rightful interest was the Commonwealth of Kentucky, and the anticipated use was in a state prosecution against the McSurelys brought by indictment on 11 September.

The majority agree with us in our characterization of this critical order as simply a preservation order. "[*T*]*he purpose* of the 'safekeeping' order of the three-judge court *was to preserve the seized items* both for

---

**35.** Brick had returned copies of the 234 documents which Brick had taken with him to Washington to Scott, Commonwealth Detective, on 14 August 1968. Senator McClellan so stated in a Committee Hearing, App. 69. Brick so testified in the contempt prosecution, D.A. 730.

**36.** The McSurelys refused to comply, which gave rise to a prosecution for criminal contempt, conviction for which was ultimately reversed by this court. *United States v. McSurely,* 154 U.S.App.D.C. 141, 473 F.2d 1178 (1972). The writer of this opinion concurred only in the result reached therein by the majority. Arguing that application of the exclusionary rule to legislative hearings was wholly inappropriate, he voted to reverse the McSurelys' conviction, not because the subpoenas in question were based upon information obtained in an unlawful search, but because the Government had failed to make the necessary showing that all of the subpoenas' demands were pertinent to the Subcommittee's legitimate inquiry. 154 U.S.App.D.C. at 157–67, 473 F.2d at 1194–1204. The writer did *not* accept the panel majority's

characterizations of Brick's actions as a "search." . . . "Second, although Brick's examination of the McSurelys' documents may be characterized as an illegal subcommittee action, passive reception of illegally seized information from others cannot even properly be termed a 'search.' " . . . "Third, if Brick's examination of the documents can be termed a search, the inspection by one law enforcement agency of documents in the custody of another might, by extrapolation, also be characterized as a search—possibly illegal if the custodian agency's original seizure was held unlawful. The exclusionary rule now makes any descriptive nomenclature of the sampling of items on the tarnished 'silver platter' irrelevant with regard to admission of evidence in a criminal case. The evidence is barred in court without consideration of whether what the federal officers did was a search or not. However, troublesome questions would arise concerning the personal liability of law enforcement officers if a second 'search' were recognized in those circumstances." (at 165, 473 F.2d at 1202).

the McSurelys' benefit and for the orderly administration of the judicial process through 'appeal or otherwise,' . . ."[37] Again, "*The court* did not return the seized materials to their owners because it *sought to preserve the existence of the res* in the event of appeal to, and reversal by, the Supreme Court."[38] In the majority's characterization of the court's order, as in the court's order itself, there is no hint of secrecy, nor a suggestion that the preservation was exclusively for the benefit of the McSurelys.

*If preservation was the "limited purpose,"*[39] *how could "Brick's investigative activity outside of the channels established by the court violate[d] its order"?*[40] *The documents were preserved in their entirety. Brick never did anything but inspect, make notes on, and receive photocopies thereof.* It seems logically inescapable to us that for Brick's investigative activity to have violated the court's order—which the three-judge court itself never indicated that it did[41] —the order must be construed as a *secrecy* order, which is impossible from the very language of this and later orders,[42] and even the majority opinion makes no claim that the order of 14 September was other than a preservation order.

In the supplement to its opinion the majority does argue, however, that what the orders really meant was that Ratliff had to receive "court approval" before granting access to anyone.[43] Nowhere does the majority seek to base its interpretation upon the language of any of the orders, but it relies instead upon their "context."[44] The custody order of 18 October was issued in connection with an injunction against a state sedition prosecution which was "instituted, at least in part, in order to stop [the McSurelys'] organizing activities."[45] If Ratliff had allowed access to other prosecutors who would seek to "chill" their activities with similar charges, then perhaps he would have acted at variance with the spirit of the custody orders. But it is a distinct jump from that to cooperation with a United States Senate Subcommittee that was directed to investigate the causes of civil unrest in the country. Where the language of the orders put no express conditions on Ratliff beyond the preservation of the *res*, it would be a real strain of the context to find a secrecy provision as against a Congressional investigator.

It is significant that the three-judge court did by the terms of its 1 November 1967 order provide that "copies thereof shall not be made before 2 p. m." on the following day, in order to give the McSurelys time to seek a Supreme Court writ. This is the only language we can find in any of the six orders of the three-judge court which in any way implies either confidentiality or a preservation of the docu-

---

**37.** Majority op. at —— of 180 U.S.App.D.C., at 1291 of 553 F.2d (emphasis supplied.)

**38.** Majority op. at —— of 180 U.S.App.D.C., at 1292 of 553 F.2d (emphasis supplied.)

**39.** Maj. op. at —— of 180 U.S.App.D.C., at 1292 of 553 F.2d.

**40.** Majority op. at —— of 180 U.S.App.D.C., at 1291 of 553 F.2d.

**41.** Even if it be now construed as a secrecy order, Brick's "violation" could properly be termed only a contempt of that court (not this court), and not at all a search and seizure within the meaning of all precedents under the Fourth Amendment, as we make clear in II. B. *infra.*

**42.** The McSurelys themselves in their amended complaint in this very law suit, Paragraph 17, reveal that they recognize that the 14 September 1967 order of the three-judge court was not what the plaintiffs sought. "It did not, however, give immediate relief as to the documents which had been seized under the statute. It ordered instead that the documents and other seized material be kept in the custody of the defendant Ratliff 'to be held by him in safekeeping' pending a possible appeal by the defendant Ratliff, et al." App. 43.

**43.** Maj. Op. (Supplement) at —— of 180 U.S. App.D.C., at 1300 of 553 F.2d.

**44.** *Id.* at —— of 180 U.S.App.D.C., at 1301 of 553 F.2d.

**45.** 282 F.Supp. 848, 852 (E.D.Ky.1967).

ments for the principal benefit of the McSurelys. In other words, when the three-judge court wanted to do more than simply to preserve the documents in safekeeping, it said so explicitly by restricting the copying of the documents, but it did *not* impose any such restriction, and then for only a period of 24 hours, until seven weeks after its order of 14 September and three weeks after Brick had inspected and made copies of the documents.

No document directed by the Court to be held in custody was transferred to Brick. Every piece of paper was still there when Brick left Pikeville. Where was the violation? Where was the seizure?

### B.

It is highly significant that the federal court order of 14 September did not prohibit Ratliff or his aides from examining the documents for any purposes the Commonwealth of Kentucky might have had. Neither this order nor any subsequent order ever recognized any alleged privacy interest of the McSurelys by restricting access to the documents.[46] When the Senate investigators (Duffy and Brick) came on the scene, it was obvious that they also had a legitimate interest in examining the documents for the Senate's purpose.

While the order of the U.S. court on 14 September did not specifically direct Ratliff to make copies available to the Senate Subcommittee, yet there is nothing in that or the two previous orders which prohibits him from doing so, as there was in the 1 November order. Of course, as of 14 September the Senate Committee's interest had not come into the picture, so there was no need for the 14 September order (or any previous order) to speak to this issue.

When the issue of the Senate Subcommittee's use of the documents did arise, by the Senate investigator Brick contacting Commonwealth Attorney Ratliff, who in turn contacted U.S. District Judge Moynahan, it is evident that Ratliff only granted access to the documents to Brick after he "contacted the federal bench," after "I had my permission." But this informal contact is not why we disagree so strongly with the majority here. The majority position rests entirely on the conclusion that Brick's inspection of the documents in Ratliff's possession was totally "unauthorized" and therefore illegal because Ratliff held as custodian for a federal court. *The short but complete answer is that there was never any need for the court formally to authorize inspection, because the court by its orders had never forbidden, nor did it intend to forbid, any such inspection.*

Thus the three-judge court did not view the Senate subpoena as the fruit of any "poisonous tree," although it was and is, of

**46.** For example, would the court custody order have barred any examination of the material by outside parties to determine if it included contraband? It is an established principle that, "[t]he mere fact of the illegal seizure, standing alone, does not immunize the goods from forfeiture." *Bacall Imports, Ltd. v. United States,* 412 F.2d 586, 588 (9th Cir. 1969). See also *United States v. Jeffers,* 342 U.S. 48, 54, 72 S.Ct. 93, 96 L.Ed. 59 (1951). Indeed, such is the implication of the opinion of the Sixth Circuit, in ordering the return of the documents to the McSurelys, when it noted that the materials, "include[d] no contraband." 398 F.2d at 818. If, in the course of compiling an inventory, Ratliff had due reason to believe some material was contraband, he surely would have been entitled, without court permission, to call in outside parties to look at the suspect materials, *e. g.,* to test whether bags of powder were narcotics.

"If the property is subject to forfeiture, appropriate proceedings should be started expeditiously." *United States v. Wilson,* 176 U.S. App.D.C. 321 at 325, 540 F.2d 1100 at 1104 (1976). Given the state interest, then, in the speedy identification of contraband, it is unlikely that a custody order, by its silence, means to preclude reasonable inspection of seized goods by outside parties for this purpose. Imagine hypothetically that a Secret Service agent, in the same circumstances that involved Brick, had copied and inspected currency taken from the McSurelys in order to determine if it was counterfeit money subject to forfeiture under federal law, 18 U.S.C. § 492. Does the majority contend that such action by the Secret Service agent would constitute a "search" on his part in violation of the court orders? The Senate of the United States surely has rights equal to those of a federal investigative agency.

course, undeniable that the Senate subpoenas came directly from Brick's inspection of the original documents in Ratliff's possession and the 234 copies Brick took back to Senator McClellan. This is borne out by the first opportunity which the court had to speak to this issue, when the McSurelys moved on 18 October to enjoin Ratliff and other defendants from releasing the documents to the Committee. The three-judge court then ruled—emphatically against the McSurelys—in favor of continued Committee access to the documents. The language in the order of 30 October (as well as in the final order of 13 December, after the matter had gone to Mr. Justice Stewart) shows that what Ratliff had done with the Senate investigator was exactly what the court wanted him to do and to continue to do.

The majority responds that the dissent "makes [too] much" of the October and December orders on the ground that "[i]t does not even appear that Brick's pre-subpoena investigation and transportation of copies of the seized documents had been raised as an objection to the subpoena." [47] What the majority cannot deny, however, is that the pre-subpoena activity of Brick had been fairly and fully set out for the court. In its order of 13 December the three-judge court stated that at the hearing of 5 December, "[t]he interested parties plaintiff and defendant jointly tendered to this Court by stipulation or exhibit all evidentiary facts desired by them to be introduced upon the question . . .." It is in the stipulations of 5 December, of course, that the pre-subpoena activity of Brick is extensively described.[48] The revelation of this activity, however, did not dissuade the 3-judge court from its renewed order that

Ratliff cooperate with the Senate Subcommittee.

In fact, it is quite apparent that the Senate subpoena made no difference in the way the court viewed what its custodian, Ratliff, should do in assisting the Senate investigator. While the majority hangs its entire theory of liability to the McSurelys on the ground that Brick had neither a court order (discussed above) nor a Senate subpoena when he first inspected and took copies of the documents, yet the three-judge court in its 30 October order (quoted in its entirety at page —— of 180 U.S. App.D.C., at page 1284 of 553 F.2d supra) *never once mentioned the subpoena.*[49] So it is unquestioned that, in the eyes of the court which the majority emphasizes did have custody of the documents, neither a court order nor a Senate subpoena was necessary to authorize Ratliff to furnish copies to Brick.

## C.

Completely consistent with this, it is noteworthy that the Sixth Circuit in its opinion [50] nowhere expressed any disapproval of the three-judge District Court's actions in making the documents available while appeal to the Supreme Court was pending and the documents were properly in the District Court's custody and in Ratliff's immediate possession. It was only after time for appeal to the Supreme Court had expired that the Sixth Circuit ordered return to the McSurelys, with the proviso that the Senate Subcommittee could then serve them with its subpoena, which it did simultaneously with the return of the documents.[51] The District Court, having com-

47. Maj. Op. (Supplement) at —— of 180 U.S. App.D.C., at 1301 of 553 F.2d (footnote omitted).

48. See Maj. Op. at —— of 180 U.S.App.D.C., at 1281 of 553 F.2d n. 7. Nine of the fifteen narrative paragraphs of the stipulation concern the activities of Brick from his arrival in Kentucky to his pre-subpoena return to Washington.

49. Looking at the text of the 30 October order, if Brick had returned *without* subpoena, it is apparent that Ratliff would have no choice but to permit Brick to inspect and copy the documents.

50. 398 F.2d 817 (6th Cir. 1968).

51. As to by whom and for what purpose the documents were being held by Ratliff, the Sixth Circuit described it thus, "The District Court

pleted its business, had no right to retain the documents and was thus ordered to return them to their owners, the McSurelys. But the right of the McSurelys, either to obtain the documents or to prevent the Senate from looking at the documents or making copies of them, did not exist until the time for appeal had expired.

Taking this as the true posture of the case, it is inconceivable that a committee of the United States Senate could be frustrated in its objective of securing documentary evidence relevant to its lawful inquiry for a legislative purpose, by the documents being withheld from even a view by its investigator, on the ground that the documents were held in "custody," "in safe keeping," by order of the United States court pending the "final disposition of the case by appeal or otherwise." The Senate Subcommittee wanted the documents in October 1967, not after the federal case had completed its journey through the federal judicial system.

If it be objected that the proper route was for the Senate Subcommittee to issue a subpoena for the documents (as was ultimately done on 16 October 1967), we suggest that it is much more reasonable, and the method which we would expect a Senate committee to follow in conducting its business, to send an investigator to look over the documents then in the custody of the United States court to determine their relevance before issuing a committee subpoena.[52] This is exactly what the Senate Subcommittee and Brick did, and it seems to us entirely reasonable, if it be postulated that the Senate Subcommittee could have had access by lawful process to those documents while the litigation between Kentucky and the McSurelys was continuing.

What our colleagues would have the Senate do henceforth is abstain from any intelligent investigation, but issue blanket subpoenas for documents which might possibly be relevant. It appears to us much more sensible to inspect a vast quantity of documents, take photocopies of those the investigator deems possibly relevant to the committee for its appraisal, and then on the committee's own authority have subpoenas issued for the limited number which the committee itself deems relevant. This was exactly what was done in this case.

If it be objected that Brick should have applied for a formal order from the three-judge U.S. District Court, THE DECISIVE ANSWER IS THAT THAT COURT ITSELF DID NOT THINK SO. The court knew the kind of custody it had conferred on the Commonwealth Attorney, for what purpose, and in no order prior to Brick's inspection did it restrict Ratliff's or any one else's access to the documents. When the court learned of the Senate investigator's viewing of the original documents and obtaining copies, as it did from the McSurelys' motion of 18 October and the subsequent hearing, as well as from Ratliff's direct prior conversation with District Judge Moynahan, the court in no way expressed disapproval of such cooperation by the Kentucky and Senate officials in its order of 30 October or later. True, by 30 October the Senate had issued formal subpoenas (to which the District Court did not even refer in its 30 October order), but these clearly rested on Brick's prior inspection, which, if it had constituted an "illegal search and seizure," would have caused the three-judge court to have stayed compliance on the "fruit of the poisonous tree" doctrine. Neither did the

directed [14 September 1967] that the seized documents be retained in the possession of the Commonwealth attorney for safekeeping until final disposition of the case by appeal or otherwise." 398 F.2d 817. And later, "The District Court denied [13 December 1967] this motion and ordered the parties to the action and officers of the court to cooperate with the Senate Committee in making available such material, or copies thereof, as the Committee considers pertinent to the inquiry, but in a manner to *keep the materials intact for use in the event of*

appeal." 398 F.2d 818. (Emphasis supplied.) The Sixth Circuit characterization of the possession of the documents by Commonwealth Attorney Ratliff is completely consistent with the language of the three-judge District Court's orders, both before and after Brick's inspection of the documents.

52. The documents seized by Kentucky warrant were of vastly greater volume than the 234 copies tendered Brick. 282 F.Supp. at 850.

Sixth Circuit nor Mr. Justice Stewart nor the Supreme Court advert to the Commonwealth Attorney's cooperation with the Senate investigator as constituting any illegality or even any search and seizure.

The truth of the matter is that neither the three-judge U.S. District Court, in construing its own orders, nor the Sixth Circuit nor the Supreme Court in passing on those orders, characterized Brick's inspection of the documents in Ratliff's "custody" "in safe keeping" for the District Court as a "search and seizure," much less an "unreasonable search and seizure." From September through December 1967 the U.S. District Court was dealing with the issues with an intimate knowledge of all the facts immediately before it, and certainly with a full awareness of the orders it had issued and the intent behind those orders. It is totally erroneous—and somewhat presumptuous—for the U.S. Court of Appeals for the District of Columbia Circuit in 1976 to hold that what the three-judge U.S. District Court for the Eastern District of Kentucky knowingly and approvingly permitted to be done by a Kentucky official, acting under its own orders, in cooperation with an agent of the U.S. Senate, constituted an "illegal search and seizure."

### D.

While the opinion of Senior District Judge Matthews in *United States v. McSurely*[53] did conclude that Brick's "unauthorized" inspection was an "unlawful encroachment" upon the Fourth Amendment, the issue remains as to the weight to be accorded to that judgment by this *en banc* court. The majority finds, as it must, that the decision is not res judicata as to the federal appellants but considers it "pertinent"[54] nonetheless, although it fails to tell us how pertinent. We believe, for a

number of reasons, that its pertinency at this point is very limited and that it should not detain this court, or the court below on remand, from reaching a contrary judgment.

The 1972 court did not have before it, as this court does now, the full text of all six orders of the three-judge court.[55] These orders, as we have shown, enable a judge to interpret the meaning of the custody order in context. Just as courts attempt to read the meaning of a term or a provision in light of the statute that contains it, so too a proper understanding of the "safekeeping" order is enhanced by a study of the various restatements of that order and of the surrounding motions and orders. Perhaps Judge Matthews assumed that the order was meant to provide for strict secrecy in addition to preservation, like the one-day order of 2 November that differed from all the rest in its ban on copying. An examination of all the orders would have refuted that assumption. In any event, the 1972 majority did not articulate the view of the custody order that underlay its conclusion. Whether its conclusion would have been different with access to all the orders is a possibility that is also "pertinent" here.

The unexplained judgment of the 1972 majority may be explainable, in part, because its view of Brick's "search" was unnecessary to its result. Even if Brick had received formal court permission for his search, the subpoenas that ensued would still have been excluded, under the reasoning of the majority's full application of the exclusionary rule to Congressional committees, as the fruit of Ratliff's original search and seizure. Not only was the 1972 conclusion dictum, but it was dictum that did not have the benefit of the decision in *Calandra*, about the consequences of post search transfer. Nor could it consider the import of cases like *Sherwin*, about what consti-

---

**53.** 154 U.S.App.D.C. 141, 473 F.2d 1178 (1972). See note 36, *supra*.

**54.** Maj. op. at —— of 180 U.S.App.D.C., at 1290 of 553 F.2d.

**55.** The only order from the three-judge court in the 1972 record was the order of 14 September. See 154 U.S.App.D.C. at 153, 473 F.2d at 1190 n. 40. The other orders were supplied to us at the request of this court after argument *en banc*.

tutes a search at all.[56] In short, the conclusions of the 1972 majority, found to be of some unspecified weight by the majority here, should in no way impair our own *de novo* determination of the issue now.

## III. THE EXISTENCE OF A SEARCH AND SEIZURE—THE SENATE INVESTIGATOR'S ACTIONS IN VIEWING THE DOCUMENTS AND TAKING COPIES THEREOF

Most simply and basically we are unable to see that Brick's action in inspecting the documents in the possession of Ratliff constituted an "unreasonable search and seizure," or even a "search and seizure."

### A.

When the documents left the possession of the McSurelys on 11 August 1967 any expectation of privacy in those documents vanished. Even though the taking by Kentucky authorities was ultimately held to be invalid, because the statute on which the search warrant and prosecution were based was declared unconstitutional, this did not make the Commonwealth Attorney's possession, during any time he held the documents, the possession of or for the McSurelys. From 11 August until the U.S. District Court's order of 11 September Ratliff held possession as Commonwealth Attorney by virtue of executed Kentucky judicial process. The McSurelys had no expectation of privacy in or right of access to those documents. Ratliff was free to read, copy, distribute copies, grant access to the documents as he willed, limited only by his responsibilities as a Kentucky prosecutor. After the court order of 11 September,

which directed that the documents "shall be kept in the custody of the defendant, Thomas B. Ratliff, and the same shall be made available to the United States Marshal," and the order of 14 September, which directed that "material now in the custody of the Commonwealth Attorney . . . continue to be held by him in safe keeping until final disposition of this case . .," Ratliff held custody for the U.S. District Court.

But the efforts of the McSurelys to have the critical documents restored to them or to have Ratliff limited in his use had been rebuffed.[57] There is not one word in any of the District Court's orders which recognizes any right or interest of the McSurelys other than perhaps to have the documents restored to them, and the time and occurrence of that event was to be entirely dependent on the outcome of the litigation. *Nor is there a single word in the court orders which purports to change what Ratliff could do with the documents.* At most, there is inferable from the context of the custody orders a prohibition on the distribution to other prosecutors who would seek to "chill" the McSurelys' activities with similar charges. See *supra* at ——————— of 180 U.S.App.D.C., at 1311 of 553 F.2d. Otherwise, his access to or use of the documents, the access of his aides and the access of anyone who Ratliff deemed had a legitimate interest in the documents was not limited by the court orders. His custody became, for at least a time, custody on behalf of the U.S. court rather than the State of Kentucky, and he was instructed to hold the material "in safe keeping."

So when Brick arrived in Ratliff's office in Pikeville on 8 October, the documents

---

**56.** In support of its finding of a "search and seizure," the 1972 majority cited, as its single reference, *Alderman v. United States,* 394 U.S. 165, 171, 203, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). See 154 U.S.App.D.C. at 154, 473 F.2d at 1191 n. 43. *Alderman* holds, on the pages listed, that surreptitious electronic surveillance —"the uninvited ear"—violates the Fourth Amendment. But in *Alderman* the police "bugging" constituted the *initial* invasion of privacy, like Ratliff's raid here. There is no indication

that the *Alderman* Court believed that any subsequent inspection of the fruits of the surveillance by an agent from another jurisdiction would be an independent Fourth Amendment wrong. The 1972 majority was thus without precedent in assuming that the inspection of fruits of an illegal search itself amounts to a search.

**57.** See note 42, *supra.*

were reposing in the vault in Ratliff's office in the County Courthouse. The McSurelys had failed in all their legal efforts to regain possession of their papers, except those Ratliff had deemed not material to his investigation.[58] Ratliff's custody was for the U.S. District Court, a part of the United States government, and perhaps ultimately again to be for the State of Kentucky. The investigator for the U.S. Senate approached the lawful custodian of the documents, satisfied the custodian of his credentials and his authorized purpose from the Senate,[59] and was then permitted to examine and copy some of the documents.

Where and when was the "search and seizure"? If an investigator for the U.S. Senate, or any other branch of the federal government, desires to see and does see documents in the custody of a U.S. District Court under absolutely no restrictions except "safe keeping," preparatory to determining for which documents, if any, to issue a formal subpoena, does this act of inspection and copying constitute a "search and seizure" under the Fourth Amendment?

### B.

The majority of this court holds that it does, that such action by Brick was a "search and seizure" and unconstitutional. Aside from the sheer illogic of their rationale evident from the undisputed factual situation, our colleagues' position cannot be reconciled with the Supreme Court's recent landmark decision in *United States v. Calandra*.[60]

In *Calandra* the Superior Court held that nothing in the Fourth Amendment barred a grand jury from subpoenaing Calandra in order to question him based on evidence

admittedly illegally seized during a search of his place of business. The Court made clear that the grand jury was not empowered itself to violate an individual's constitutional rights,[61] but rejected the argument made in this connection that a grand jury's questions based upon unlawfully seized evidence themselves constituted an independent violation of Calandra's Fourth Amendment rights.[62]

"The purpose of the Fourth Amendment is to prevent unreasonable governmental intrusions into the privacy of one's person, house, papers, or effects. The wrong condemned is the unjustified governmental invasion of these areas of an individual's life. *That wrong, committed in this case, is fully accomplished by the original search without probable cause.* Grand jury questions based on evidence obtained thereby involve no independent governmental invasion of one's person, house, papers, or effects, but rather the usual abridgment of personal privacy common to all grand jury questioning. Questions based on illegally obtained evidence are only a derivative use of the product of a past unlawful search and seizure. *They work no new Fourth Amendment wrong.*"[63]

The Supreme Court in *Calandra* did not directly address the issue whether an action for personal damages would lie against the members of a grand jury or its agents for utilizing information derived from an unlawful search and seizure. Nevertheless, the Court's reasoning appears largely to answer the question. In the first place, such an action could not be premised on a violation of the Fourth Amendment, since the Court made clear that the constitutional wrong is fully accomplished by the original unlawful search. Some other basis would

---

**58.** U.S. District Court order of 11 September 1967, final paragraph.

**59.** Since Ratliff's custody was for the U.S. court, he took the precaution of consulting District Judge Moynahan. See text at notes 25–27, *supra.*

**60.** 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974).

**61.** *Id.* at 346, 94 S.Ct. 613.

**62.** *Id.* at 354, 94 S.Ct. 613.

**63.** *Ibid.,* 94 S.Ct. at 623 (emphasis added).

have to be found for the suit, such as a statutory or common law invasion of privacy.

It would appear extremely counterproductive, however, on the one hand, to grant a grand jury the right to consider and base questions on materials derived from an unlawful search and, on the other, to expose the members of the grand jury or their agents to personal liability for exercising that right. It is impossible for a prosecutor to determine whether certain materials may or may not be useful in a grand jury investigation without examining them beforehand. So long as it appears that the information may be relevant to the grand jury's task, it is implicit in the Court's decision that this activity is within the lawful scope of the prosecutor's duty and, therefore, immune from suit.

In sum, it would appear under *Calandra* that a Congressional committee should enjoy at least the same prerogative as a grand jury to use material which has been unlawfully seized. As with the grand jury, the Congressional committee may not be privileged to utilize such information if its agents have actively participated in the original unlawful seizure. Outside of that circumstance, however, a committee commits no new Fourth Amendment wrong by examining and copying documents originally unlawfully secured.

The majority argues that Brick's examination of the McSurely materials after the original unlawful seizure was itself violative of the Fourth Amendment because he knew the materials had been unlawfully seized and because a three-judge federal court had ordered Ratliff to hold the materials in safekeeping. Certainly, after *Calandra,* the fact that Brick knew the docu-

ments had come wrongfully into Ratliff's possession could not render his own examination unlawful. That a grand jury knows its information springs from an illegal search does not prevent it from examining the fruits of that search, and basing questions thereon, in the pursuit of a lawful investigation. A Congressional committee, as we detailed above, is entitled to the same prerogative—without becoming civilly liable.[64]

That Ratliff had been ordered to hold the materials in safekeeping also does not render Brick's examination violative of the Fourth Amendment. The three-judge court's order was simply a function of its finding that the materials had been unlawfully seized. There was no implication in the order that investigatory committees of a legislative body which would otherwise be entitled to utilize unlawfully seized materials were barred from such utilization by the court's formal ruling. This does not mean Brick could have broken into Ratliff's office to obtain access to the materials. Such an entry would have been in violation of *Ratliff's* Fourth Amendment rights. Ratliff himself, however, invited the Subcommittee to come to Pikeville to examine the materials. He alerted the Subcommittee to the fact that the product of his search of the McSurelys' home might be relevant to its investigation.

*Calandra* makes clear that a grand jury or, we submit, a Congressional committee has the right in its investigatory capacity to use the product of a past unlawful search and seizure. The Supreme Court emphasized that such use works no new Fourth Amendment wrong on the owners of the seized property. Since effective utilization of materials requires their examination, it is difficult to conceive, after *Calandra,* how

---

**64.** Quoted by the Majority op. at —— of 180 U.S.App.D.C., at 1294 of 553 F.2d n.62, *Calandra* noted the availability of "damages against the officers who conducted the unlawful search." In no way should this simple reminder of *Bivens* (a citation in the original dropped by the Majority in its quotation) be read as a suggestion that any inspection of the illegally seized evidence in *Calandra* amounted to a vio-

lation of the Fourth Amendment. *Calandra* had already stated with full explicitness, see quotation *supra* at —— of 180 U.S.App.D.C., at 1317 of 553 F.2d that the unconstitutional invasion of privacy had been "fully accomplished by the original search." The reminder of *Bivens* is clearly directed at the original search and not at any subsequent inspection by the grand jury or prosecutor.

the inspection by one authorized government agent of documents in the custody of another can be characterized as an unconstitutional search. The constitutional violation is completed with the original taking.[65]

### C.

The majority attempts to distinguish *Calandra* from the case at bar by saying: ". . . the government agent who authorized delivery to the grand jury had taken custody *before* there was any judicial determination of illegality or ruling restricting access to the seized materials. Here prior to Subcommittee access a court had intervened and declared the state search and seizure without legal justification . . ."[66] For the majority to attempt to make a distinction between this case and *Calandra* on the basis of the *timing* of the judicial determination of illegality is startling, because the timing of the judicial determination in *Calandra* was precisely the same as in the case at bar.

In *Calandra* the "government agent who authorized delivery to the grand jury" is in the position comparable to Commonwealth Attorney Ratliff here. Both "had taken custody *before* there was any judicial determination of illegality." The Grand Jury in *Calandra* is in the same position as Brick and the Senate Committee in the case at bar. Neither used the illegally seized material until *after* the judicial determination of illegality.

Thus, *Calandra*, directly contrary to what the majority claims, in regard to the time element of the judicial determination, is exactly like the relationship of Ratliff, the federal court, and Brick here. Brick did not use, *i.e.*, inspect, make notes on, and copy the documents until after the federal court had ruled they had been illegally seized. In *Calandra* the grand jury did not use the illegally seized evidence, *i.e.*, put questions to the witnesses based on the inspection, until *after* the judicial determination of illegality. If the trial court in *Calandra* had done what the Supreme Court later said it should have done, it would have found the illegality of the search, ordered the evidence suppressed but then allowed the grand jury to ask questions based on it.[67]

This is exactly what the three-judge court in Kentucky did here. It first judi-

---

**65.** As support for its view that we should hold that Brick's examination of the materials in Ratliff's custody was an unlawful search, the majority cites language in the writer's concurring opinion in . *McSurely* to the effect that Ratliff's consent would not operate to "legalize this 'search.' " The majority also notes that I never concluded there that Brick's actions were constitutional. The word "search" was in quotes in this writer's opinion, however, because I did *not* consider it as such. Nevertheless, the issue of the proper legal characterization of Brick's acts appeared difficult at the time, and I felt no need to decide it. The Supreme Court's later landmark decision in *Calandra* provides solid support for our position that an authorized investigatory body which examines and utilizes the fruit of an unlawful search and seizure—with the cooperation of the custodian—commits no Fourth Amendment violation.

**66.** Maj. op. ———–——— of 180 U.S.App.D.C., 1293–94 of 553 F.2d.

**67.** The majority disputes the similarity of the timing by contending that the grand jury in *Calandra* used the seized evidence *before* the determination of illegality, Maj. op. (Supple-

ment) at ——— of 180 U.S.App.D.C., at 1300 of 553 F.2d n. 80. It is not clear, first of all, that this alleged use by the grand jury ever took place, and, even, if it did, *this is not the event that is the subject of the Supreme Court opinion, to which we make our comparison.*

The first step in *Calandra* was the seizure of the documents pursuant to a search warrant in December 1970. The first step in *McSurely* was the seizure of the documents by a search warrant by the state in August 1967.

The second step in *Calandra,* according to the majority, was the use of the documents by the grand jury prior to the determination of illegality in October 1971. The majority only infers this use from the text of the subpoena, issued before the finding of illegality, which sought to ask Calandra questions "based on the evidence seized." After a search through the Supreme Court opinion, *supra,* as well as those of the lower courts, 332 F.Supp. 737 (N.D.Ohio. 1971) and 465 F.2d 1218 (6th Cir. 1971), it is not clear that the second step occurred at all, *i.e.,* there is no indication that the prosecutor, who framed the subpoena, ever showed the documents to the grand jury prior to October. The *second step* in *Calandra, which was the subject of the Supreme Court opinion, was the questioning of Calandra before the grand jury,*

cially determined that the evidence was illegally seized. But thereafter the court permitted the use of that evidence by another investigative agency, *i.e.,* the Senate Subcommittee, just as the trial court in *Calandra* should have permitted the Grand Jury to use that illegally seized evidence.

So, contrary to the reasoning in the majority opinion, comparing *Calandra* directly with this case, it is quite apparent *it makes no difference whatsoever whether the determination of illegality is made before or after the transfer to or use by the second investigative agency.* That transfer is not a search and seizure, and that use is not to be barred, simply because of an originally illegal search and seizure by the first investigative agency, just as was held in *Calandra.* The time of the judicial determination is thus immaterial. The question is in this case whether the inspection, taking notes, and transportation of the copies by Brick, *i.e.,* use, constituted an "unreasonable search and seizure" within the Fourth Amendment. The question of whether it was an unreasonable search and seizure or a second wrong (as phrased in *Calandra*) is, on the facts and rationale of *Calandra,* not

in any way decided by whether the judicial determination of illegality came before the use of the material, as it did in *both* this case and *Calandra.*

The majority attempts to distinguish *Calandra* on a second ground: "In Fourth Amendment terms, *Calandra* involved a single search, and seizure by federal agents and mere 'derivative use' by the grand jury, whereas two separate independent search and seizures took place here." [68] What the majority is referring to are the comparable facts that in *Calandra* the original illegal search was by federal agents with use after transfer by a United States grand jury, while here the original illegal search was by Kentucky officials with use after transfer by a United States Senate committee and its investigator.[69]

A moments reflection will show that the majority should never have brought the subject up. For years (between *Weeks v. United States* [70] (1914) and *Elkins v. United States* [71] (1960)) it was held that where the transfer was between two jurisdictions or two sovereigns, and the second jurisdiction played no part in the original illegal search and seizure, then the second jurisdiction

---

with the prosecutor probably asking the questions, based on knowledge gained from the seized documents. The second step in *McSurely,* to which comparison must be made to *Calandra,* was Brick's inspection and note-taking on the documents during a Congressional investigation.

In both *Calandra* and *McSurely* the issue around which the Supreme Court opinion and our opinion revolve is the use of the documents *after* a determination of illegality. In *Calandra,* the Supreme Court permitted the grand jury to ask questions based on documents which had been declared illegally seized. Similarly in *McSurely,* putting aside the question of the interpretation of custody orders, the use of the documents by Brick, after the three-judge court had found the state search illegal, should not be regarded as "a fresh and independent violation of . . . constitutional rights," as *Calandra, supra,* 414 U.S. at 353, 94 S.Ct. at 622, also declined to do.

**68.** Maj. op. —— of 180 U.S.App.D.C., 1294 of 553 F.2d. The majority tries to attach peculiar significance to the term "derivative use" referring to it as "mere 'derivative use'" (Maj. op. —— of 180 U.S.App.D.C., 1295 of 553 F.2d) and inferring that it refers to the same sover-

eign or jurisdiction being involved. Aside from the fact that the two jurisdiction situation has always been thought to be the stronger for allowing use by the second (see text, *supra* ), use by the grand jury in *Calandra* and the Senate investigator here is equally "derivative." All the Supreme Court intended by the phrase "derivative use" was to employ a less pejorative term than "fruit of the poisonous tree" to describe the second agency's use of the illegally seized material on which to base questions or to discover other tangible evidence. The majority's employment of the term here is obviously not the same as that of Justice Powell in *Calandra, i.e.,* use of the seized documents as original evidence as contrasted with "any question or evidence derived therefrom." 414 U.S. 354–5, 94 S.Ct. 623.

**69.** Our position is, of course, that there was no second "search and seizure" in either situation.

**70.** 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914).

**71.** 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960).

received the evidence on a "silver platter" with no taint of illegality. *Calandra* was a *Weeks* situation, federal agents seizing with a federal grand jury using· this case is an *Elkins* situation, state agents seizing with federal legislative committee and its investigator using. It is obvious that if use can be permitted in a *Weeks* situation, as the Supreme Court did in *Calandra,* use must be permitted in an *Elkins* situation, which is this case.

### D.

The result and the language in *Calandra,* ". . . a derivative use of the product of a past unlawful search and seizure . . work[s] no new Fourth Amendment wrong," [72] was almost inevitable, if the rationale of the "silver platter" doctrine search and seizure cases is examined. In the "silver platter" cases, if there had been a second wrong in the second investigative agency's inspection and taking of the seized material, the combined actions of the two agencies in making the transfer would never have been termed "silver platter." It was precisely because there was *nothing wrong* with the second agency inspecting and taking the seized material that the agency was thought to receive it on a "silver platter."

Mr. Justice Frankfurter coined the phrase [73] and explained it thus: "The crux of that doctrine is that a search is a search by a federal official if he had a hand in it; it is not a search by a federal official if evidence secured by state authorities is turned over to the federal authorities on a silver platter." [74]

To invalidate the second agency's use of the material as evidence, the courts therefore turned to the defect in the original search and seizure, as in *Elkins v. United States, supra,* because the transfer to the second agency was *not* a search and seizure, nor was it assailable as being a wrongful act of any kind. If the second agency's actions in inspecting and taking the material from the first, which is comparable to Brick's inspecting and taking the material from Ratliff here, had been assailable as a wrongful act, it would certainly have been more logical to predicate the exclusion of the seized material on the ground of the wrongful action of the second jurisdiction's own agency, which offered the material as evidence in the courts of that jurisdiction, than it was to predicate the exclusion of the seized material on the ground of the original sin of the first investigative agency, over which the second jurisdiction had no control whatsoever.

Thus when the majority here attempts to label Brick's (U.S. Congress) action in inspecting and receiving the documents illegally seized by Ratliff (Kentucky) as an illegal search or seizure, our colleagues are unthinkingly breaking totally new ground, and in so doing are totally inconsistent with the Supreme Court's rationale in all the Fourth Amendment "silver platter" doctrine cases. Throughout the history of the development of the exclusionary rule, the "silver platter" doctrine exception, and the invalidation of the "silver platter" doctrine in *Elkins,* the inspection and taking of material by the second investigative agency for use in the second jurisdiction has simply never been thought of by the Supreme Court as constituting in itself a second search and seizure.

The very latest Supreme Court decision on the "silver platter" doctrine once again does not consider whether the transfer between sovereigns or jurisdictions constitutes a separate search, the assumption, as always, being that it does not. *In United States v. Janis* [75] evidence illegally seized by state police was turned over to federal offi-

**72.** 414 U.S. at 354, 94 S.Ct. at 623 (1974).

**73.** See *Elkins v. United States,* 364 U.S. at 208, n.2, 80 S.Ct. 1437.

**74.** *Lustig v. United States,* 338 U.S. 74, at 78–79, 69 S.Ct. 1372 at 1374, 93 L.Ed. 1819 (1949).

**75.** 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976).

cials, who sought the admission of the evidence and its fruits in a civil proceeding for a tax assessment. Following a balancing test, the Court declined to extend *Elkins* beyond criminal proceedings and admitted the evidence and its fruits. In *Janis* the transfer occurred before an adjudication that the original search was illegal. Nowhere in the Court's opinion, or in the two dissents, was there any suggestion that an intersovereign or interjurisdiction transfer had to occur prior to a judicial finding of illegality in the search for the evidence to be admissible in a subsequent civil proceeding.

For the first time the majority here point to this completely customary cooperative exchange of information between different governmental units of different jurisdictions, which has never necessitated the prerequisite of a subpoena or formal court order unless the possessing agency objected to sharing the information, as being in itself an independent second search and seizure or a separate wrongful act. This doctrine comes out of an absolutely clear legal sky, with no precedent to support it, and in direct contradiction to *Calandra,* which says very clearly that there is no second wrong in the use by another investigative agency for another purpose of documents or information originally illegally seized.

Our colleagues are forced into this novel approach because they recognize that we do not here reach the exclusionary rule admissibility of evidence question, which the Court had in *Elkins* and various other Fourth Amendment cases, where there was also a transfer between two different law enforcement jurisdictions. The issue here posed by plaintiffs' claim is entirely as to the right or wrong of the second governmental unit's (Congress') inspection and receipt of documents in the hands of the first (Kentucky or the U.S. Court).[76] Hence the majority is forced to concoct an entire new legal theory, *i. e.,* that the acts of the second governmental unit in themselves constituted a new search and seizure or "new Fourth Amendment wrong." So far as our research reveals, this theory has been squarely decided as an issue only once before[77] in the search and seizure cases, for, as pointed out above, the courts from the start eschewed the easier task (if there had in truth been a second independent "new Fourth Amendment wrong") of holding the second agency responsible for its own actions, in favor of the logically more difficult stratagem of holding it responsible for the first agency's action, of which it may never had had prior knowledge or connection.

Further flaws in the majority's logic are seen if we compare what their rationale

**76.** The majority might repeat at this point that Ratliff was the custodian for the U.S. Court, not Kentucky, that Brick violated court orders, and this is the wrong for which the Congressional defendants are liable to the McSurelys. This is the first of three possible theories of liability inherent in the majority opinion. The answer is given in extenso in Parts I and II. A. of this opinion, *i.e.,* the court which issued the order never thought so, and it is rather illogical and a trifle presumptuous for this court nine years later to tell that court it did not know what it meant by its own orders.

The second theory of liability offered somewhat implicitly by the majority is that the original illegal search and seizure by Kentucky barred any use of the documents by the U.S. Congress so long as they were in Ratliff's possession (and even thereafter if the subpoenas were based on the "fruit of the poisonous tree"). This theory is answered squarely by *Calandra* (which incidentally would seem to overrule our own court's majority opinion in

*United States v. McSurely,* 154 U.S.App.D.C. 141, 473 F.2d 1178 (1972)).

The third theory of liability, stressed by the majority, is that the Congressional investigator's inspection and taking copies of the documents, with the consent of the lawful custodian, was an illegal act on the Congressional agent's part. This theory is squarely refuted by the entire rationale of the "silver platter" cases, both those upholding and those repudiating the doctrine. See *Lustig v. United States,* 338 U.S. 74, 78–79, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949); *Elkins v. United States,* 364 U.S. 206, 208, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960); *United States v. Janis,* 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976). This theory of an illegal independent second "search and seizure" is specifically considered and repudiated by the Ninth Circuit (en banc 11–2) in *United States v. Sherwin,* 539 F.2d 1 (1976). We discuss *Sherwin* fully at note 80 *infra.*

**77.** *United States v. Sherwin,* note 76, *supra.*

means here with the rationale of *Burdeau v. McDowell*[78] and in turn compare *Burdeau v. McDowell* with the rationale of *United States v. Elkins* and the other "silver platter" doctrine cases, either those prior to *Elkins* upholding the use of the material or *Elkins* and cases thereafter. In *Burdeau v. McDowell* the Supreme Court held that over the protests of the rightful owner the Government could have access to material in the possession of a person who had stolen the material originally. The thief having obtained the material without any prior knowledge or connivance of the Government, the Government investigators were entitled to take the material, despite the protest of its rightful owners, from the thief by the thief's consent or by the usual legal process. In other words, if we look at the transfer between the first wrongful possessor and the Government investigator, this was to be legally tested by whatever objections the thief could or wished to raise, not by those of the rightful owner. Consent of the thief or ordinary lawful legal process would suffice.

This situation was held to be no different where the first wrongful possessor was not a thief but an investigative agency which had obtained the material by an illegal search and seizure. For many years the courts looked only at the possessory rights of the first investigative agency in determining the propriety of the second governmental jurisdiction's action in inspecting and taking the material; that is, if the first jurisdiction's investigative agency cooperated and willingly transferred that material to the second jurisdiction's investigative agency, as was usually the case, no problem arose, just as in the instance of the thief transferring possession to the governmental investigator. The second jurisdiction was therefore said to receive the material on a "silver platter," since there could be no challenge to the validity of this transfer. If there was objection by the first investigative agency holding the material, ordinary legal process, a search warrant or subpoena, would suffice to obtain the material from its possessor, any objections of the original rightful owner notwithstanding.

When the "silver platter" doctrine was invalidated in some state courts and in the federal courts by *Elkins,* this was not done by saying that the action of either the first or second investigative agency in cooperating to effect inspection and transfer of the originally seized material was wrongful in any way. Such inspection and taking by the second agency was never characterized as a search and seizure, wrongful or otherwise. The "silver platter" doctrine was invalidated by pointing to the originally invalid search and seizure, and maintaining that this original sin carried through and should bar the use of the material as evidence in the courts of the second jurisdiction.

Therefore, analyzing the rationale of the Government's obtaining evidence through a thief's possession as in *Burdeau v. McDowell,* or obtaining evidence through illegal search and seizure by a first jurisdiction's investigative agency as in the pre-*Elkins* cases, or by analyzing that rationale of the Supreme Court in *Elkins* and subsequent cases, the inspection and transfer from the first illegal possessor to the second investigative agency has never been thought to constitute a search and seizure. If it had ever been thought so, federal courts would simply have characterized it as such and excluded the evidence under the *Weeks* doctrine.

Logically the inspection of material by a second investigative agency has never been called a search and seizure, requiring any type of independent formal authorization of the court, because the authority of an investigative agency to inspect material voluntarily tendered to it is derived from its own charter, *i. e.,* the investigative agency has the right and the duty to receive all kinds of information from any source that is voluntarily offered to it. When it does so, it engages in no search or seizure whatsoever, and needs no independent court authority

**78.** 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921).

for so doing. If the possessing agency, whether it acquired the material in question legally or illegally, objects to inspection by or transfer to the second investigative agency, then and then only has the second investigative agency been obliged to resort to legal processes to obtain the desired material.[79] But this necessity of legal process was not to overcome any rights asserted at this stage by those who may have been the rightful owners of the material in question, it was to overcome the rights of the possessor of the material, i. e., the thief in *Burdeau v. McDowell* or the first investigative agency as in numerous "silver platter" doctrine cases.

And so it was with Brick here when he came to Ratliff. Brick did not come to engage in a search and seizure, he came to carry out his normal duties as an investigator, and no court in previous Fourth Amendment cases has ever said that, given the willing consent of the custodian of the material in question, Brick should have come with a search warrant or a court order. No inspection or taking by a second investigative jurisdiction has ever been held to require independent formal court justification, if the possessor of the material in question is willing to permit the inspection and transfer. Hence the decision in *Calandra,* that "a derivative use of the product of a past unlawful search and seizure . . work[s] no new Fourth Amendment wrong" was an inevitable logical outgrowth of all prior Fourth Amendment search and seizure decisions, and sustains the Congressional investigator's actions here.

### E.

In closing this analysis of whether transfers between consenting parties, as in *Elkins* or *Burdeau,* constitute "searches," we note of particular significance the en banc opinion of the Ninth Circuit in *United States v. Sherwin.*[80] In this case a manager of a shipping terminal inspected some books from a damaged carton, called the FBI, and turned two of the books over to its possession. The Ninth Circuit held that the FBI agent did not need a search warrant in order to receive the books because, "[a] consensual transfer is by definition not a seizure." [81] The court relied in part upon *Coolidge v. New Hampshire,*[82] where a voluntary transfer of evidence by a private party to police officers was held not to be a search and seizure. Other Circuits appear to be in accord with the *Sherwin* position.[83]

We note with some surprise our colleagues' argument that "[c]ooperation of a custodian without authority to grant access may obviate use of force, but it does not validate an otherwise unlawful search and seizure." [84] This analysis is totally beside the point and begs the question, as is shown by the facts and legal issue in the cases cited. The "consent search exception" and the question of whether the custodian had authority to grant access has to do with an *original* search by the police. None of the cases involving the authority of the custodian, or whether there was any rightful consent to a search, have any bearing, because the *premise* for all those cases is that there *was* a search, and the issue there is consent or authority. Here the issue is

**79.** It frequently happens that before presentation in court or to a grand jury the second jurisdiction will get out a formal subpoena to obviate any question of the possessor's authority to transfer the material, but this has nothing to do with the second jurisdiction's right to inspect preliminarily or to receive the material. See *Elkins v. United States, supra.*

**80.** 539 F.2d 1 (1976). The vote was 11–2 on the holding that there was no seizure when the government accepted materials offered to it. The en banc reversed a 2–1 decision. The dissenter there was Judge Moore of the Second Circuit, sitting by designation, who argued

that, "The fallacy of the majority opinion lies in the assumption of a seizure." 16 Cr.L. 2314.

**81.** *Id.* at 7.

**82.** 403 U.S. 443, 488–89, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

**83.** *See, e. g., United States v. Blanton,* 479 F.2d 327 (5th Cir. 1973).

**84.** Maj. op. —— of 180 U.S.App.D.C., 1291 of 553 F.2d (footnote omitted.)

whether there was any search and seizure at all.

The Ninth Circuit *en banc* made this important clarifying distinction in *Sherwin*: "For the purpose of determining if a seizure has taken place, however, only the fact of consent is relevant, not whether it was properly authorized. The appellee's argument is mistaken because it confuses the question of third party consent as a justification for a governmental search with the problem of when the government's acquisition of property constitutes a seizure.

"In the former case, the search concededly falls within the scope of the fourth amendment because it is conducted by government agents.

. . . . .

"In the latter situation, the question is whether the governmental activity falls within the scope of the fourth amendment at all. *A consensual transfer is by definition not a seizure.*"[85]

Explicitly rejected by the Ninth Circuit was a contrary decision of the Eighth Circuit in *United States v. Kelly,*[86] with regard to a transfer similar to that in *Sherwin.* The *Kelly* court *assumed,* without discussion, that the FBI "activity" in receiving books constituted a *"seizure."*[87] It then considered whether such a warrantless seizure could be justified under any of the traditional exceptions. Finding none,[88] it posited a violation of the Fourth Amendment and excluded the evidence.

The error in *Kelly,* as *Sherwin* noted,[89] is its unexplained characterization of the voluntary transfer to the FBI as a "seizure." Indeed, the *Kelly* court does not even acknowledge this question as an issue. Where the issue has been expressly considered, as in *Sherwin,*[90] the judicial judgment has been that police receipt of evidence voluntarily tendered does not violate the Fourth Amendment.

The reasoning behind these cases applies with full force to transfers between sovereigns or jurisdictions. Where a private party invades the privacy of another to seize his property, then the wrong to that person has already taken place so that the mere government receipt of those goods involves no new invasion of privacy.[91] Where one sovereign or jurisdiction engages in an illegal seizure of goods, mere access to those goods allowed to another sovereign or jurisdiction does not work a new violation of the Fourth Amendment, since the invasion of privacy has been completed by the original search.[92] "Once a search is found to have been conducted without state [federal] action, then any invasion of privacy is not the [federal] government's responsibility."[93]

## IV. THE SENATE INVESTIGATOR'S ACTION IN SELECTING AND TRANSPORTING COPIES HE ALLEGEDLY KNEW TO BE WHOLLY UNRELATED TO THE LEGISLATIVE INQUIRY.

First we note that this claim of the McSurelys, which our colleagues would remand for further action in the trial court, relates only to Brick, who is now dead. From the very description of the alleged impropriety of Brick's actions, and from the stipulated facts, it is apparent that of the federal appellants Brick alone was responsi-

---

85. *Sherwin, supra* at 7.

86. 529 F.2d 1365 (1976).

87. *Id.* at 1371 (emphasis original).

88. *Id.* at 1371–73.

89. *Supra* at 7.

90. A dissenting opinion was filed in *Sherwin* by Judge Hufstedler, joined by Judge Ely. It reads, "I would affirm because I subscribe to the views well expressed in *United States v. Kelly* (8th Cir. 1976), 529 F.2d 1365." *Id.* at 9.

91. See *Sherwin, supra* at 8 n. 10.

92. See discussion of *Calandra, supra* at —— of 180 U.S.App.D.C., at 1317 of 553 F.2d.

93. *Sherwin, supra* at 8 n. 10.

ble for the selection [94] and transportation of the 234 copies of the documents back to Washington. The majority holds that even if Brick did not violate the Fourth Amendment in his "search and seizure," he may have violated the right of privacy of the McSurelys by taking private letters he believed to be irrelevant.[95]

### A.

The most simple and complete answer to the majority's position, which does not necessitate evaluating the facts as to relevance or irrelevancy, is to point out the clear law in the Supreme Court that, absent an illegal search and seizure by Brick, the charge of invasion of privacy does not state a cause of action under the Constitution. Since the McSurelys' amended complaint does not allege any invasion of privacy on a statutory or common law basis, this cause of action should be dismissed if there has been no Fourth Amendment offense.

If undertaken without relevance to his official inquiry, Brick's inspection and copying of the private papers of Mrs. McSurely may amount to a cause of action at common law for "intrusion" [96] upon her privacy. McSurelys' amended complaint, however, does not allege any such common law or statutory violation, but alleges rather a violation of the Fifth Amendment, which, of course, protects each person from deprivation by a federal official of life, liberty or property, without due process of law. Pre-

sumably, the McSurelys are alleging that Brick impaired the privacy interest that is implicit in the "liberty" protected by due process.

Does the Fifth Amendment provide liability under *Bivens* against federal officers for what amount to common law torts? The Supreme Court appears to have answered that question in the negative in the recent case of *Paul v. Davis*.[97] Finding a "classical claim" [98] for common law defamation against a state official, the *Paul* Court refused to allow a cause of action under either § 1983 or the Fourteenth Amendment, provisions it considers comparable to the Fifth Amendment.[99] The Court clearly rejected the view that the due process clause should "extend . . . a right to be free of injury wherever the State may be characterized as the tortfeasor." [100]

Like the defamation claim in *Paul,* the claim of invasion of privacy here resembles a common law tort and involves the Fifth Amendment only by implication. As in *Paul,* the complaint here "has pointed to no specific constitutional guarantee safeguarding the interest he asserts has been invaded." [101] Such claims should be resolved within the more settled contours of the statutory and common law and, indeed, need not be denied in federal courts if statutory and common law claims properly accompany the constitutional charges.[102]

The *Paul* Court, of course, did not mean to cut back on the substantive aspects of

---

**94.** When we say alone, we mean that neither Chairman McClellan nor any of his aides had any knowledge of or part in the selection and transportation, as is clear from the agreed facts. It was stipulated that the 234 photocopies of the documents were originally selected by Ratliff or one of his aides and delivered to Brick's motel room on the evening of 8 October 1967, Brick's first day in Pikeville, that Brick himself had no part in their selection, and did not see the originals until the next day. See text at note 22.

**95.** Majority Op. —— of 180 U.S.App.D.C., 1294 of 553 F.2d.

**96.** See W. Prosser, The Law of Torts, 807–09 (4th ed. 1971).

**97.** 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976).

**98.** *Id.* at 694, 96 S.Ct. 1155.

**99.** *Id.* at 702, 96 S.Ct. 1155 n.3.

**100.** *Id.* at 701, 96 S.Ct. at 1160.

**101.** *Ibid.*

**102.** Compare *Doe v. McMillan,* 412 U.S. 306, 309, 93 S.Ct. 2018, 2023, 36 L.Ed.2d 912 (1973): "Petitioners alleged that . . . defendants had violated the petitioners' and their children's statutory, constitutional, and common-law rights to privacy . . . ." For the plaintiffs to add on a common law count at this junction, see Maj. op. (Supplement) at —— of 180 U.S.App.D.C., at 1302–33 of 553 F.2d, the McSurelys must not only secure the leave of the District Court to amend but must also maintain their new claim under the doctrine of

privacy that have already been recognized as implicit in the liberty of due process. But its review of that privacy law shows that Mrs. McSurely's claim does not necessarily reach constitutional status. Privacy, *Paul* agreed,[103] can be invaded in the course of an unreasonable search. But if Brick is found not to have violated the custody order, if a consensual transfer by definition is not a search, then no constitutional invasion ensues. The *Paul* Court also noted that with regard to matters of procreation, education and other areas it named, concern for privacy has led the Court to put "limitations on the State's power to substantively regulate conduct."[104] In this case, the federal officer was not involved in the regulation of conduct, as if he sought to limit the McSurelys' access to birth control or abortion. Rather, his activity involved an intrusion into her past personal life, an offense that may be actionable at state law, but which does not constitute the type of "regula[tion] [of] conduct" that has been found to violate the constitutional right to privacy.

Our position, in short, is that if Brick is found to have acted without violation of the

custody order, and, thus, without violation of the Fourth Amendment, then the claim for invasion of privacy ought to be dismissed, for the claim cannot be brought under the Fifth Amendment. The claim should be dismissed even if we or the trial court consider the personal letters irrelevant, a finding which we shortly shall demonstrate is erroneous. An intrusion into Mrs. McSurely's past private life may violate the common law but is not actionable under the Fifth Amendment. The due process clause does not convert all governmental torts affecting life, liberty or property into actionable violations of the Constitution, so held this year the Supreme Court in *Paul v. Davis.*[105]

### B.

In evaluating the nature of Brick's action we refer to two statements in the majority opinion: "We have no doubt that information gathering, whether by issuance of subpoenas or field work by a Senator or his staff, is essential to informed deliberation over proposed legislation."[106] "And there was reason for investigative focus on the

---

pendent jurisdiction. Since, as we shall show, the Speech or Debate Clause fully immunizes the transportation of this "arguably relevant" material, nothing would be served by amendment as a common law tort is barred, *a fortiori,* if a constitutional claim is foreclosed.

**103.** *Paul v. Davis, supra* at 711–713, 96 S.Ct. 1155.

**104.** *Ibid.,* 96 S.Ct. at 713.

**105.** See *Paul v. Davis, supra* at 701, 96 S.Ct. 1155. The reasoning of *Paul* may also warrant a dismissal of claims against the federal appellants arising out of their alleged dissemination of documents outside Congress. Upon remand the trial court may determine that this charge essentially resembles a common law invasion of privacy for "public disclosure of private facts." See W. Prosser, The Law of Torts, 809–12 (4th ed. 1971). Characteristic of such claims is that the damage to the plaintiff is the embarrassment and humiliation that ensues from the disclosures, as in the leading case of *Melvin v. Reid,* 112 Cal.App. 285, 297 P. 91 (1931), where the identity of a reformed prostitute was revealed in a motion picture. To the extent that the McSurelys are pursuing essen-

tially a common law claim against a federal officer as tortfeasor, *Paul v. Davis* requires a dismissal under the current state of the pleadings. Only if the McSurelys are alleging a "constitutional" tort, *e. g.,* due to some injury to their First Amendment rights, do the current pleadings support a cause of action against the federal appellants. Simply stating the issue without deciding it, it may be that there is a First Amendment violation, actionable for damages, where an unjustified disclosure, see *Gibson v. Florida Legislative Comm.,* 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963), enables third parties to retaliate against persons who have exercised their right to freedom of association, *N.A.A.C.P. v. Alabama,* 357 U.S. 449, 460–63, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). But absent a showing by the McSurelys that such a claim for violation of the First Amendment may exist, the trial court ought to follow the reasoning of *Paul v. Davis* and dismiss any common law claim that has not been so pleaded.

**106.** Maj. op. —— of 180 U.S.App.D.C., 1286 of 553 F.2d.

McSurelys." [107] Brick clearly enjoyed the prerogative—so long as he did not obtain the documents by unlawful means—to bring to Washington copies of all material which might prove useful to the Subcommittee's investigation. The question which the majority wishes to remand for further proceedings arises from Brick's testimony at the McSurely contempt trial that not all of the batch of 234 documents he received from Ratliff—in the selection of which Brick had played no part—were needed by him for the performance of his duties.[108] Nevertheless, rather than attempt a document-by-document determination of which items might or might not be relevant, he carried all the papers to Washington for the Subcommittee's inspection.

The question posed here is whether it was incumbent upon Brick either to separate out those papers which were in his judgment clearly not required for the investigation or forfeit his protection under the Speech or Debate Clause. Ordinarily, as the majority acknowledges,[109] a court will decline to "second-guess" the judgment of a legislator or his aide on what is deemed relevant for an investigation. Indeed, in *Doe v. McMillan*,[110] the Court unequivocally avoided any such entanglement by saying, "[W]e have no authority to oversee the judgment of the Committee in this respect or to impose liability on its Members if we disagree with their legislative judgment."

The majority argue that this case is different from *Doe* because in *Doe* the Committee itself found the "private" data to be relevant to its investigation, thus precluding further judicial inquiry. Here, however, with a concession of irrelevance by the investigator, the majority contends, there is sufficient doubt about "arguable relevance" to warrant a denial of summary judgment. This decision still amounts to "second-guessing" the legislative process since it overrides an independent estimate of relevance that could be "plausibly interposed," [111] and it appears to override a judgment of relevance inferable from the subpoenas.[112] Given the permissiveness of the majority's own standard for protected investigative activity, *i. e.*, whether there is

---

**107.** Maj. op. —— of 180 U.S.App.D.C., 1287 of 553 F.2d.

**108.** D.A. 726–39. The *only* such document specified by the McSurelys in their contempt trial or in the instant case is a letter—characterized by the McSurelys as a "love letter"—to Mrs. McSurely. Despite the majority's reference to "letters," "papers," "material," "documents," only one letter, addressed to "Dearest Cucumber" from Drew Pearson, has ever raised an issue here. (That among the 234 items were "some personal letters" creates no presumption that these were irrelevant to the committee's inquiry merely because they were "personal," nor has it been so argued; the argument has been about the one specific letter.) At oral argument before the panel counsel for the McSurelys revealed that this letter, upon whose character they stake so much, was destroyed by Mrs. McSurely (along with the copy Brick had taken to Washington) upon its return to her.

A great deal of the argument of the McSurelys, as well as the position of our colleague, rests upon this one so-called "love letter." Rarely has a single document—which we discovered to be now nonexistent—been mentioned so often in brief and oral argument. Yet the characterization of it as a "love letter" rests solely upon the assertion of Mrs. McSurely through her counsel; the writer is dead, Brick is dead, and according to the affidavits and Brick's testimony the only two living people to have seen it besides Mrs. McSurely are Senator McClellan and Commonwealth Attorney Ratliff.

While the letter may have been as terribly embarrassing as Mrs. McSurely now asserts, it is perhaps not unchivalrous to point out that it was Mrs. McSurely herself who kept the letter around the house where it might have been seen by any prying eye. It is now certain that since she destroyed it, it will never be admitted into evidence, and it is also clear that the world would never have heard of this letter had it not been for the lengthy discussion of it by Mrs. McSurely's own counsel at various stages of this lawsuit.

**109.** Maj. op. at —— of 180 U.S.App.D.C., at 1296 of 553 F.2d n.66.

**110.** 412 U.S. 306, 313, 93 S.Ct. 2018, 2025, 36 L.Ed.2d 912 (1973).

**111.** See n.118, *infra*.

**112.** See n.123, *infra*.

"a *claim* of *conceivable* legislative interest,"[113] there is no justification for further proceedings.

## C.

In no way can we agree with the majority that the documents which they term "concededly irrelevant to legislative inquiry" were indeed not relevant to the inquiry undertaken by the Senate Subcommittee here. The documents referred to are some of the 234 taken by Brick and returned by him to the McSurelys on 8 November 1968. From the inventory list put in evidence at the McSurely contempt trial[114] it is apparent that a number of these were personal letters of the McSurelys. The contents of these letters may or may not have been relevant to the Senate inquiry, but surely the names of the people with whom the McSurelys were in contact were highly relevant. Some names no doubt were merely personal friends, others were from the return addresses obviously relevant to the actions with which the inquiry was concerned. The Senate investigator was required to take these to the Committee to examine. The Senators or others on the staff may easily have seen something of significance in any one of these letters, definitely relevant to the inquiry of the Committee, which might have escaped the knowledge or attention of Brick.

Even if item 201 was indeed a love letter from Mrs. McSurely's former employer, this obviously could have been relevant to the Committee's inquiry. Mrs. McSurely's former employer was a highly influential nationwide syndicated columnist. He and what he wrote could be influenced by a woman for whom he had affection, either to write or to withhold from writing. He could have been influenced either to write favorably about the causes which the McSurelys espoused, or to withhold critical comment. He could have been influenced to write unfavorably about government officials who were investigating the McSurelys' actions. He could have revealed to the McSurelys information about law enforcement investigations being made of the McSurelys, of which they would not have been cognizant without this columnist's particular sources of information.

The nature of the relationship between Mrs. McSurely and her former employer which was evidenced by this so-called "love letter" could have been of definite relevance to a Senate subcommittee's inquiry. Item 217, for example, is a single page document[115] giving addresses of Drew Pearson's office staff. Mrs. McSurely had not worked for Pearson for several years. This may have been an indication that she was maintaining contact not only with Pearson but with his office staff for purposes connected with her current activities in Tennessee and Kentucky.

Certainly these personal letters of Mrs. McSurely meet the standard of relevancy laid down by the majority. The majority opinion states: "In the usual case if the activity is *arguably within* the 'legitimate legislative sphere' the Speech or Debate Clause bars inquiry even in the face of a claim of 'unworthy motive'."[116] The majority also refers to materials "at least *arguably relevant* to its investigation,"[117] and states that "the immunity shield . . . in an area that is at least *arguably within* a proper legislative sphere . . . is not a license to invade privacy where no legislative purpose can be *plausibly interposed*."[118] And on remand the trial court is instructed to inquire regarding "documents he knew to be *wholly unrelated*

---

**113.** Maj. op. —— of 180 U.S.App.D.C., 1296 of 553 F.2d n.66 (emphasis added.)

**114.** D.A. II 628–49.

**115.** D.A. II 648.

**116.** Maj. op. at —— of 180 U.S.App.D.C., at 1295 of 553 F.2d.

**117.** Maj. op. at ——, at 1298 of 553 F.2d.

**118.** Maj. op. at ——, at 1296 of 553 F.2d.

*to the legislative inquiry.*"[119] Surely these letters were "arguably within" the sphere of the legislative investigation and a legislative purpose for their examination by the Committee in Washington can be "plausibly interposed;" surely these letters are "at least arguably relevant;" they are not "wholly unrelated to the legislative inquiry."

Without deigning to give any reasons therefor, the majority blandly treats the Senate investigator Brick's testimony that he did not "need that letter signed [sic] Dearest Cucumber" as a final irrevocable concession binding on the Senate Committee and this court that this particular letter (and all other letters similarly characterized by the McSurelys) were totally irrelevant to the Senate inquiry. This is a rather astonishing assumption.

In the first place, Brick's testimony[120] was only an expression of his own need for the letter, not that of the Committee's. Brick had read the letter and presumably remembered any important features of its contents. Neither Chairman McClellan nor Brick's staff superiors had seen the letter

and had had the opportunity to evaluate its contents.

Secondly, we are at a total loss to understand by what principle of law it can be held that a subordinate Senate Committee staff member can bind the Senate Committee, or indeed this court, on the question of relevance.[121] Surely the determination of the relevance of any of the documents which Brick had inspected was for the Senate Committee, or under its usual operating procedures, for the Committee Chairman. The agreed facts are that "on October 16, 1967, at the personal direction of Senator John L. McClellan, he prepared the subpoenas involved herein." Brick took the subpoenas to McClellan, "with whom he had conferred on the subject matter thereof since October 6, 1967,"[122] and McClellan signed the four subpoenas, two of which were directed to the McSurelys. This action of the Senate Committee Chairman, after a review of the copies of the documents brought back by Brick, evidenced the Committee Chairman's determination of what he thought was relevant for the Senate's inquiry, *i. e.,* the 234 documents.[123] What Brick said he himself "needed for the

**119.** Maj. op. at ——, at 1299 of 553 F.2d.

**120.** D.A. II 734–36.

**121.** Imagine, for example, that one of the congressional aides in *Doe* who sought out the school records testified that the school officials suggested that he delete the actual names of the students. Having declined the suggestion, the aide testified that he nonetheless believed at the time that the actual names were not necessary elements of the school records for purposes of the Congressional inquiry. If he so testified, would he be liable for invasion of privacy even though, as was the case in *Doe,* the Committee later had the names published as relevant to its investigation? Surely not, since "the judgment of the Committee," as stated in *Doe,* 412 U.S. at 313, 93 S.Ct. 2018, is to be respected on the determination of relevance. Nor should a court refuse to consider an objective case that can be advanced for "arguable" relevance if the judgment of a Committee is absent. This latter approach, as employed in the case at bar, is comparable to the long-time effort of the Supreme Court to assess possible purposes and reasons that support the constitutionality of legislation even if the legislature does not fully articulate them. See *e. g.,*

*Williamson v. Lee Optical Co.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). Thus, the majority acts with unnecessary confinement in its unexplained insistence, Maj. op. (Supplement) at —— of 180 U.S.App.D.C., at 1303 of 553 F.2d, on limiting consideration to claims of relevance found on in the record.

**122.** Stip. 12, App. 21.

**123.** The majority takes the position "that the subpoenas called for materials that were at least arguably relevant to its investigation, but did not call for the production of Mrs. McSurely's letter or any other demonstrably irrelevant private correspondence." Maj. op. at —— of 180 U.S.App.D.C., at 1298 of 553 F.2d. We suggest that this interpretation by the majority is simply not justified, because since 1967 all parties to this lawsuit, *i. e.,* the Senate Committee personnel and the McSurelys themselves, have taken the position that the subpoenas both of October 1967 and November 1968 were intended to embrace *all* the 234 documents taken by Brick to Washington. There is no hint in either Senator McClellan's conduct of the Subcommittee inquiry or in Brick's testimony that anything other than the 234 documents were expected to be produced by the subpoena. McSurely himself testified:

performance of [his] duties"[124] is of little importance in determining what the Senate Subcommittee might reasonably find relevant for its inquiries.

We would hold that, relevant or irrelevant, the Senate investigator's actions in regard to the allegedly personal letters of the McSurelys are in no way a ground for a claim of constitutional significance, as the Supreme Court held in *Paul v. Davis, supra,* and since the McSurelys have alleged no other type claim on this basis, their action on this point should be dismissed.

But if the question of relevance or irrelevance of these letters is necessary to be decided in this lawsuit, we suggest that the

> Q. Did Mr. Brick attempt to find the documents that he wanted you to bring back in response to the subpoena with which you had been served that day?
> McSurely. Mr. Brick?
> Q. Did he identify them?
> A. He identified them in general. He said this was in general what the McClellan committee wanted. Of course *they had already had it for a year and a half.* D.A. II 651. (Emphasis supplied.)
> And further
> Q. On March 4, when you and your wife appeared . . . did either of you have with you in your possession the records called for by the Subpoena?
> A. We do not have a record because we didn't know what records they wanted. We assumed from what Mr. Brick had told me that they wanted pretty much of those letters that they had stolen from us by Mr. Ratliff . . . that was the only thing that we understood they wanted. It was very difficult to tell, from reading that subpoena, what they did want. D.A. II 674–675.
> McSurely further testified: "We finally got the papers back and when the day came that we got them back, Mr. Brick, sitting back there, comes down and goes over the record with me and makes sure I got them all back and then has a Deputy U.S. Marshal give me another subpoena *to bring the same papers back up there again* . . . ." D.A. II 665. (Emphasis supplied.)
> The majority quotes, Maj. op. at —— of 180 U.S.App.D.C., at 1298 of 553 F.2d n.76, what appears to be a concession by appellants that the subpoena did not call for the production of the private letters. Any support derived from this quotation, however, is wholly illusory. The footnote expressly states that the conces-

trial court on remand is no better place to decide it than is this appellate court. The only personal letter specifically referred to by the McSurelys, and discussed by the majority opinion, was destroyed, original and only copy, on its return to Mrs. McSurely. Its relevance or irrelevance would indeed be hard to establish. For the reasons stated above, on the standard of relevance set out by the majority, both this personal letter and the others of the McSurelys were "at least arguably relevant" to the Committee's inquiry. Certainly Brick, only a subordinate staff investigator, was justified in taking copies of them to the Committee Chairman and his staff superiors for their own evaluation.

> sion is offered only *"if"* the letter was nothing more than a love letter and *"if"* it was not relevant to any possible investigation into riots. Given a plausible showing of possible relevance, as has been interposed here, appellants' concession, by its own terms, is without weight.
> All the uncontroverted testimony, quoted above, about the scope of the subpoenas is particularly important because the nature of the subpoenas here makes it impossible to determine their reach by textual examination alone. The subpoenas called for documents depending upon their content, *e. g.,* all correspondence relating to the employment of the McSurelys by the United Planning Organization in Washington, D.C. for the period 1 January 1964 to date. Paragraph Eight, Subpoena of 17 October 1967, App. 70. (Item 201, the "love letter" from Drew Pearson was dated 6 October 1964, a date that was included in virtually all of the periods listed in the subpoenas.) The subpoenas, it should be noted, covered a wide range of organizations in various parts of the country. The private correspondence of the McSurelys, the content of which remains unknown, may well have involved the groups and the activities listed in the subpoenas. It cannot, therefore, be flatly asserted that the private letters fell outside the scope of the subpoenas. Given the independent estimate of "arguable" relevance, however, it is not necessary to remand on the unsettled reach of the subpoenas. There is already enough basis for finding that the transportation of the documents to Washington, D.C. constituted protected legislative conduct.

**124.** D.A. II 735.

## V. CONCLUSION

The absolute immunity afforded by the Speech or Debate Clause in *Bivens*-type suits reflects the judgment that the public interest in encouraging the fearless and vigorous activity of its elected representatives outweighs the interest of the individual in seeking redress by money damages for violations of his rights. At the heart of that judgment is the recognition, with the late Learned Hand, that "as a litigant I should dread a lawsuit beyond almost anything else short of sickness and death".[125] Without absolute immunity all claims against representatives, both "innocent as well as guilty," would proceed to trial, with the consequent damage, as Learned Hand again put it, of "dampen[ing] the ardor of all but the most resolute." [126]

In applying the balancing process described above, however, the Supreme Court has been sensitive to the functional nature of the protection. Where an activity like pre-subpoena investigation is concerned, not at the core of the legislative process, as is voting, and where harm to the individual is alleged from a constitutional violation, like an unreasonable search and seizure, then the balance will be struck differently and the trial will proceed. Such is the holding of *Dombrowski v. Eastland.*[127]

Since, as the majority acknowledges,[128] the Speech or Debate Clause has been "read broadly to effectuate its purposes," *United States v. Johnson,*[129] exceptions to its protection, as when legislative investigation violates the Fourth Amendment, should customarily be read narrowly. The *Dombrowski* rule originated with a classic violation of the Fourth Amendment, a massive police raid akin to the original seizure here by the local police. Perhaps allegations of a clear and classic Fourth Amendment offense, as in *Dombrowski,* ought to proceed to litigation where evidence provides "merely colorable substance" of a violation.[130] The permissive threshold of evidence employed in *Dombrowski,* however, is inappropriate here where the Fourth Amendment claim is so novel and borderline; [131] a greater showing of a violation should be required to justify a remand.

The purpose of an absolute immunity is to cut off claims against protected parties at the outset. To be true to this purpose, a court should make every effort to determine if a claim is inside or outside the protection of the Speech or Debate Clause. A remand for further factual proceedings on the issue of absolute immunity itself should be required only in the case of clear need. Otherwise the "mini-trial" that the defendant is forced to undergo constitutes an erosion of the principle of absolute immunity. The majority is engaging in such an erosion of the Speech or Debate Clause here.

The uncontroverted facts of this case, the logic of the Fourth Amendment, and the

125. 3 Lectures on Legal Topics, Association of Bar of the City of New York (1926), quoted at *Johnson v. Louisiana,* 406 U.S. 356, 392, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972) (Douglas, J., dissenting).

126. *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir. 1949).

127. 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967). Indeed, actions by Congressmen may be so "extraordinary" as to lose absolute immunity even in regard to core legislative functions. Mr. Justice Miller hypothesized in the leading case of *Kilbourn v. Thompson,* 103 U.S. 168, 204, 26 L.Ed. 377 (1881), that if members of Congress went so far "as to imitate the Long Parliament in the execution of the Chief Magistrate of the nation," then their freedom of speech and debate would not necessarily screen them from punishment for their part in the act.

128. Maj. op. at —— of 180 U.S.App.D.C., at 1284 of 553 F.2d.

129. 383 U.S. 169, 180, 86 S.Ct. 749, 755, 15 L.Ed.2d 681 (1966).

130. Maj. op. at —— of 180 U.S.App.D.C., at 1289 of 553 F.2d.

131. *Cf., Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (Powell, J., concurring) (the degree of evidence required for finding of volition under the "fruits" doctrine should differ depending on degree of offensiveness of search).

available case law support our conclusion here that the inspections and copying by Brick did not amount to an unreasonable search and seizure. Not only does the majority err in its contrary conclusions, but it abrogates its duty in deciding absolute immunity by calling for a remand.

DANAHER, Senior Circuit Judge:

I have previously noted and now repeat my concurrence in the opinion prepared by Judge Wilkey. I venture to suggest an alternative basis for our disposition of this case.

It will be remembered that the McSurelys in this action are seeking damages. They had been under subpoena *duces tecum* to appear on March 4, 1969, before a United States Senate Subcommittee. A quorum of the Subcommittee was present. That day— and before presenting themselves at an executive session of the Subcommittee—the McSurelys had filed their complaint in the United States District Court under No. 516–69–CA. That was the complaint in this action.[1] Named as defendants, in addition to certain Subcommittee staff representatives, were all members of the SENATE PERMANENT SUBCOMMITTEE ON INVESTIGATIONS OF THE COMMITTEE ON GOVERNMENT OPERATIONS including Senators McClellan, Jackson, Ervin, Muskie, Ribicoff, Griffin, Mundt, Percy and Javits.

Mr. William M. Kunstler, counsel to the McSurelys, presently joined by co-counsel, Mr. Philip J. Hirschkop, announced that Mr. Alan McSurely and Mrs. Margaret McSurely were present. Chairman McClellan made an opening statement tracing the history of various major riots and civil disturbances and other background circumstances which the Subcommittee's investigations had disclosed up to that date.

Mr. Kunstler in moving that the executive session of the Subcommittee be opened to the public stated that the grounds for his motion were set forth in detail in the complaint filed that day.

The Subcommittee's subpoena *duces tecum* had called for the production of books, records, correspondence, documents and other papers in the possession or control of Alan McSurely or Margaret McSurely or their agents which related or pertained to:

(1) Meetings, from April 5 through April 8, 1967, attended by Alan McSurely and Margaret McSurely as individuals or as members or employees of Southern Conference Educational Fund . . . prior to the civil disturbances (riots) which occurred in Nashville, Tennessee, on or about April 8, 1967;

\* \* \* \* \* \*

(3) All books, records, correspondence, documents, and other papers which relate to or are concerned with the membership in or employment by the Southern Conference Educational Fund of Alan McSurely and/or Margaret McSurely.

\* \* \* \* \* \*

The McSurelys refused to comply with the Subcommittee's subpoena, and in due course, following the submission of the Subcommittee's report to the Senate, they were cited for contempt.[2] Following their conviction, they brought their appeals to this court, the judgments of conviction were reversed, and the case was remanded to the district court which was directed to enter judgments of acquittal. *United States v. McSurely,* 154 U.S.App.D.C. 141, 473 F.2d 1178 (1972).

This court's opinion recited, *id.,* 154 U.S. App.D.C. at 157, 473 F.2d at 1194:

The information upon which the Subcommittee subpoenas were framed was de-

---

1. The complaint, to be sure, was amended when, more than two years later as of August 30, 1971, Commonwealth's Attorney Ratliff was added as a defendant. Those members of the Subcommittee's staff who had been named as defendants were retained, as was the Sub-

committee Chairman, Senator McClellan. All other senators, *supra,* were dropped from the case.

2. *See* S.Res. 191, 91st Cong., 1st Sess., 115 Cong.Rec. 11278 (May 5, 1969).

rived by the Subcommittee through a previous unconstitutional search and seizure by the Kentucky officials and the Subcommittee's own investigator. We hold that the "exclusionary rule" applies to these subpoenas and that it was error for the District Court to receive them in evidence at the trial.[3]

### THE McSURELY CLAIM

The McSurelys assert that the search and seizure conducted by the state authorities was illegal as based upon an unconstitutional statute. From that premise they contend that the Senate investigator gleaned his knowledge by reliance upon the illegal Kentucky seizure. Thus, the Senate Subcommittee subpoena was illegal, and accordingly with their rights so violated, the McSurelys claim damages from Senator McClellan and certain members of his staff.

### KENTUCKY CHRONOLOGY

On the night of August 11, 1967, Kentucky officials in Pike County, Kentucky, had arrested the McSurelys, and from their home had seized a substantial volume of books, pamphlets, correspondence and other documents. The Kentucky officials then had relied upon K.R.S. 432.040.[4]

Alan McSurely, Margaret McSurely, Southern Conference Educational Fund, Inc.,[5] and other plaintiffs then brought action against Thomas B. Ratliff, Commonwealth's Attorney, Pike County, Kentucky, Pike County Sheriff Perry A. Justice and others.

Attorney Kunstler on August 17, 1967, moved that a three-judge court be convened, and that court, so convened, entered its order as of September 14, 1967, that the statute, *supra*, was unconstitutional. Accordingly prosecution of the McSurelys in the Kentucky courts was enjoined.

So it was that not until September 14, 1967, could the Kentucky officials have known [6] that K.R.S. 432.040 was unconstitutional.

Nearly two months were to elapse following the August 11 seizure before Subcommittee staff representatives learned what had happened.

The Three-judge Court handed down its opinion on October 18, 1967, in *McSurely, et al. v. Ratliff, et al.,* 282 F.Supp. 848, one judge dissenting.

Meanwhile Chairman McClellan had determined that the McSurely documents and other papers were pertinent to the investigation being carried on by the Senate Subcommittee. In execution of the Subcommittee's duties within the sphere of legitimate legislative activities, *Tenney v. Brandhove,* 341 U.S. 367, 376, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), he caused to be issued identical subpoenas *duces tecum* which were served on Ratliff and Marshal Craft on October 17, 1967, and on the McSurelys on October 18, 1967.

**3.** That was a criminal case. The Court, after a careful review of the authorities, has now concluded that the judicially created exclusionary rule is not to be applied in a case such as this. *United States v. Janis,* 428 U.S. 433, 454, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976).

**4.** In *Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), the Court noted that Anti-Syndicalism Statutes had been adopted by some 20 states. When the Louisiana Three-judge Court wrote in *Dombrowski v. Pfister,* 227 F.Supp. 556 (D.C.La., 1964), the majority at 567–569 had attached Appendix C listing those states including Kentucky which had passed legislation comparable to K.R.S. 432.040.

**5.** *Compare Dombrowski v. Pfister,* 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), where at 482, 85 S.Ct. at 1118, the Court noted "Appellant Southern Conference Educational Fund, Inc. (SCEF), is active in fostering civil rights for Negroes in Louisiana and other States of the South. Appellant Dombrowski is its Executive Director." *And see, id.,* 493, 85 S.Ct. 1116, where SCEF had been denominated a "Communist Front organization."

**6.** The validity of the Kentucky statute had never been called into question, *McSurely, et al. v. Ratliff, et al.,* 282 F.Supp. 848, 849 (1967).

*See United States v. Janis, supra,* note 3, 428 U.S. at 455, 96 S.Ct. 3021 n.35 and cases there cited.

As of October 18, 1967, the plaintiffs sought an order enjoining the release of the seized documents "pursuant to a subpoena duces tecum of the Senate Permanent Subcommittee of Investigations of the Committee on Government Operations."

That motion was denied by the Three-judge Court on October 30, 1967, and the order further concluded:

> The parties to this action and the officers of this Court are directed to cooperate with the Senate Committee in making available such of the materials, *or copies thereof,* as the Committee considers pertinent to its inquiry . . . . (Emphasis added.)

The "FINAL ORDER" of the Three-judge Court filed December 15, 1967, directed that Ratliff

> comply with the subpoena duces tecum of the Senate Committee by allowing said Committee representatives to photograph copies of any of the desired books, papers, documents and other materials now in his possession under order of this Court
>
> . . . .

The Supreme Court having denied relief, the appellants including Southern Conference Educational Fund, Inc., were remitted to an appeal to the Sixth Circuit. That court in its opinion, *McSurely, et al. v. Ratliff, et al.,* 398 F.2d 817 (1968), noted that the appellants had contended that their rights under the First and Fourth Amendments had been violated. That court, *id.,* 398 F.2d at 818, ruled that the claims of the appellants might be adjudicated under "appropriate procedure for challenging subpoenas of Congressional Committees. We decline to render an advisory opinion on these issues." The court continued that the judgment of the district court

was reversed "without prejudice to the right of the Senate Committee to proceed with the enforcement of the subpoenas against Mr. and Mrs. McSurely."

## SENATE BACKGROUND

It is common knowledge that during the nineteen-sixties the Nation confronted turmoil in many areas. There were riots, student uprisings, growing dissatisfaction over the Vietnam War, unsettling assassinations of public figures, strikes over mining conditions, and multiple instances of racial and other social and economic disparities of disturbing nature. It is abundantly clear from the record that the senators considered that causes of the rioting and disturbances were part and parcel of economic and social problems.[7]

Senator Mansfield on August 11, 1967, made Senate Resolution 150 the order of business. Extensive debate followed, some senators desiring investigation into specific situations, with others seeking to emphasize economic and social factors as causes of riots. Some felt that there was just reason for grievances which had caused an environment, both physical and mental, out of which disturbances emerged. Details may be seen in Volume 113, Part 17, Congressional Record, 90th Cong., 1st Sess., pages 22409 through 22425.[8] S.Res. 150 was finally adopted unanimously after the senators were satisfied that the resolution met their requirements. Continued committee operations were further authorized by S.Res. 216, 90th Cong., 2d Sess., and finally by S.Res. 26, February 17, 1969, 91st Cong., 1st Sess.

## PERTINENCY

Of special importance to us at this point are Sections 5 and 6 of S.Res. 150 as appli-

---

7. *See generally* Senate Report No. 91–137, May 1, 1969, 91st Congress, 1st Session. In addition to other facts developed during the Subcommittee's investigation, that Report specifically noted that on April 7, 1967, the day before the Nashville riots, the McSurelys were there attending a secret meeting of the directors of the Southern Conference Educational Fund.

8. Congressional inquiry by various committees had been so extensive that Senator Jackson listed and identified, *id.,* pages 22417 and 22418, some 110 witnesses whose testimony concerning problems in the area under consideration had helped to establish an awareness of the need for investigation and for possible corrective legislation.

cable pursuant to the extended life and authorization of the Committee by S.Res. 216 and S.Res. 26, *supra.* The exact text of those sections may be seen in footnote 5, *United States v. Fort,* 143 U.S.App.D.C. 255, 443 F.2d 670, 672–673 (1970), *cert. denied,* 403 U.S. 932, 91 S.Ct. 2255, 29 L.Ed.2d 710 (1971). The Senate had deemed particularly relevant the requirement that the Committee, (or its Subcommittee), make a full and complete study of riots and other disturbances and ascertain "immediate and longstanding causes, . . . " and thereafter report with specific legislative recommendations as to "measures necessary for their immediate and long-range prevention and for the preservation of law and order and to insure domestic tranquility within the United States."

It would seem that the activities of the McSurelys in behalf of Southern Conference Educational Fund and like entities came squarely within the scope of the Subcommittee's investigatory duties. The Three-judge Court opinion, *McSurely, et al. v. Ratliff, et al.,* 282 F.Supp. 848 (October 18, 1967), recited details. The Court identified the McSurelys, husband and wife, as "field organizers for plaintiff Southern Conference Educational Fund, Inc.," 282 F.Supp. at 850,[9] and pointed to the claim of the McSurelys that "their official duties are to investigate the socio-eco-political milieu of Pike County, 'to inform the people of their rights', and to help local citizens 'organize to overcome their problems'." *Id.* at 850.

In view of what the McSurelys themselves had contended, as the Three-judge Court noted, *supra,* Chairman McClellan and the Subcommittee may well have concluded that the McSurelys would prove to be prime witnesses concerning the economic and social problems prevalent in Kentucky.

**9.** In view of the references by that court at 851 and 852, *id.,* and the citation of *Dombrowski v. Pfister, supra* note 5, it is not to be supposed that either the court or the Subcommittee had overlooked the operations of the Southern Conference Educational Fund, Inc., as described in *Dombrowski.*

## DISCUSSION

The opinion of the Sixth Circuit Court of Appeals, *supra,* 398 F.2d 817, had been released as of July 29, 1968. The court there assuredly had been aware of the previous orders entered in the course of the litigation. After directing that the seized materials be returned to the plaintiffs, the court expressly ruled that its action was "without prejudice to the right of the Senate Committee to proceed with the enforcement of the subpoenas against Mr. and Mrs. McSurely."

So it was that *four months later* on November 8, 1968, *new* Subcommittee subpoenas were served upon the McSurelys. That important fact has been little noticed. Those were the subpoenas in response to which the McSurelys had appeared but refused to testify on March 4, 1969. That was the date when the instant action was commenced.

Whether the Senator and his staff aides should have defended upon the Speech or Debate Clause or on other grounds may seem, at this moment, to be immaterial. One is reminded of the brilliant aphorism of Mr. Justice Holmes in *Irwin v. Gavit,* 268 U.S. 161, 168, 45 S.Ct. 475, 476, 69 L.Ed. 897 (1925). There he said:

Neither are we troubled by the question where to draw the line. That is the question in pretty much everything worth arguing in the law. . . . Day and night, youth and age are only types.

Whether to provide complete immunity for the Senator and his staff by reliance upon the Speech or Debate Clause, or whether we see an affirmative interference with an on-going activity by Congress, the ultimate result is the same. Whatever the status of the claims of these plaintiffs, the public interest here is superior and must

Moreover, the Senate Report, *supra* note 7, incorporated references to the earlier litigation and quoted from *McSurely et al. v. Ratliff et al.,* 398 F.2d 817 (CA 6 1968), predicating the new subpoenas dated November 8, 1968, *infra.*

prevail. The duly authorized activity of a coordinate branch of our government, in the circumstances here, should not be circumscribed [10] by the courts.

We should not, and in the view now to be suggested, can not ignore what has been happening. As was pointed out in *Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 511, 95 S.Ct. 1813, 1825, 44 L.Ed.2d 324 (1975);

> This case illustrates vividly the harm that judicial interference may cause. A legislative inquiry has been frustrated for nearly five years during which the Members and their aide have been obliged to devote time to consultation with their counsel concerning the litigation, and have been distracted from the purpose of their inquiry. The Clause was written to prevent the need to be confronted by such "questioning" and to forbid invocation of judicial power to challenge the wisdom of Congress' use of its investigative authority.[17]

*And see, id.,* 421 U.S. at 511, n. 17, 95 S.Ct. 1813.

### SUMMARY

What we have here is a situation where Congress through the Subcommittee had been engaged in execution of an indispensable function. The Subcommittee had been directed to investigate the causes of unrest. Surely the Subcommittee was free to seek the data essential to an informed judgment with respect to possible ameliorating legislation if deemed necessary, and thereupon to submit appropriate recommendations for correctives. In the performance of its duty, the Subcommittee had a right in the public interest to ascertain pertinent facts from a citizenry competent and duty-bound to testify respecting the Nation's social, economic or political system. Senator McClellan and the members of his staff were entitled *under the circumstances here presented* to complete immunity from such claims as have been advanced by the McSurelys.

It has long been recognized as was pointed out in *Tenney v. Brandhove,* 341 U.S. 367, 377, 71 S.Ct. 783, 788, 95 L.Ed. 1019 (1951) that "Legislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good." Even more specifically, the Court, *id.,* 378, 71 S.Ct. 789, has told us:

> Investigations, whether by standing or special committees, are an established part of representative government. Legislative committees have been charged with losing sight of their duty of disinterestedness. In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed. Courts are not the place for such controversies. Self-discipline and the voters must be the ultimate reliance for discouraging or correcting such abuses. The courts should

---

**10.** The gradations between absolute immunity and qualified immunity and situations where one or the other classification may apply need not now detain us in light of our record. Moreover, whereas in the criminal case, *United States v. McSurely, supra,* 154 U.S.App.D.C. at 157, 473 F.2d at 1194, the exclusionary rule had been said to have its place, it has none here. This is a civil action.

The Court has told us that consistently with our duty to administer the law, we cannot continue to create barriers to law enforcement in the pursuit of a supervisory role that is not ours.

. . . . We therefore hold that the judicially created exclusionary rule should not be extended to forbid the use in the civil proceeding of one sovereign of evidence seized by a criminal law enforcement agent of another sovereign.

*United States v. Janis,* 428 U.S. 433, 459–460, 96 S.Ct. 3021, 3035, 49 L.Ed.2d 1046 (1976). *Cf. United States v. Calandra,* 414 U.S. 338, 347, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) and *United States v. Peltier,* 422 U.S. 531, 538, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975). And *see Scheuer v. Rhodes,* 416 U.S. 232, 247–248, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Pierson v. Ray,* 386 U.S. 547, 555, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967).

not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province.[11] (footnotes omitted).

Having in mind the treatment, *generally,* in *Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975), and other cases,[12] it would be nothing short of supererogation were we now to undertake our own delineation of the scope of congressional immunity, whether under the Speech or Debate Clause [13] or by specification of the extent of official immunity on other grounds. The Court itself has recognized distinctions depending upon the facts. *Barenblatt v. United States,* 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959), applied a "balancing" test where First Amendment aspects were presented. There the Court, *id.,* 111, 79 S.Ct. 1081, saw itself required to resolve the Constitutional claims of congressional power in contrast to an individual's right to resist its exercise. It was concluded finally that the individual interest was to be subordinated to that of the government, *id.,* 134, 79 S.Ct. 1081. *Compare Imbler v. Pacht-man,* 424 U.S. 409, 418, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), where the Court read the *Tenney* opinion as having recognized that in some situations there are general principles of tort immunities which will control and which must be harmonized as to claims predicated upon § 1983.

*Imbler* has demonstrated for us the treatment as to differing officials, whether immunity was to be absolute, as having been developed at common law or as having stemmed from the provisions of federal and state constitutions. Principles of public policy in some situations will clearly fortify a conclusion of absolute immunity. *Id.* 424 U.S. at 422, 96 S.Ct. 984 and *see, id.* at 424, 96 S.Ct. 984. *Compare* cited by the Court, *Yaselli v. Goff,* 12 F.2d 396, 406 (CA2, 1926), affirmed 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1927); *Gregoire v. Biddle,* 177 F.2d 579, 581 (CA2, 1949), *cert. denied,* 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950).

Whatever might have been true in the past, no longer "are we troubled by the question where to draw the line." *Irwin v. Gavit, supra.* In view of the background

**11.** While Mr. Justice Douglas had broadly agreed with the majority opinion in *Tenney* even as he took a slightly modified view of what had been said, he recognized, 341 U.S. at 382, 71 S.Ct. at 791, that privileged were "the actions of legislative committees that are authorized to conduct hearings or make investigations so as to lay the foundation for legislative action."

Well he might so have conceded for it long since had been established that

A legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite information—which not infrequently is true—recourse must be had to others who do possess it. *McGrain v. Daugherty,* 273 U.S. 135, 175, 47 S.Ct. 319, 329, 71 L.Ed. 580 (1927).

**12.** *See, e. g., Dombrowski v. Eastland,* 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967), where the claim against Senator Eastland had been dismissed but where the case against Counsel Sourwine was remanded. Even then, after hearing and argument, the Sourwine case was dismissed by the District Court "with prejudice" on August 12, 1970; *cf. Doe v. McMillan,* 412 U.S. 306, 312–313, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973) and *Barenblatt v. United States,* 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959).

**13.** Note the succinct observation of Mr. Justice Marshall, *id.,* 421 U.S. at 514, 95 S.Ct. at 1827:

If the Senators' actions were within the "legitimate legislative sphere," the matter ends there and they are answerable no further to the court.

And so as to their counsel's actions, he said, citing cases and his note 1.

Quite different treatment would have been necessary as to the Subcommittee's staff members if they, on their own, had so conducted themselves as did the Kentucky officials on the night of August 11, 1967. That simply is not this case. We cannot even suppose that the Congress or one of its Subcommittees could— or would attempt to—authorize an unconstitutional search and seizure but, under circumstances such as are shown on this record, a coordinate branch of our government in the duly authorized execution of its duty when acting in the public interest is not to be deprived of relevant and pertinent evidence. The Subcommittee's staff should here be "answerable no further to the court."

hereinbefore developed, it becomes crystal clear that the public interest must prevail, and we draw the line accordingly. A Subcommittee of the United States Senate was engaged in the truthfinding process which it had been commanded to execute. So it is that the Chairman of that Subcommittee and the members of its staff, under the circumstances [14] here, should be entitled to absolute immunity.

It is respectfully submitted [15] that this case should be remanded to the District Court with directions to dismiss the complaint.

**14.** The claims of the McSurelys here sound hollow indeed, especially where now, some nine years and multiple amendments later, they would complain of the "publicity" which they had so long sought, whenever or wherever the opportunity arose. For example, as they flouted the Subcommittee's subpoenas, their attorney Kunstler demanded that the Subcommittee's executive session be opened. Their co-counsel Hirschkop announced that there were 100 people outside the hearing room pressing for admittance only to find their efforts were being suppressed by police—or so he said.

Perceptive Subcommittee Senators, members of a coordinate branch of our Government, well aware of the respective rights of the parties (cf. *Ansara v. Eastland,* 143 U.S.App.D.C. 29, 442 F.2d 751, 754 (1971)) ruled against the McSurelys. The Senate unanimously approved the Subcommittee resolution, *supra,* note 2.

Certainly the absolute immunity to be accorded to the Senators is available to protect from the burden of defending themselves the "officers or employees of a legislative body". *Dombrowski v. Eastland,* 387 U.S. 82, 85, 87 S.Ct. 1425, 1427, 18 L.Ed.2d 577 (1967).

Without further detailed classification of distinctions between absolute immunity, qualified immunity, arising under circumstances to be noted in cases previously cited, or whether the source of the claim stemmed from alleged tortious conduct or statutory or constitutional bases, these federal defendants should be protected.

We need not reach whatever other aspects of the McSurely claims have been pressed. The ultimate fact remains, the Subcommittee and the Senate itself, had ratified the actions of the Senators and of the members of the staff of the Subcommittee.

Any other view would present "a serious and delicate exercise of judicial power." *United States v. Smith,* 286 U.S. 6, 48, 52 S.Ct. 475, 483, 76 L.Ed. 954 (1932); cf. *Powell v. McCormack,* 395 U.S. 486, 517, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). *See generally, Consumers U., Etc. v. Periodical Corr. Ass'n,* 169 U.S.App. D.C. 370, 515 F.2d 1341, 1351 (1975).

**15.** What has herein been said·in no way is submitted in derogation of Judge Wilkey's splendid statement of the facts. Rather, one may hope that the chronology as developed and the treatment now tendered may be considered as an alternative predicate for our disposition of this case.